UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

SEP 29 __ 5:50

U.S. DISTRICT COURT
N.D OF ALABAMA

| | |
|---|---|
| AMERICAN TOWER, L.P., a Delaware limited partnership, TRITEL COMMUNICATIONS, INC., a Delaware corporation and BGR PROPERTIES, L.L.C., an Alabama limited liability company, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CV-99-B-2933-NE ) |
| CITY OF HUNTSVILLE, ALABAMA, DAVID WILLIAMS, BOB GAMMONS, JANET WATSON, CRAWFORD HOWARD and PHIL LOFTIS, in their capacities as Members of the Board of Zoning Adjustment of the City of Huntsville, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**ENTERED**

__ __ __ 2000

## <u>MEMORANDUM OPINION</u>

Currently before the court are defendants' Motions to Dismiss and plaintiffs' and

defendants' cross Motions for Partial Summary Judgment.  Plaintiffs American Tower, L.P.

("American Tower"), Tritel Communications, Inc. ("Tritel"), and BGR Properties, L.L.C.

("BGR") (collectively, "plaintiffs") filed suit against defendants City of Huntsville, Alabama

(the "City"), David Williams ("Williams"), Bob Gammons ("Gammons"), Janet Watson

("Watson"), and Phil Loftis ("Loftis") (collectively, "defendants") under Section 704 of the

Federal Telecommunications Act of 1996 (the "TCA"), codified at 47 U.S.C. § 332(c).  Upon

review of the record, the submissions of the parties, and the relevant law, the court is of the

opinion that defendants' Motions to Dismiss are due to be denied, plaintiffs' Motion for Partial

Summary Judgment is due to be granted, and defendants' Motion for Partial Summary Judgment

33

is due to be denied.

## I.  PROCEDURAL HISTORY

On October 19, 1999, the Board of Zoning Adjustment (the "BZA") of the City denied plaintiffs' application for a special exception and variance (the "Application") requesting authorization to build and operate a wireless telecommunications facility on land owned by BGR.  On November 3, 1999, American Tower and Tritel filed an Appeal and Complaint Seeking Equitable Relief (the "Original Complaint") challenging the BZA's decision.  On February 14, 2000, American Tower, Tritel and BGR filed their First Amended Appeal and Complaint Seeking Equitable Relief (the "First Amended Complaint").  The First Amended Complaint asserts claims against the City and the members of the BZA based on the TCA, Alabama law, the United States and Alabama Constitutions, and the Civil Rights Act (42 U.S.C. §§ 1983 *et seq.*).

Before plaintiffs filed their First Amended Complaint, defendants filed Motions to Dismiss pursuant to Federal Rules of Civil procedure 12(b)(1) and 12(b)(6) challenging American Tower's and Tritel's claims in the Original Complaint.  Defendants' 12(b)(1) Motion to Dismiss ("Defendants' 12(b)(1) Motion") challenges the court's subject matter jurisdiction over American Tower's and Tritel's claims under the TCA and the United States Constitution by challenging American Tower's and Tritel's standing to pursue those claims.  Defendants' 12(b)(6) Motion to Dismiss ("Defendants' 12(b)(6) Motion") challenges American Tower's and Tritel's claims against the members of the BZA, Dallas Fanning, and Hulan Smith[1] in their individual capacities; American Tower's and Tritel's claims against Dallas Fanning and Hulan

---

[1]     Dallas Fanning is the Director of the Planning Department of the City of Huntsville. Hulan Smith is the Director of the Inspection Department of the City of Huntsville.  (*See* Appeal and Complaint Seeking Equitable Relief at 2; Affidavit Testimony of Harlan Smith at ¶ 2.)

Smith in their official capacities; American Tower's and Tritel's substantive due process claims under the United States Constitution; and American Tower's and Tritel's claims under the Civil Rights Act. After considering the parties' briefs and hearing oral arguments, the court informed the parties during a telephone conference on February 14, 2000, that it would deny defendants' motions to dismiss at that time and would consider plaintiffs' claims on their merits.

At the parties' request, the court postponed the commencement of discovery in this action to allow the parties to file potentially dispositive motions. (*See* Report of Parties' Planning Meeting filed Dec. 20, 1999.) The parties filed cross Motions for Partial Summary Judgment. Plaintiffs seek summary judgment on Count I of the First Amended Complaint in that the BZA's decision is not supported by substantial evidence contained in a written record and, therefore, violates subsection (iii)[2] of the TCA. Defendants seek summary judgment on each of plaintiffs' TCA claims.

## II.   FACTUAL SUMMARY

### A.   Tritel's PCS Service

Tritel is a telecommunications service provider offering wireless personal communications services ("PCS") in several southeastern states, including Alabama. (*See* Affidavit of Barry E. Gannon filed Mar. 24, 2000 ("March 24, 2000 Gannon Aff.") at ¶ 3; First

---

[2]      For simplicity of reference, the court will refer only to the numbered subsections of 47 U.S.C. § 332(c)(7)(B). For instance, "subsection (iii)" refers to 47 U.S.C. § 332(c)(7)(B)(iii).

Am. Compl. at ¶ 14[3]; R.[4] at 431, 432.)  Tritel holds a broadcast license from the Federal

Communications Commission ("FCC") to develop and operate a PCS network in the Huntsville

area, (*see* First Am. Compl. at ¶ 15; R. at 431; *see also* R. at 536 (Tr. at 7)), and Tritel currently

is designing and constructing its Huntsville network, (*see* First Am. Compl. ¶ at 18; R. at 431,

432, 536-37 (Tr. at 7-8)).  Tritel's PCS network consists of a network of antenna facilities in and

around the City that serve portable wireless communications handsets and mobile telephones.

(*See* First Am. Compl. at ¶ 16; *see also* R. at 543 (Tr. at 45-46).)  Each antenna facility serves an

immediately surrounding geographic region, commonly referred to as a "cell."  (*See* First Am.

Compl. at ¶ 16; R. at 420.)  To provide uninterrupted service to PCS customers in a given area,

Tritel must provide a continuous, interconnected and overlapping series of antenna facilities

providing a continuous signal.  (*See* First Am. Compl. at ¶ 17; R. at 420, 423, 432.)

Additionally, Tritel must locate each antenna facility within a limited area in the center of each

cell (commonly referred to as a "search ring") so that each facility can both produce a PCS

signal that reaches all of the surrounding cell and properly interact with surrounding antenna

facilities.  (*See* First Am. Compl. at ¶ 17; R. at 538 (Tr. at 16-17).)

---

[3]     In paragraph 3 of his March 24, 2000, affidavit, Barry E. Gannon ("Gannon") verified
the averments in plaintiffs' First Amended Complaint.  For the sake of simplicity, citations in
this Memorandum Opinion are to the numbered paragraphs of the First Amended Complaint;
such citations refer to the specified paragraphs of the First Amended Complaint as verified by
Gannon in his Affidavit of March 24, 2000.

[4]     Defendants submitted materials, documents and hearing transcripts from the BZA's
records (the "Record") to the court on March 24, 2000.  The Record includes the evidence before
the BZA on October 19, 1999, when it denied plaintiffs' Application.  Many citations in this
Memorandum Opinion are to the Record, including parallel citations to specific pages of the
transcript of the BZA's October 19, 1999, hearing (the "Transcript") where appropriate.

**B..    Selection of the Site**

Tritel's radio frequency ("RF") engineers determined that Tritel must locate an antenna facility in the search ring encompassing Virgil I. Grissom High School and extending east of the intersection of Blevins Gap Road and Bailey Cove Road. (*See* First Am. Compl. at ¶ 20; R. at 423, 424.) Tritel's RF engineers established that the coverage goals of the proposed antenna facility included the provision of Tritel PCS service to nearby roads, homes, and businesses in this vicinity. (*See* First Am. Compl. at ¶ 20; R. at 419, 500.)

After identifying this search ring, Tritel investigated properties in the search ring that would potentially provide a suitable location for Tritel's antenna facility. (*See* First Am. Compl. at ¶ 21; R. at 432-33.) Tritel first investigated the use of any existing towers or other tall structures so as to avoid constructing any new towers, if possible. (*See* R. at 432.) There are no existing towers or tall structures within this search ring or within one and one-half miles of the proposed site. (*See* R. at 419, 428, 432, 498-99, 537 (Tr. at 9), 543 (Tr. at 46-48).) Tritel next sought to identify those tracts having the appropriate size, shape, topography, and development to allow the installation of a telecommunications facility. (*See* First Am. Compl. at ¶ 23; R. at 432-33, 537 (Tr. at 10).) Tritel also analyzed the zoning classifications and conditions of properties in the search ring to determine whether location of a telecommunications facility would be legally permissible. (*See* First Am. Compl. at ¶ 24; R. at 537 (Tr. at 10).) In the applicable search ring, Tritel identified only one available tract large enough and properly developed and zoned to allow the installation of the proposed telecommunications facility: a 6.33-acre tract of land owned by BGR (the "Property").[5] (*See* First Am. Compl. at ¶ 25; R. at

---

[5]      Although the adjacent school property is large enough to accommodate applicable setbacks and other zoning requirements, the Executive Director of Business for the Huntsville City Schools declined plaintiffs' offer to locate the proposed facility on school property. (*See* R. at 502, 527, 545 (Tr. at 59).)

5

432-33.)  The Property lies east of Bailey Cove Road and Grissom High School and has an

address of 1220 Blevins Gap Road, Huntsville, Alabama.  (First Am. Compl. at ¶ 26; *see also* R.

at 401, 402, 430, 524.)  The Property is zoned as a Residence 1-A District ("R-1A") pursuant to

the 1989 Zoning Ordinance for the City, as updated to May 1, 1998 (the "Zoning Ordinance"),

and portions of the Property are used as soccer fields by Grissom High School and as a

Montessori School.  (*See* First Am. Compl. at ¶ 26; R. at 402, 420.)

On May 18, 1999, Tritel entered into an Option and Lease Agreement with BGR, thereby

securing an option to lease a site (the "Site") consisting of a 10,000 square-foot parcel of the

Property.  (*See* R. at 438-44.)  The Site lies approximately in the center of the Property, and the

proposed tower would be approximately 211 feet south of the right of way of Blevins Gap Road.

(First Am. Compl. at ¶ 27; *see also* R. at 401, 402, 524.)  On June 23, 1999, Tritel assigned its

interests in the Option and Lease Agreement with BGR to American Tower.  (*See* Affidavit of

Barry E. Gannon filed Feb. 10, 2000 ("Feb. 10, 2000 Gannon Aff."), Ex. A.)  BGR also executed

a Limited Authorization To Act as Applicant, authorizing American Tower to represent BGR

before the City for the purpose of obtaining the permits and variances required for the

construction and operation of a wireless telecommunications facility at the Site.  (*See* R. at 426.)

On November 1, 1999, American Tower exercised its option under the Option and Lease

Agreement and became the Lessee of the Site.  (*See* First Am. Compl. at ¶ 27; Feb. 10, 2000

Gannon Aff. and Exs.)

Plaintiffs submitted evidence to the BZA demonstrating that the Site is the only location

in the applicable search ring suitable for Tritel's proposed telecommunications facility, (*see* R. at

423, 433), that the proposed antenna facility at the Site is critical to the overall engineering and

technical plan of Tritel's PCS network, (*see* R. at 419, 423, 433, 499-500, 536-40 (Tr. at 7-27),

542 (Tr. at 38-43)), and that without the proposed telecommunications facility at the Site, Tritel

6

would not be able to provide adequate PCS service to this portion of the City, (*see* R. at 423, 433). Plaintiffs submitted evidence demonstrating that the Property is the only available tract located within this search ring that is large enough to accommodate the applicable setbacks and other zoning requirements. (*See* R. at 432-33.) Plaintiffs also noted that the Property is located separate and apart from the residential community, which is located on the opposite side of Blevins Gap Road and further east along Blevins Gap Road. (*See* R. at 401, 402, 524.)

**C.    Plaintiffs' Application**

On August 31, 1999, American Tower, acting on behalf of BGR, filed an Application with the BZA seeking (i) a special exception authorizing the proposed telecommunications facility, and (ii) a variance authorizing American Tower to construct a 180-foot monopole, exceeding the Zoning Ordinance's height limitation by eighty feet. (*See* First Am. Compl. at ¶¶ 35-36; R. at 430.)  The Application was scheduled for hearing before the BZA on September 21, 1999, but the BZA voted to delay consideration until October 19, 1999. (*See* First Am. Compl. at ¶ 37; R. at 421.)  At the BZA hearing on October 19, 1999, the BZA received the Application and supporting materials, as supplemented and amended through the date of the hearing, and representatives of American Tower and Tritel presented oral testimony and additional documentation and demonstrative evidence supporting the Application. (*See* First Am. Compl. at ¶ 38; R. at 498-504, 534-50 (Tr. at 1-80).)  Eleven local residents spoke in opposition to the Application, and one opponent submitted a Memorandum for Record -- a petition -- signed by members of approximately 37 households in the area. (*See* R. at 500-03, 540-48.)  At the conclusion of the hearing, the BZA voted to deny the Application. (*See* R. at 532, 548-49 (Tr. at 77-80).)

## II.   DISCUSSION

**A.   Defendants' Motions To Dismiss**

*1.      Defendants' 12(b)(1) Motion To Dismiss*

It is extremely difficult to dismiss a claim for lack of subject matter jurisdiction under

Fed. R. Civ. P. 12(b)(1).  *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256,

1260 (11th Cir. 1997) (citing *Simanonok v. Simanonok*, 787 F.2d 1517, 1519 (11th Cir. 1986)).

The burden of establishing a federal court's subject-matter jurisdiction, once challenged, rests on

the party asserting jurisdiction. *See Thomson v. Gaskill*, 315 U.S. 442, 445 (1942); *Menchaca v.*

*Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.), *cert. denied*, 449 U.S. 953,(1980).

Defendants' 12(b)(1) Motion challenges this Court's subject matter jurisdiction over American

Tower's and Tritel's claims by challenging American Tower's and Tritel's standing to assert

their claims.  Specifically, Defendants argue that American Tower and Tritel lack sufficient

property interests in the Site to satisfy the standing requirements imposed by the TCA and the

United States Constitution.

**a.      American Tower's and Tritel's Standing Under the TCA**

Defendants' allege that American Tower and Tritel lacked sufficient property interests in

the Site at the time they appealed to the BZA as a matter of Alabama law.  (Defs.' Brief in

Support of Motion to Dismiss at 5-12.) Therefore, defendants contend that American Tower and

Tritel necessarily lack standing to pursue TCA claims based on the BZA's decision.  (*Id.*)  The

Zoning Ordinance provides:

> Appeals to the [BZA] may be taken by any person aggrieved or by
> any officer, department, or Board of the City affected by any
> decision . . . .

(R. at 374 (Zoning Ordinance § 92.3).)  Citing Alabama caselaw, defendants contend that

American Tower and Tritel are not "person[s] aggrieved" and, therefore, lacked standing to seek

8

a special exception and a variance from the BZA. (*Id.* at 11.) Defendants further argue that,

with the exception of certain substantive limitations not implicated in this case, the TCA does

not supplant the substantive standards of state law applied by a local government in regulating

the placement of wireless telecommunications facilities. (*Id.* at 5-7.) Therefore, defendants

argue that because American Tower and Tritel lacked standing before the BZA, and because

American Tower's and Tritel's standing to pursue TCA claims based on the BZA's decision is

derivative of their standing before the BZA, American Tower and Tritel lack standing under the

TCA to challenge the BZA's decision. (*Id.* at 7.) The court disagrees.[6] The court concludes that

American Tower and Tritel enjoy standing to pursue their TCA claims irrespective of their status

---

[6]      Relying on *Hudson v. Mobile County*, 439 So. 2d 1304 (Ala. 1983), and *Board of Adjustment of the City of Mobile v. Matranga, Hess and Sullivan*, 283 So. 2d 607 (Ala. Civ. App. 1973), defendants argue that the holder of an option to purchase real property is not a "person aggrieved" under Alabama law. (Defs.' Brief in Support of Motion to Dismiss at 7.) Defendants further argue that American Tower, as the holder of an option to lease the proposed tower site, is not a "person aggrieved." First, the court does not agree with defendants' reading of Alabama caselaw. Second, the court notes that American Tower is not merely the holder of an option to lease the proposed tower Site. The Option and Lease Agreement gave American Tower broad authority to obtain governmental approval for the proposed facility:

> Upon the request of [American Tower], [BGR] agrees to cooperate with [American Tower] in obtaining, at [American Tower's] expense, any licenses, permits and other approvals required by any federal, state or local authority for the [Site], [American Tower's] use of the [Site] and/or the installation and use of the [proposed telecommunications facility] (the "Approvals") during the Option Period and the Initial Term and/or Renewal Terms of this Agreement. [American Tower], without the consent or joinder of [BGR], may file any applications, obtain any Approvals or otherwise take any actions necessary for any Approvals (in [American Tower's] discretion) or to obtain any Approvals . . . .

(R. at 438, ¶ 5.) Moreover, the Limited Authorization To Act as Applicant authorizes American Tower to represent BGR "before any municipal or county Government for the sole purpose of obtaining permits and/or variances as may be required" for American Tower to locate the proposed telecommunications facility at the Site. (R. at 426.) The court finds that American Tower had standing before the BZA both as BGR's appointed representative and as a "person aggrieved" in its own right.

as "person[s] aggrieved" under Alabama law.

The substantive criteria found in state law apply when determining whether a local government's decision to deny a request to place a wireless service facility is supported by substantial evidence contained in a written record. *See, e.g., Coweta County*, 50 F. Supp. 2d at 1342-43. Defendants assume, without citing any authority to support their assumption, that the TCA also incorporates the standing requirements found in state law. Defendants' assumption is contradicted by the TCA's independent standing provision:

> Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction.

47 U.S.C. § 332(c)(7)(B)(v). In *OPM-USA-Inc. v. County of Marion*, the district court held that Congress did not intend the phrase "person[s] adversely affected" appearing in the TCA to include only wireless service providers licensed by the Federal Communications Commission. Order Denying Defendant's Motion to Dismiss and Granting Plaintiff's Motion for Expedited Hearing, entered Mar. 17, 1998, at 6-9, *OPM-USA-Inc. v. County of Marion*, No. 97-290-CIV-OC-10B, 1999 WL 1427699 (M.D. Fla. Sept. 30, 1999). Rather, the court concluded that Congress intended for this avenue of judicial relief to reach any entity that has suffered personal and concrete adverse effects from inconsistent State or local governmental actions. *Id.* at 8.

"[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992). In order to accept defendants' contention that a plaintiff who lacks standing to appeal to the BZA necessarily lacks standing to pursue claims under the TCA, this court must find that Congress intended the phrase "person adversely affected" to be coterminous with the phrase "person aggrieved" appearing in the Zoning Ordinance (or whichever of countless other state and local

standing requirements is at issue in a particular TCA appeal). If this had been Congress's intention, it is difficult to believe that it could not have explicitly stated so.

The court concludes that Congress intended "[a]ny person adversely affected" to mean just that: "any [person who] has suffered personal and concrete adverse effects" resulting from local governmental action that is inconsistent with the requirements of the TCA. *See County of Marion*, Order at 8. Therefore, irrespective of American Tower's and Tritel's standing before the BZA as "person[s] aggrieved," American Tower and Tritel have standing to pursue their TCA claims as "person[s] adversely affected" by the BZA's decision.

### b.    Constitutional Standing Limitations

Defendants also argue that neither American Tower nor Tritel hold a sufficient property interest in the Site to satisfy the standing requirements imposed by the United States Constitution. The doctrine of standing in federal courts is based in part on the case-or-controversy requirement found in Article III of the United States Constitution. This "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must suffer an "'injury in fact.'" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984)). Second, "there must be a causal connection between the injury and the conduct complained of . . . ." *Id.* Third, it must be likely that the injury will be "'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon v. East Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). Although each plaintiff bears the burden of establishing these constitutional elements of standing, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990)).

As with defendants' TCA standing argument, defendants argue that American Tower and Tritel lack standing due to constitutional limitations because American Tower and Tritel lack a sufficient property interest in the Site. Defendants further allege that American Tower and Tritel are unable to satisfy the constitutional elements of standing (i) because neither has suffered an injury in fact, and (ii) because any injury suffered by American Tower or Tritel cannot be redressed by a favorable decision of this court. In support of this argument, defendants rely exclusively on *Sprint Spectrum, L.P. v. City of Woburn*, 8 F. Supp. 2d 118 (D. Mass. 1998).

In *City of Woburn*, a wireless service provider sought to locate an antenna facility on a city-owned water tank. *City of Woburn*, 8 F. Supp. 2d at 119. The mayor agreed in writing to grant the provider a license or lease to use the water tank if the provider were able to obtain the special permit required by the city's zoning ordinance. *Id.* After the city council denied the provider's application for a special permit, the mayor notified the provider that the agreement between them had been cancelled. *Id.* The district court noted that, as a matter of Massachusetts law, "a lease executed by a mayor is not enforceable against the city unless all terms are specifically approved by the city council." *Id.* at 121. This fact did not, however, affect the provider's standing to seek the special permit; rather, this fact rendered the provider unable to enforce any property interest in the site against the property owner. *Id.* at 122.

> Given that [the provider] had standing to apply for a special permit, and even assuming [the provider's] appeal of the special permit denial is meritorious, the legal question remains whether this court can offer [the provider] any relief. Because [the provider] no longer has any ownership or authorization to use the property in question, this court is at a loss as to how it could properly, not only order the [c]ity [c]ouncil to issue the special permit, but also order the [c]ity to execute a lease of town property. This is properly characterized as a standing problem, because the court cannot offer relief to redress the alleged harm.

*Id.* at 121. Defendants cite *City of Woburn* for the proposition that lack of standing before the

12

local authority deprives a plaintiff of standing under constitutional limitations.  On the contrary, the court in *City of Woburn* assumed that the provider had standing to seek zoning approval.  The problem in *City of Woburn* was the provider's inability to require the property owner to allow it to install its telecommunications equipment.

In the instant case, American Tower is the lessee of the Site pursuant to a valid and enforceable lease agreement with the property owner.  (*See* Feb. 10, 2000 Gannon Aff., Exs. A and B.)  If the court were to order defendants to approve the Application, American Tower would have the right under state law to enforce the terms of its lease agreement against BGR and to construct the proposed telecommunications facility on the Site.  Thus, American Tower's and Tritel's injuries would be redressed by a favorable decision of this court.

Defendants also argue that neither American Tower nor Tritel has suffered an injury in fact sufficient to satisfy constitutional standing requirements.  (*See* defs.' Brief in Support of Motion to Dismiss at 8.)  Again, defendants rely exclusively on *City of Woburn*, in which the district court offered the following analysis:

> This court notes that there is also some strength to the argument that [the provider] suffers only hypothetical injury because denial of the special permit did not adversely affect [the provider] since it lacked legal permission to use the . . . water tanks.

*City of Woburn* 8 F. Supp. 2d at 122 n.2.  Again, in the instant case, American Tower is the lessee of the Site pursuant to an enforceable lease agreement with BGR.  Thus, unlike the provider in *City of Woburn*, American Tower has legal permission to use the Site.[7]

---

[7]      To the extent that defendants argue that American Tower and Tritel have suffered no injury in fact for purposes of constitutional standing limitations because they lacked standing to appear before the BZA as "person[s] aggrieved," defendants again ignore the TCA's independent standing provision.  "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."  *Linda R. S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973).  In enacting the TCA, Congress created such rights in favor of, and consequently conferred standing upon, "person[s] adversely affected" by state

The court concludes that American Tower had standing under Alabama law to appeal to the BZA. Moreover, the court finds that, even if American Tower and Tritel lacked standing under Alabama law, the TCA's independent standing provision confers standing upon American Tower and Tritel to pursue TCA claims in this court. Finally, the court finds that American Tower's and Tritel's claims satisfy the standing requirements imposed by Article III of the United States Constitution. Therefore, defendants' 12(b)(1) Motion to Dismiss is denied.

### 2.    Defendants' 12(b)(6) Motion

Defendants' 12(b)(6) Motion challenges American Tower's and Tritel's claims against the members of the BZA, Dallas Fanning, and Hulan Smith in their individual capacities and American Tower's and Tritel's claims against Dallas Fanning and Hulan Smith in their official capacities. American Tower and Tritel did not oppose dismissal of these claims in Plaintiffs' Brief in Opposition to Defendants' Motions to Dismiss and in Response to Defendants' Brief in Support of Motion to Dismiss. Plaintiffs subsequently mooted Defendants' 12(b)(6) Motion with respect to these claims; before the court ruled on Defendants' 12(b)(6) Motion, plaintiffs filed the First Amended Complaint, which does not include these claims. Thus, defendants' 12(b)(6) Motion is moot as to the claims against the members of the BZA, Dallas Fanning, and Hulan Smith in their individual capacities and American Tower's and Tritel's claims against Dallas Fanning and Hulan Smith in their official capacities.

Defendants' 12(b)(6) Motion also challenges American Tower's and Tritel's substantive due process claims under the United States Constitution. In their brief, American Tower and Tritel conceded that their federal substantive due process claims are subsumed into their takings claims under the Fifth Amendment to the United States Constitution, (Plaintiffs' Brief in

_____

action in violation of the TCA.

14

Opposition to Defendants' Motions to Dismiss and in response to Defendants' Brief in Support of Motion to Dismiss ("Pls.' Br. in Opp. to Mot. to Dismiss") at 2, 20-21). *See Bickerstaff Clay Prods. Co., Inc. v. Harris County,* 89 F.3d 1481, 1489-90 (11th Cir. 1996) (holding that the plaintiff's takings clause claim subsumed the plaintiff's substantive due process claim). American Tower and Tritel also conceded that, until their adverse condemnation claims under the Alabama Constitution are resolved, their federal takings claims are unripe, (Pls.' Br. in Opp. to Mot. to Dismiss at 2, 20-21). *See Bickerstaff Clay Prods.,* 89 F.3d at 1490-91 ("A Takings Clause claim does not become ripe unless the state provides no remedy to compensate the landowner for the taking."). Thus, these claims are due to be dismissed. Additionally, these claims are moot because plaintiffs did not assert them in their First Amended Complaint.

Finally, defendants' 12(b)(6) Motion challenges American Tower's and Tritel's claims under the Civil Rights Act, 42 U.S.C. § 1983 *et seq.* The court postponed its ruling with respect to American Tower's and Tritel's Civil Rights Act claims pending the decision of the Eleventh Circuit Court of Appeals in *AT&T Wireless PCS, Inc. v. City of Atlanta,* 210 F.3d 1322 (11th Cir. 2000). In *City of Atlanta,* the court considered whether, in enacting the TCA, Congress intended to preclude enforcement of its provisions through the Civil Rights Act. *See id.* at 1325. The court concluded that the TCA creates a federal right, Congress did not intend to preclude a separate remedy under § 1983, and that compensatory damages and attorneys' fees are available under 42 U.S.C. §§ 1983 and 1988 for violations of the TCA. *Id.* at 1325-30. However, on August 25, 2000, the Eleventh Circuit issued an opinion finding that it lacked jurisdiction to render its previous decision because the judgment of the district court from which the plaintiff had appealed was not a final order, but an interlocutory order. *AT&T Wireless PCS, Inc. v. City of Atlanta,* No. 99-12261, 2000 WL 1210663 (11th Cir. Aug. 25, 2000). Thus, the Eleventh Circuit vacated its previous opinion and dismissed the plaintiff's appeal. (*Id.*)

15

Although the Eleventh Circuit's April 26, 2000, opinion is no longer binding precedent upon this court, the opinion is indicative of the conclusion that the Eleventh Circuit is likely to reach in a case that is properly before the court. Thus, the court concludes that plaintiffs may seek redress under § 1983 for alleged violations of the TCA and Defendants' 12(b)(6) Motion to Dismiss as to this claim is due to be denied.

**B.      Cross Motions for Summary Judgment**

Both plaintiffs and defendants both seek Partial Summary Judgment on plaintiffs' claim that the BZA's decision is not supported by substantial evidence contained in a written record. The TCA is "expansive legislation designed primarily to increase competition in the telecommunications industry." *BellSouth Mobility, Inc. v. Gwinnett County*, 944 F. Supp. 923, 927 (N.D. Ga. 1996). The legislative history of the TCA describes its purpose as follows:

> to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition . . . .

H.R. Conf. Rep. No. 104-458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124. In furtherance of Congress's goal of increased competition, the TCA "does not eradicate, but certainly limits, a local zoning authority's ability to regulate the placement and construction of personal wireless service facilities . . . ." *AT&T Wireless PCS, Inc. v. City of Chamblee*, 10 F. Supp. 2d 1326, 1328-29 (N.D. Ga. 1997). Plaintiffs' and defendants' Motions for Partial Summary Judgment concern the limitations imposed by subsections (i) and (iii) of the TCA.

**1.    Decision in Writing Supported by Substantial Evidence Contained in a Written Record**

Traditionally, federal courts have reviewed zoning decisions with great deference.  *See*

*Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir. 1999) (citing *Schad v.*

*Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981)).  However, the TCA has altered the

landscape.  The TCA's primary procedural limitation provides:

> [a]ny decision by a State or local government or instrumentality
> thereof to deny a request to place, construct, or modify personal
> wireless service facilities shall be in writing and supported by
> substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7)(B)(iii).

### *a.    Decision in Writing*

Defendants seek Partial Summary Judgment on plaintiffs' claim that the BZA failed to

produce a decision in writing as required by subsection (iii) of the TCA.  Courts are divided over

the proper interpretation of subsection (iii)'s writing requirement.  Some courts have interpreted

subsection (iii) to require a local government to produce factual findings and to enumerate the

bases for its decision.  *See, e.g., Powertel/Atlanta, Inc. v. Clayton County*, No. 1:98-CV-0375-

JEC (Order at 11) (N.D. Ga. May 22, 1998); *AT&T Wireless Servs. of Florida, Inc. v. Orange*

*County*, 982 F. Supp. 856, 859 (M.D. Fla. 1997); *Western PCS II Corp. v. Extraterritorial*

*Zoning Auth. of Santa Fe*, 957 F. Supp. 1230, 1236 (D.N.M. 1997).  Conversely, other courts

have interpreted subsection (iii) to require only that the local government's decision in fact be in

writing.  *See, e.g., AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment*, 172

F.3d 307, 312-13 (4th Cir. 1999);  *AT&T Wireless PCS, Inc. v. City Council of the City of*

*Virginia Beach*, 155 F.3d 423, 429-30 (4th Cir. 1999).

The Record in this case contains the minutes and the transcript of the BZA's October 19,

1999 hearing.  (*See* R. at 498-04; Tr. at 77-79.)  The Record also contains two letters from the

clerk of the BZA to American Tower, one informing American Tower of the BZA's decision, (*see* R. at 532), and the other enclosing a copy of the minutes and offering to provide a copy of the transcript, (R. at 506). The court notes that such conclusory writings offer little or no insight into the findings and conclusions that motivated the decision and, consequently, provide little or no guidance to a court charged with reviewing the local government's decision under the TCA. The court need not resolve this issue, however, because plaintiffs concede that the BZA's decision is in writing for purposes of the TCA. (Plaintiffs' Brief in Opposition to Defendants' Motion for Partial Summary Judgment ("Pls.' Opp. Br.") at 3.)

### b.    *Substantial Evidence Contained in a Written Record*

Under the TCA, substantial evidence review "is intended to provide procedural protections with respect to determinations of factual issues made by a state or local authority in the course of applying state and local zoning law" and is intended to be conducted on the basis of the factual record before the local government. *APT Pittsburgh Ltd. Partnership v. Penn Township*, 196 F.3d 469, 474-75 (3d Cir. 1999). *See also Town of Amherst v. Omnipoint Communications Enters., Inc.*, 173 F.3d 9, 16 n.7 (1st Cir. 1999) ("[i]n considering whether substantial evidence supports the [local government's] decision, the court is acting primarily in a familiar 'review' capacity ordinarily based on the existing record . . . ."). In this case, although the Record includes certain additional materials created after the BZA's October 19, 1999 hearing, the Record contains the entire body of evidence before the BZA when it denied plaintiffs' Application.

### (i)    Standard of Review and Burden of Proof

The legislative history of the TCA reveals that "the phrase 'substantial evidence contained in a written record' is the traditional standard used for judicial review of agency actions." H.R. Conf. Rep. No. 104-458, at 208 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124,

223.  *See also Sprint Spectrum L.P. v. Jefferson County*, 968 F. Supp. 1457, 1468-69 (N.D. Ala. 1997) (quoting *Gwinnett County*, 944 F. Supp. at 928).  This standard is "not so stringent as a preponderance of the evidence test," but does mandate a harder look at the local authority's action than "under the more deferential arbitrary and capricious standard . . . ."  *Color Pigments Mfrs. Ass'n, Inc. v. O.S.H.A.*, 16 F.3d 1157, 1160 (11th Cir. 1994).  *See also City of Chamblee*, 10 F. Supp. 2d at 1329.  "Although the court is not free to substitute its judgment for that of the [local government], it must overturn the [local government's] decision under the substantial evidence test if it 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [local government's] view.'"  *Gwinnett County*, 944 F. Supp. at 928 (quoting *Bickerstaff Clay Prods. Co., Inc. v. N.L.R.B.*, 871 F.2d 980, 984 (11th Cir. 1989)).  Thus, the local authority's decision must have "a sound factual basis and [account] for relevant evidence which contradicts it."  *City of Chamblee*, 10 F. Supp. 2d at 1329 (citing *Northport Health Servs., Inc. v. N.L.R.B.*, 961 F.2d 1547, 1550 (11th Cir. 1992)).  *See also Town of Oyster Bay*, 166 F.3d at 494 ("the record should be viewed in its entirety, including evidence opposed to the [local government's view]"); *Cellular Tel. Co. v. Zoning Bd. of Adjustment*, 197 F.3d 64, 71 (3rd Cir. 1999) ("if the record as a whole contains conflicting evidence, the fact-finder must adequately explain its reasons for rejecting or discrediting competent evidence").

Plaintiffs and defendants disagree over the proper allocation of the burden of proof in substantial evidence analysis under the TCA.  At least one district court within the Eleventh Circuit has placed the burden on the local government:  "'[R]ather than burdening the applicant with producing substantial evidence supporting [the] approval' of a communications tower, the [TCA] shifts the burden to the government entity denying the application to demonstrate that there is substantial evidence in the record to support its denial."  Order on Plaintiff's Motion for

Immediate Writ of Mandamus entered May 21, 1998, at 12, *Powertel/Atlanta, Inc. v. Clayton County*, No. 98-CV-0375-JEC (N.D Ga. May 21, 1998) (quoting *Sprint Spectrum L.P. v. Town of Easton*, 982 F. Supp. 47, 49 (D. Mass. 1997)). *See also PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F. Supp. 2d 1052, 1064 (N.D. Ill. 1998) (placing burden of proof on local government); *Smart SMR of New York, Inc. v. Zoning Comm'n of the Town of Stratford*, 995 F. Supp. 52, 56 (D. Conn. 1998) (same). Other courts have placed the burden of proof on the party seeking to overturn the zoning decision. *See APT Minneapolis, Inc. v. Eau Claire County*, 80 F. Supp. 2d 1014, 1023 (W.D. Wis. 1999); *Sprint Spectrum v. Board of County Comm'rs of Jefferson County*, 59 F. Supp. 2d 1101, 1105 (D. Colo. 1999); *Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus*, 24 F. Supp. 2d 359, 366 (D.N.J. 1998), *aff'd in part, rev'd in part on other grounds* 197 F.3d 64 (3d Cir. 1999). While the opinions placing the burden of proof on the local government appear to be better reasoned, the court need not resolve the issue: regardless of where the burden lies, the BZA's decision in this case is insupportable.

### (ii)    Authority of the BZA

Unlike other provisions of the TCA, subsection (iii) imposes only procedural limitations on a local government's consideration of requests to locate telecommunications facilities; the substantive criteria governing such requests are found in state and local law. *See, e.g., Town of Oyster Bay*, 166 F.3d at 494. For this reason, a court must identify the state law criteria applicable to a request before engaging in substantial evidence review under the TCA.

The parties sharply disagree over the criteria the BZA was authorized to consider in connection with plaintiffs' Application. Defendants contend that state and local law allowed the BZA to consider potential health and safety concerns implicated by plaintiffs' Application and the potential aesthetic impact of plaintiffs' proposed facility on the surrounding area. (Defs.'

20

Brief in Support of Motion for Partial Summary Judgment ("Defs' Supp. Br.") at 13-20.)

Plaintiffs contend that the scope of the BZA's review was limited to the specific criteria

established by the City Council and set forth in the Zoning Ordinance. (Pls.' Opp. Br. at 6-9.)

To support their position that the BZA considered valid factors under state law,

defendants cite Alabama Code §§ 11-52-72 and 11-52-73. These statutes, however, describe the

authority of a local legislative body: Alabama Code § 11-52-72 describes the proper concerns

that may motivate zoning regulations enacted by a local legislative body, and Alabama Code §

11-52-73 allows "the legislative body of incorporated cities and towns" to regulate land uses for

certain purposes. Defendants also cite *City of Mobile v. Weinacker,* 720 So. 2d 953, 954 (Ala.

Civ. App. 1998), for the proposition that the BZA may regulate aesthetics in maintaining

property values. Although the court in *Weinacker* observed that a legislative body may regulate

aesthetics in maintaining property values, it found an attempt to do so to be unconstitutional

partly because the legislative body failed to establish "ascertainable criteria, requirements, or

guidelines for approval," instead leaving applicants prey to "the review board's unbridled

discretion." *Id.* at 955 (internal quotations omitted). Thus, Alabama law conditions a local

legislative body's power to regulate aesthetics in maintaining property values upon the

establishment of specific criteria to guide administrative review. *Id.*[8]

---

[8]     Defendants also cite two provisions of the Zoning Ordinance to support their contention
that the BZA enjoys broad authority. First, defendants cite the City Council's stated intentions
underlying the Zoning Ordinance's wireless telecommunications tower regulations. (*See* R. at
342 (Zoning Ordinance § 73.20).) While these goals may have motivated the City Council in
adopting the City's wireless telecommunications tower regulations, the regulations themselves
establish the specific criteria that govern the BZA's review. To allow the BZA to establish its
own independent standards to achieve the City Council's stated goals would be to ignore the
specific measures adopted by the City Council to achieve those same goals. Second, defendants
contend that Zoning Ordinance § 73.20.16 allows the BZA to deny a special exception if the
proposed tower would "endanger persons or property" or "have an impermissible . . . visual[] or
aesthetic impact on the surrounding area." (R. at 356 (Zoning Ordinance § 73.20.16(2)(b) and
(d)).) Zoning Ordinance § 73.20.16 imposes collocation requirements on applicants seeking to

The BZA is not the City's legislative body.  The BZA's members are appointed, not elected.  (*See* R. at 374 (Zoning Ordinance § 92.1: BZA members are "appointed for a term of three years by the Mayor and approved by the City Council").)  The BZA performs administrative functions, not legislative ones.  *See Ball v. Jones*, 272 Ala. 305, 311, 132 So. 2d 120, 125 (1961) (the BZA is "established by the legislature to execute and administer the zoning laws, where the legislative body has formulated the standards by which the [BZA] should be governed in making its decisions").  (*See also* R. at 375 (Zoning Ordinance § 92.5.2: empowering the BZA "[t]o hear and decide only such special exceptions as the [BZA] is specifically authorized to pass on by the terms of the [Zoning Ordinance]" and "to decide such questions as are involved in determining whether special exceptions should be granted").)  In the Zoning Ordinance, the City Council has formulated precise standards to direct the BZA's consideration of applications for special exceptions and variances.  (*See* Zoning Ordinance § 92.5.2.)  Therefore, the court must determine whether the BZA's decision that plaintiffs failed to satisfy the necessary criteria for a special exception and variance is supported by substantial evidence.

### (iii)    The Evidence

Having determined the appropriate standard of review and the proper scope of the BZA's authority to review plaintiffs' Application under state law, the court must determine whether the BZA's decision is supported by substantial evidence contained in a written record.  Section

---

construct new telecommunications facilities, and requires an applicant to demonstrate that collocation is not feasible before that applicant may construct a new tower.  (R. at 354-55 (§ 73.20.16(1)).)  Even if an applicant demonstrates that collocation is not feasible, the BZA may deny the application for the quoted reasons if the BZA also determines "that the proposed location of the tower is not essential to the applicant to provide service in a given geographical area."  (R. at 355-56 (Zoning Ordinance § 73.20.16(2)).)  Defendants do not contend that the BZA reached any such conclusion, and, in any event, any such conclusion would be unsupported by the Record.

73.20 of the Zoning Ordinance regulates the construction and placement of wireless telecommunications towers, (R. at 342-58), and an applicant must obtain a special exception in order to locate a wireless telecommunications tower in a residential district, (R. at 343 (Zoning Ordinance § 73.20.1(3)).).  To obtain the required special exception, an applicant must demonstrate compliance with a number of specific criteria.  (*See* R. at 348-51, 354-58, 380-81 (Zoning Ordinance § 92.5.3(9): enumerating nine requirements -- § 92.5.3(9)(a) through (i) -- and incorporating by reference additional requirements found at Zoning Ordinance §§ 73.20.4 (lighting), 73.20.5 (tower color), 73.20.6 (site security), 73.20.8 (structural design of towers), 73.20.9 (signs), 73.20.10 (access), 73.20.11 (landscaping), 73.20.16 (collocation), and 73.20.17 (building permits for towers)).)  Plaintiffs demonstrated compliance with all conditions required to obtain a special exception, with the exception of the 100-foot height limitation.  (*See* R. at 398-412, 427-29, 499, 537-38 (Tr. at 8-18).)

Because plaintiffs sought to locate a 180-foot monopole at the Site, the Zoning Ordinance required Plaintiffs to obtain a variance from the 100-foot height limitation.  To obtain the required variance, an applicant must demonstrate satisfaction of specific criteria set forth in the Zoning Ordinance.  (*See* R. at 386-88 (Zoning Ordinance § 92.5.4).)  Plaintiffs demonstrated compliance with the conditions required to obtain a variance from the Zoning Ordinance's 100-foot height limitation.  (*See* R. at 432-36, 498-500, 536-40 (Tr. at 7-28).)

Having concluded that plaintiffs carried their burden of demonstrating to the BZA  that they were entitled to a special exception and variance, the court will consider whether substantial evidence in the Record supports the BZA's denial of plaintiffs' Application.  After voting, BZA Members Williams, Howard, Watson, and Gammons stated, "for the record," their respective reasons for denial.  (*See* R. at 548-49 (Tr. at 77-79).)  The proffered grounds for denial included (i) health and safety concerns, (ii) aesthetic concerns, and (iii) concerns about the height of the

23

proposed monopole.  (*see id.*)[9]  The court will address each ground in turn.

### (1)    Health and Safety Concerns

The BZA members and opponents of the Application expressed three types of health and

safety concerns.[10]  First, BZA Member Howard expressed his concern over potential

unauthorized entry into the fenced equipment area at the base of the proposed monopole and the

potential for resulting injury.  (*See* R. at 548 (Tr. at 78)) ("there is a potential safety hazard that

[the proposed facility] could pose if the kids, as an example, kicked their soccer ball over [the

fence] -- and the gate is locked and all -- and start climbing the fence and go over inside to get

it").)  In adopting the Zoning Ordinance, the City Council considered the risk of unauthorized

entry into such a fenced equipment area, and the Zoning Ordinance addresses that risk by

requiring that "[a] chain link fence or a wall not less than eight (8) feet in height from finished

grade . . . be provided around each tower and all accessory structures" and that "[a]ccess to the

tower . . . be through a locked gate."  (R. at 348 (Zoning Ordinance § 73.20.6).)  Plaintiffs

demonstrated their compliance with these requirements.  (*See* R. at 403-06, 411, 427, 537 (Tr. at

13).)  Moreover, plaintiffs demonstrated that the proposed facility would exceed the Zoning

---

[9]    Defendants divide the evidence opposing plaintiffs' Application into two categories:
evidence of "health and safety risks created by the proposed [facility]," (Defs.' Supp. Br. at 15),
and evidence of "a negative aesthetic impact on the surrounding area, including the threat of
diminished property values," (*Id.* at 16).

[10]    In addition to the specific types of health and safety concerns raised by the BZA
members and opponents, Defendants argue that the proposed facility's proximity to the two
nearby schools alone supports an inference that the proposed facility would create a potential
safety hazard.  (Defs.' Supp. Br. at 15.)  The Zoning Ordinance imposes specific setback
requirements that must be satisfied in order to obtain a special exception.  (R. at 381 (Zoning
Ordinance § 92.5.3(9)(f)).)  The Record demonstrates, (R. at 401, 402, 429, 537 (Tr. at 11-12)),
and defendants concede, (Defs.' Supp. Br. at 15), that the proposed facility would comply with
the Zoning Ordinance's setback requirements.  Therefore, the proposed facility's proximity to
surrounding structures supports the conclusion that plaintiffs are entitled to a special exception.

Ordinance's requirements by incorporating an anti-climbing device on top of the security fence, (*see* R. at 403-06, 411, 431), an added security measure directly addressing the hypothetical posed by BZA Member Howard. *See Petersburg Cellular Partnership v. Board of Supervisors of Nottoway County*, 205 F.3d 688, 696 (4th Cir. 2000) (finding that concerns over children attempting to climb a proposed tower were rebutted in part by the presence of an eight-foot security fence and that such concerns were, therefore, unreasonable).[11] To allow the BZA now to modify the standard established by the City Council and set forth in the Zoning Ordinance would be unjust.

Second, one opponent expressed concern over the potential structural failure of the monopole. (*See* R. at 540 (Tr. at 29) ("[w]e have a lot of storms in this city, and I don't think we need a monopole right next to where we have all these four-year-olds and three-year-olds").) The City Council considered the risk of potential structural failure of a telecommunications tower, and the Zoning Ordinance addresses that risk by requiring that towers meet specific structural criteria. (R. at 348 (Zoning Ordinance § 73.20.8: requiring that towers meet or exceed structural standards published by the Electronic Industries Association and applicable City building codes).) Plaintiffs showed that the proposed monopole would comply with these structural criteria. (*See* R. at 415-17, 427, 538; Tr. at 15.) Specifically, plaintiffs submitted a letter from Michael Deines ("Deines"), P.E., Project Engineer with Valmont/Microflect, describing the structural characteristics and integrity of the proposed monopole. (*See* R. at 415-17.) Deines's letter demonstrates that the proposed monopole would be designed to withstand the highest windspeed on record for the Huntsville area in the last fifty years and to withstand

---

[11]     Although the court in *Nottoway County* reversed the district court's grant of mandamus relief to the wireless service provider, 205 F.3d at 706, two of the three judges, Judge Niemeyer and Judge King, found that the local government's decision was not supported by substantial evidence, *id.* at 710.

seventy-five percent of that windspeed while covered with one-half inch of radial ice. (R. at 415.) Deines's letter further demonstrated that, in the event of structural failure, the proposed monopole would be designed to "buckle" at a predetermined point and fold onto itself rather than collapsing to the ground. (R. at 416, 417.) Finally, in the event that a monopole meeting the Zoning Ordinance's structural standards failed, and in the further event that a monopole such as the one proposed by plaintiffs failed to "buckle" at its predesigned point, the Zoning Ordinance addresses the potential for resulting injury or damage by imposing setback requirements. (R. at 381 (Zoning Ordinance § 92.5.3(9)(f)).) As previously noted, plaintiffs showed, and defendants concede, that the proposed facility would comply with the setback requirements. (*See* R. at 401, 402, 429, 537 (Tr. at 11-12).) No evidence, scientific or otherwise, appears in the Record to cast doubt on the structural integrity of the proposed monopole or to support this opponent's concern over potential injury or damage resulting from structural failure. *See Nottoway County*, 205 F.3d at 696 (finding that concern that a proposed monopole would collapse and cause injury to people or property was speculative and unreasonable in light of specific evidence of structural integrity).

Third, one opponent expressed concern about the proximity of the Site to a nearby soccer field. Specifically, this opponent asserted that the nearest corner of the Site would be 12 feet from the boundary of a soccer field. (*See* R. at 547 (Tr. at 69)) ("[w]hen those fellows play across there, they tend to run into the area that is surveyed for the [Site]".) The Record shows that the proposed facility and surrounding fenced area would not extend to the Site's boundaries, but would occupy only 3,600 square feet, slightly more than one-third of the Site's total area. (R. at 431 (explaining that the fenced area would constitute a 60-foot by 60-foot portion of the 10,000 square-foot Site).) Thus, it appears that this opponent's concern arises, in part, from a misunderstanding of the location of the proposed facility on the Site. Moreover, the City

26

Council considered the risk of unauthorized entry into an equipment area at the base of a tower facility; and the Zoning Ordinance addresses that risk by requiring that "[a] chain link fence or a wall not less than eight (8) feet in height from finished grade . . . be provided around each tower and all accessory structures . . . ." (Zoning Ordinance § 73.20.6; R. at 348.)  Plaintiffs demonstrated that their proposed facility would comply with this requirement.  (*See* R. at 403-06, 411, 427, 537 (Tr. at 13).)

The health and safety concerns expressed by BZA Member Howard and the two opponents of plaintiffs' Application are speculative and are rebutted by plaintiffs' evidence. Therefore, the BZA's decision is not supported by substantial evidence in the Record of these concerns.[12]

### (2)   Aesthetic Impact

The second reason for denial offered by the BZA members at the hearing was concern over the aesthetic impact of the proposed facility.  (R. at 548 (Tr. at 78).)  Defendants also cite opponents' concerns over the threat of diminished property values in connection with aesthetic concerns as a basis for the BZA's decision.  (Defs.' Supp. Br. at 16-19.)

As a preliminary matter, the court is not convinced that the BZA was authorized to consider such matters in connection with plaintiffs' Application.  Both Alabama law and the Zoning Ordinance limit the factors that the BZA may consider in hearing an application for a special exception.  The City Council considered the potential aesthetic impact of telecommunications towers on surrounding areas, and the Zoning Ordinance addresses the issue by imposing several specific restrictions on towers in residential districts.  (*See* R. at 347-51,

---

[12]   Even if the BZA was authorized to consider health and safety concerns, generally, and was not limited to the specific criteria established by the City Council, the outcome would remain the same, as the Record does not contain substantial evidence of any such concerns.

380-81 (Zoning Ordinance §§ 92.5.3(9)(a): requiring use of "the least visually obtrusive"

antennas available; § 92.5.3(9)(h): requiring accessory buildings and security fences to be

"compatible with the surrounding residential neighborhood by virtue of their design, materials,

textures, and colors;" § 73.20.4: "[t]owers shall not be artificially illuminated except as required"

by federal regulations; § 73.20.5: "[t]owers shall have a galvanized finish"); § 73.20.8(3):

"[t]owers 180 feet in height or less . . . shall be monopoles;"; § 73.20.8(4): "[t]ower diameter at

the base shall not be greater than required;" § 73.20.9: "[n]o signs shall be allowed on any tower

or antenna;" and § 73.20.11: providing detailed landscaping requirements).)  The Record

demonstrates that the proposed monopole and facility would satisfy these aesthetic requirements.

(*See, e.g.*, R. at 427-29, 499, 537-38 (Tr. at 9-18).)[13]

Even if the BZA were entitled to consider aesthetic impact, in general, or diminished

property values, in particular, the BZA's decision would be insupportable on such grounds.  As

evidence supporting the BZA's decision on these grounds, defendants cite a Memorandum for

Record submitted by certain residents of the area surrounding the Site.  (*See* R. at 528-31; Defs.'

Supp. Br. at 16.)  Although defendants cite the Memorandum as evidence that the proposed

tower would have a negative aesthetic impact and would threaten property values, the

Memorandum does not offer any reasons for the signatories' opposition:

---

[13]        Defendants argue that Zoning Ordinance § 73.20.16 authorizes the BZA to deny an
application for a special exception if a proposed tower would have an "impermissible . . .
visual[] or aesthetic impact on the surrounding area." (Defs.' Reply Br. at 4; *see also* R. at 356
(Zoning Ordinance § 73.20.16(2)(d)).)  As previously noted, Zoning Ordinance § 73.20.16(2)
allows the BZA to deny an application for a special exception on this ground if the BZA also
determines "that the proposed location of the tower is not essential to the applicant to provide
service in a given geographical area." (R. at 355-56 (Zoning Ordinance § 73.20.16(2)).)
Defendants do not contend that the BZA made such a determination, and any such determination
would not be supported by the Record.

> We, the undersigned, strongly oppose granting [American Tower]
> and [Tritel] a variance to locate a communications tower on the
> McComb acres.  We respectfully request the Board of Adjustments
> to deny all requests for commercial use of McComb acres and any
> and all adjoining properties.  We further request the area remain
> zoned R-1A single family residence for now and in the future.

(R. at 528.)  The Memorandum does not constitute evidence of any fact other than the fact that

the signatories "strongly oppose" plaintiffs' Application.

Defendants also cite a question raised by one opponent concerning potential aggravation

of existing drainage problems in the area:

> The only thing I haven't heard is where the water is going to go
> when they build up the drainage, except for the soccer field and
> out in the street.  And you know that we have got a drainage
> problem there anyway, because that has been worked on for the
> last two months.

(R. at 546 (Tr. at 64-65).)  The opponent's remarks express no opinion concerning whether the

proposed facility would actually contribute to any drainage problem; the opponent's remarks at

most constitute a question.  Plaintiffs' site plans answer this question.  First, most of the fenced

equipment area would be covered with gravel rather than impervious surfaces.  (R. at 407.)

Second, the fenced equipment area would lie approximately ten feet below street elevation.  (R.

at 405.)  Finally, a drainage scale on the opposite side of the fenced equipment area from the

soccer field would cause any excess water to drain away from that field.  (R. at 405, 408.)

Finally, defendants cite opponents' remarks at the BZA hearing as evidence of a negative

aesthetic impact and the potential for diminished property values.  (Defs.' Supp. Br. at 17.)

Specifically, some opponents opined that the proposed facility would be aesthetically

displeasing, (*see* R. at 544-46 (Tr. at 51, 54, 56, 63)), and would be incompatible with the

surrounding residential area, (*see* R. at 540, 544 (Tr. at 30, 50)).  Such assertions are conclusory

in nature and fail to provide substantial evidence to support the BZA's decision.  Aesthetic

impacts may be determined objectively by reference to certain measurable effects on properties

surrounding telecommunications facilities.  One such measurable effect that would evidence a

negative aesthetic impact would be declining property values about which opponents expressed

concern at the hearing.  (*See* R. at 541 (Tr. at 33) (anecdotal testimony offered by realtor that her

customers are not interested in purchasing homes near towers); *see also* R. at  544-45 (Tr. at 54,

58) (conclusory allegations by residents of declining property values).)  Despite the objectively

ascertainable nature of any such decline in property values, however, the Record contains no

study, analysis or other credible evidence to support this concern, but only the same sort of

conclusory remarks discussed above.[14]

By contrast, plaintiffs presented to the BZA an appraisal study prepared by Ronald

Curry, an MAI-certified real property appraiser, and Harris Simpson, a certified real property

appraiser ("the appraisers"), analyzing the Site in issue, other sites in the City, and sites in other

cities in the southeast.  (*See* R. at 447-97, 547 (Tr. at 69-70).)  In studying the potential effects of

the proposed facility on surrounding property values, the appraisers visited the proposed Site,

inspected existing telecommunications structures in the region, studied the appreciation in value

of homes located near telecommunications structures, and interviewed local real estate

professionals and homeowners concerning the impact of such structures on the marketability or

---

[14]     Defendants attempt to bolster the opponents' remarks by noting that Alabama law
permits owners to testify as to the value of their property:

> Direct testimony as to the market value is in the nature of opinion
> evidence; one need not be an expert or dealer in the article, but
> may testify as to value if he has had an opportunity for forming a
> correct opinion.

Ala. Code § 12-21-114.  Pretermitting the issue of whether the opponents' remarks would satisfy
the Alabama Code's foundational requirement, the court is concerned with the substantiality, not
the admissibility, of opponents' remarks.

value of surrounding properties.  (R. at 448-49.)  The appraisers concluded "that [plaintiffs']

proposed monopole structure will not affect the value or marketability of properties in this area."

(R. at 448.)  The opponents' unsubstantiated concerns of a potential negative impact on property

values do not constitute substantial evidence to support the BZA's decision, especially in light of

the opposing expert evidence.  *See, e.g., Town of Oyster Bay*, 166 F.3d at 496 (suggesting that,

"since property values can be objectively proven, it is not clear if [a local government] must

receive traditional evidence [of diminished property values] in order to satisfy the substantial

evidence test," and finding generalized concerns of reduced property values and an

unsubstantiated real estate appraiser's affidavit insufficient when countered by expert evidence);

*Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township*, 181 F.3d 403, 409 (3rd Cir.

1999) (generalized concerns of reduced property values insufficient when countered by expert

evidence); *See also OPM-USA-Inc. v. Board of County Comm'rs of Brevard County*, 7 F. Supp.

2d 1316, 1324 (M.D. Fla. 1997) (finding that an "unsupported and hypothetical 'potential' for a

decrease in property values" does not constitute substantial evidence).  The remarks of

opponents in the Record concerning the potential for a negative aesthetic impact or for declining

property values are unsupported and speculative, and are rebutted by credible expert evidence.

Therefore, the BZA's decision is not supported by substantial evidence in the Record of these

concerns.

### (3)   Height of the Monopole

Although not raised by defendants before the court, the third reason for denial offered by

the BZA members at the hearing was the height of the proposed monopole.  (*See* R. at 548, 549

(Tr. at 77, 79).)  While the BZA members did not explain why they opposed the height of the

proposed monopole, their statements may reflect a determination that plaintiffs failed to satisfy

the criteria required to obtain a variance from the City's 100-foot height limitation.  Four types

31

of arguments raised by opponents at the BZA hearing may be interpreted as relevant to the variance criteria.

First, some opponents argued that the community currently enjoys adequate PCS coverage. (*See* R. at 540, 541, 542, 544 (Tr. at 28, 30, 33, 40, 54).) In the context of the variance criteria, such an argument may be construed as an argument that plaintiffs failed to show that a literal enforcement of the Zoning Ordinance's 180-foot height limitation would result in unnecessary hardship. (*See* R. at 386-88 (Zoning Ordinance § 92.5.4).) However, this conclusion is not supported in the Record. Plaintiffs demonstrated through scientific evidence that, although some carriers may provide coverage to the area surrounding the Site, Tritel's coverage is inadequate. (R. at 432, 435, 543 (Tr. at 44-46).) Plaintiffs further demonstrated that two other carriers had expressed interest in collocating on plaintiffs' proposed monopole to remedy deficiencies in their coverages. (*See* R. at 422, 425, 537 (Tr. at 11).)[15]

Second, some opponents speculated that better alternative sites and collocation options were available. (*See* R. at 541-44 (Tr. at 35-36, 41, 43-44, 52).) In the context of the variance criteria, this, too, may be construed as an argument that plaintiffs failed to show that a literal enforcement of the Zoning Ordinance's 180-foot height limitation would result in unnecessary hardship. (*See* R. at 386-88 (Zoning Ordinance § 92.5.4).) The Record does not support such an argument. The Record shows that no existing tower or structure is suitable for Tritel's proposed antenna facility. (R. at 419, 423, 428.) Further, plaintiffs proved either the inadequacy of or

---

[15]     There is no evidence in the Record supporting the conclusion that Tritel provides adequate PCS coverage without an antenna facility at the Site. Moreover, the court is concerned that a decision to deny plaintiffs' Application because other service providers provide adequate coverage to this area would undermine the pro-competitive purpose of the TCA and might unreasonably discriminate against Tritel in favor of providers of functionally equivalent services whose antenna facilities are already in operation in violation of subsection (i)(I) of the TCA.

Tritel's presence on other towers and structures in the area. (*See* R. at 543 (Tr. at 47-48).) The Record further demonstrates that no alternative site is available within Tritel's required search ring for the construction of the proposed monopole. (R. at 423-24.)

One opponent suggested several alternative structures or sites upon which he speculated Tritel could locate an antenna or monopole and still provide adequate PCS coverage to the area surrounding the Site. (*See* R. at 541-44; Tr. at 34-50.) Nathan McNeal, an RF engineer speaking on behalf of plaintiffs, explained that technical limitations rendered each alternative structure and site proposed by this opponent inadequate. (*See* R. at 542-43 (Tr. at 38-48).)[16] Thus, the record does not support defendants' argument regarding the availability of other suitable sites or structures. *See, e.g., Group EMF, Inc. v. Coweta County*, 50 F. Supp. 2d 1338, 1348 (N.D. Ga. 1999) (even though local authority did not believe testimony of service provider's representative that commercial properties outside of search ring would not provide adequate coverage, "substantial evidence must exist in the record to support [its] disbelief").

Third, one opponent claimed that, by designing its coverage network in and around the City so as to require an antenna at the Site, Tritel created its own coverage problem. (*See* R. at 544 (Tr. at 54-55).) In the context of the variance criteria, this argument may be construed as an argument that plaintiffs have failed to demonstrate that "the special conditions and circumstances do not result from the actions of the applicant[s]." (*See* R. at 386-88 (Zoning

---

[16]     At the hearing, an opponent stated that he "believe[d] that there [was] a little bit more work that can be done to try and find a more suitable site than in the middle of a residential area." (*See* R. at 543 (Tr. at 49).) BZA Member Loftis suggested to the opponent that "the best way to determine exactly what you are trying to do [-- i.e., to establish the suitability of an alternative structure or site --] is to do an analysis that defeats [plaintiffs' analysis]." (*See* R. at 544 (Tr. at 50).) The opponent responded as follows: "That's correct. And, unfortunately, I have not had the time to do that." (*See id.*) Thus, the Record contains no analysis or other evidence establishing the suitability of alternative structures or sites.

Ordinance § 92.5.4(1)(c)).)  The Record demonstrates that thirteen of Tritel's seventeen required

antenna facilities in and around the City were collocated on existing structures.  (R. at 498, 537

(Tr. at 8).)  Moreover, the Record shows that Tritel lacks adequate coverage in the area

surrounding the Site despite having located antennas on each available tower surrounding the

Site.  Defendants nor anyone else failed to present evidence to the BZA establishing that Tritel's

coverage network in the City was poorly designed or that any alternative network design would

obviate the need for an antenna facility at the Site.

Finally, two opponents argued that granting plaintiffs a variance from the height

limitation would be the first step down a slippery slope that ultimately would require the BZA to

grant variances to any applicant seeking to exceed the 100-foot height limitation.  (*See* R. at 545

(Tr. at 56, 57.)  However, this argument is unavailing because neither the Zoning Ordinance nor

the TCA would require the BZA to grant a variance to any applicant who did not demonstrate

compliance with the variance criteria.  Further, the Zoning Ordinance provides:

> [n]o non-conforming use of neighboring lands, structures or
> buildings in the same district, and no permitted use of lands,
> structures, or buildings in other districts shall be considered
> grounds for the issuance of a variance.

(R. at 387 (Zoning Ordinance § 92.5.4(1)(d)).)  The TCA's legislative history explains that the

prohibition against unreasonable discrimination among providers of functionally equivalent

services found in subsection (i)(I) allows localities "to treat facilities that create different visual,

aesthetic or safety concerns differently to the extent permitted under generally applicable zoning

requirements even if those facilities provide functionally equivalent services."  H.R. Conf. Rep.

No. 104-458, at 208 (1996), *reprinted in* 1996 U.S.C.C.A.N. at 222.  The opponents' concern is

unsupported.

### (4)    General Opposition

The Record does not support the BZA's stated reasons for denial or the generalized

concerns raised by opponents.  Courts disagree, however, over whether the opponents' concerns,

themselves, can constitute evidence to support a decision under the TCA.  Many courts have

concluded that generalized opposition cannot constitute substantial evidence to support a local

government's decision.  *See, e.g., Pine Grove Township*, 181 F.3d at 409 (generalized and

speculative concerns do not constitute substantial evidence); *Town of Oyster Bay*, 166 F.3d at

495-96 (generalized concerns of aesthetic impacts and declining property values do not

constitute substantial evidence); *Clayton County*, Order at 12-14 (defendants' suggestion that

plaintiff's permit was denied because of unspecified aesthetic concerns and its close proximity to

residential areas unsupported by the evidence in the record and unpersuasive); *City of*

*Chamblee*, 10 F. Supp. 2d at 1333 (substantial evidence test not satisfied where "'sole basis for

denying [application] was little more than that numerous people opposed it'" (quoting *Illinois*

*RSA No. 3, Inc. v. County of Peoria*, 963 F. Supp. 732, 745 (C.D. Ill. 1997)); *Gwinnett County*,

944 F. Supp. at 926-28 (opponent's generalized concerns over children entering tower site,

structural failure, aesthetic incompatibility and decreased property values did not constitute

substantial evidence in light of compelling evidence presented by applicant).  Other courts have

applied a more deferential substantial evidence standard when reviewing the decision of a local

legislative body under the TCA and have considered citizen opposition as evidence supporting a

local government's decision.  *See, e.g., Virginia Beach*, 155 F.3d at 430.

Although the more deferential standard set forth in the *Virginia Beach* decision has been

criticized by other courts, *see Aegerter v. City of Delafield*, 174 F.3d 886, 889-90 (7th Cir.

1999); *Pine Grove Township*, 181 F.3d at 409, this court need not decide the question.  As

discussed previously, the BZA is not a legislative body; rather, it is an administrative body

performing quasi-judicial functions. *See Ball,* 132 So.2d at 125; *see also Alabama Farm Bureau,* 470 So.2d at 1236. For this reason, the Fourth Circuit's relaxed substantial evidence standard based on deference to *local legislators* is inapplicable to the instant case. In any event, regardless of whether general opposition, alone, can constitute substantial evidence to support a local government's decision, the same degree of widespread opposition does not appear in this case.

Plaintiffs carried their burden of demonstrating compliance with the criteria for obtaining a special exception and a variance, and no substantial evidence appears in the Record to suggest otherwise. Moreover, the BZA's decision is not supported by substantial evidence of any concerns regarding health or safety, concerns over a negative aesthetic impact on the surrounding area, concerns implicated by the height of the proposed monopole, or any other facts or concerns that would support the BZA's refusal to grant either a special exception or a variance. Therefore, the BZA's decision is not supported by substantial evidence in the Record and violates subsection (iii) of the TCA. Plaintiffs' Motion for Partial Summary Judgment is due to be granted, and defendants' Motion for Partial Summary Judgment with respect to plaintiffs' claims under the substantial evidence requirement of subsection (iii) of the TCA is due to be denied.

### 2. Unreasonable Discrimination and Prohibition of Service

Defendants seek partial summary judgment on plaintiffs' claims under the substantive limitations found in subsections (i)(I) and (i)(II) of the TCA, forbidding unreasonable discrimination among providers of functionally equivalent services and prohibition of the provision of wireless services, respectively. In addition to arguing the merits of these claims based on the Record before the BZA, defendants contend that neither American Tower nor BGR have standing to assert claims under subsection (i). The court finds that American Tower and

36

BGR have standing to pursue claims under subsection (i) of the TCA, and the court finds that

defendants' Motion for Partial Summary Judgment on the merits of these claims is premature.

### a. *Standing*

Defendants' Motion for Partial Summary Judgment contains defendants' second

challenge in this case of plaintiffs' standing to pursue claims under the TCA.  In Defendants'

12(b)(1) Motion to Dismiss, defendants challenged American Tower's and Tritel's standing to

pursue claims under the TCA based on the standing requirements found in Alabama law.  As

previously discussed, the TCA provides an independent basis of standing for "person[s]

adversely affected" by actions inconsistent with its provisions, and, as the court has previously

held, American Tower and Tritel have standing to pursue their TCA claims in this court.

Although unable to cite any supporting case law, defendants now argue that neither

American Tower nor BGR have standing to pursue unreasonable discrimination or prohibition of

service claims under subsection (i) of the TCA because neither is a licensed wireless service

provider.  Defendants' argument overlooks the plain language of subsection (v) of the TCA,

which does not distinguish between claims under subsection (i) and claims under other

subsections:

> Any person adversely affected by any final action or failure to act
> by a State or local government or any instrumentality thereof **that is
> inconsistent with this subparagraph** may, within 30 days after
> such action or failure to act, commence an action in any court of
> competent jurisdiction.

47 U.S.C. § 332(c)(7)(B)(v) (emphasis added).  Defendants' analysis of "personal wireless

services," "unlicensed wireless service," "commercial mobile services," and "interconnected

service" notwithstanding, the TCA confers standing to challenge a violation of any of its

requirements on one category of individuals:  "person[s] adversely affected."

This argument was considered and rejected in *OPM-USA-Inc. v. County of Marion*. Order Denying Defendant's Motion to Dismiss and Granting Plaintiff's Motion for Expedited Hearing entered March 17, 1998, *OPM-USA-Inc., v. County of Marion*, No. 97-290-CIV-OC-10B, 1999 WL 1427699 (M.D. Fla. Sept. 30, 1999).  In *County of Marion,* a tower company that was not licensed by the FCC  to provide personal wireless services, brought an action against a local government under the TCA alleging violations of subsections (iii) (substantial evidence), (i)(I) (unreasonable discrimination) and (i)(II) (prohibition of service).  *Id.* at 3, 5.  The local government challenged the tower company's standing under the TCA, arguing that the phrase "any person adversely affected" in subsection (v) "refers solely to providers of 'personal wireless services' and providers of 'functionally equivalent services.'"  *Id.* at 7.  Therefore, the local government argued, because the tower company was not a provider of wireless services or functionally equivalent services, it was not entitled to relief under the TCA.  *Id.* at 7-8.  The court rejected this argument based on the plain language of the TCA:

> By employing the phrase "any person" as opposed to "any wireless service provider," . . . . Congress intended for this avenue of judicial relief to reach any entity that has suffered personal and concrete adverse effects from inconsistent State or local government actions.  If the intent of Congress in drafting this provision was to limit judicial review, it easily could have inserted the [phrase] "provider of personal wireless services" or even "provider of functionally equivalent services," both of which Congress separately defined within the [TCA] and its legislative history.  However, Congress did not choose any of these terms; it chose the broad phrase "any person." . . .  Nowhere does 47 U.S.C. § 332(c)(7) limit judicial review to licensed wireless service providers, and nowhere else, whether in the other provisions of 47 U.S.C. § 332 or any other statute, has Congress indicated that the unadorned words of [subsection (v)] are in some way limited by implication.

*Id.* at 8-9.

The court concludes that American Tower and BGR are persons adversely affected by the BZA's decision within the meaning of the TCA.  Moreover, the court holds that "persons adversely affected" have standing to pursue claims for violations of any of the TCA's limitations, including the limitations concerning unreasonable discrimination and prohibition of service found in subsection (i).  Therefore, the portion of defendants' Motion for Partial Summary Judgment based on American Tower's and BGR's standing to pursue unreasonable discrimination and prohibition of service claims is due to be denied.

### b.      *De Novo Review*

Plaintiffs' claims under subsection (iii) of the TCA turn on whether the BZA's decision is "supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).  By contrast, subsection (i) of the TCA contains no reference to either "substantial evidence" -- or any other standard of review -- or a "written record" of the local government's proceedings below:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--
>
> (I)     shall not unreasonably discriminate among providers of functionally equivalent services; and
>
> (II)    shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C. § 332(c)(7)(B)(i).  Congress's choice of language indicates that it did not intend for unreasonable discrimination or prohibition of service claims to be reviewed by courts under the substantial evidence standard based on the record of the proceedings before the local government.

Two United States Courts of Appeals have confirmed this reading of the TCA.  In *Penn Township*, the Third Circuit distinguished claims under subsection (iii), which require substantial evidence review, from claims under subsection (i), which require de novo review:

> It thus seems apparent that subsection [(iii)] is intended to provide procedural protections with respect to determinations of factual issues made by a state or local authority in the course of applying state and local zoning law . . . . By contrast, it also seems apparent that subsection [(iii)] is not intended to apply to decisions that are not to be made solely on the basis of the factual record before the agency and that are not to be the subject of deferential substantial evidence review.
>
> We have recently held, for example, that the substantial evidence review contemplated by subsection [(iii)] is not applicable to the issue of whether a state's denial of an application to construct a personal wireless service facility 'has the effect of prohibiting the provision of personal wireless services.' See *Cellular Telephone v. Ho-HoKus*, 197 F.3d 64 (3d Cir. 1999). That decision is to be made de novo by a reviewing court that will not necessarily be limited to the record compiled by the state or local authority.

*Penn Township*, 196 F.3d at 474-75 (footnote omitted). *See also Borough of Ho-Ho-Kus*, 197 F.3d at 71 (noting that the substantial evidence test does not apply to subsection (i)(II): "the statutory bar against regulatory prohibition is absolute, and does not anticipate any deference to local findings."); *AirTouch Cellular v. City of El Cajon*, 83 F. Supp. 2d 1158, 1163 (S.D. Cal. 2000) ("in a claim under [subsection (i)(I) or (i)(II)], there is no deference to local findings").

Likewise, in *Town of Amherst*, the First Circuit noted that, while claims under subsection (iii) "would ordinarily be resolved (one way or the other) on the record before the district court and require no trial," the same is not true for claims under subsection (i). *Town of Amherst*, 173 F.3d at 16.

> In considering whether substantial evidence supports the agency decision, the court is acting primarily in a familiar 'review' capacity ordinarily based on the existing record. . . . By contrast, whether the town has discriminated among carriers or created a general ban involves federal limitations on state authority, presenting issues that the district court would resolve de novo and for which outside evidence may be essential. See *AT&T Wireless PCS, 155 F.3d at 426-28.*

*Id.* at 16 n.7. *See also City of El Cajon*, 83 F. Supp.2d at 1164 (finding that, while "in subsection [(iii)] inquiries, the reviewing court may not go beyond the administrative record in making its

decision," in subsection (i) inquiries, "outside evidence may be considered" (citing *Town of Amherst, N.H. v. Omnipoint Communications Enter. Inc.,* 173 F.3d 9, 16 n.7 (1st Cir. 1999)). Therefore, the court must conduct a de novo review of plaintiffs' subsection (i) claims, and the parties are entitled to present evidence that was not before the BZA.

Summary judgment should not be granted when major factual contentions are in dispute and the parties have not yet conducted pretrial discovery. *See National Life Ins. Co. v. Solomon,* 529 F.2d 59, 61 (2d Cir. 1975); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2741 (3d ed. 1998). This principle is particularly applicable where a court has stayed discovery pending the disposition of pre-discovery motions. *See Kinee v. Abraham Lincoln Fed. Sav. & Loan Ass'n,* 365 F. Supp. 975, 981 (E.D. Pa. 1973) (when discovery has been stayed pending disposition of motions to dismiss, and plaintiffs have had no opportunity to conduct discovery, it would be patently unfair to grant defendants' motion for summary judgment).

At the parties' request, the court stayed the commencement of formal discovery in this action pending disposition of the pending Motions for Partial Summary Judgment. The stay of discovery was not intended to preclude discovery, however, (*see* Report of Parties' Planning Meeting filed Dec. 20, 2000 at ¶ 2), and plaintiffs are entitled to conduct discovery on their claims under subsection (i) of the TCA. Plaintiffs submitted evidence showing that they have not yet conducted discovery on their subsection (i) claims and that they anticipate that facts developed through discovery will substantiate those claims. (*See* Affidavit of Barry E. Gannon filed Apr. 13, 2000.) Defendants' Motion seeking Partial Summary Judgment on the merits of Plaintiffs' claims under subsection (i) of the TCA is premature and, therefore, is due to be denied.

### 3.   Remedy

The TCA does not prescribe the appropriate remedy for its violation, but mandates that courts "hear and decide" TCA claims "on an expedited basis." 47 U.S.C. § 332(c)(7)(B)(v).

41

Courts finding violations of the TCA generally have found mandamus or injunctive relief

ordering the local government to grant the improperly denied application to be the appropriate

remedy. *See, e.g., Pine Grove Township*, 181 F.3d at 409-10; *Town of Oyster Bay*, 166 F.3d at

497; *Clayton County*, Order at 17-18; *City of Chamblee*, 10 F. Supp. 2d at 1334; *Jefferson*

*County*, 968 F. Supp. at 1469; *Gwinnett County*, 944 F. Supp. at 929; *Coweta County*, 50 F. Supp.

2d at 1351; *Iowa Wireless Servs., L.P. v. City of Moline*, 29 F. Supp. 2d 915, 924 (C.D. Ill. 1998);

*Town of Stratford*, 995 F. Supp. at 62; *Town of Easton*, 982 F. Supp. at 52; *Brevard County*, 7 F.

Supp. 2d at 1327; *County of Peoria*, 963 F. Supp. at 747; *Santa Fe*, 957 F. Supp. at 1237, 1240.

Moreover, rights granted by the TCA are enforceable under the Civil Rights Act, and injunctive

relief is available to remedy a violation of the Civil Rights Act, *see, e.g., Luckey v. Harris*, 860

F.2d 1012 (11th Cir. 1988).

Plaintiffs contend that only injunctive relief will remedy effectively defendants' violation

of the TCA. The court agrees. Remanding this matter to the BZA for further proceedings would

frustrate the TCA's goal of providing plaintiffs full relief on an expedited basis. *See Town of*

*Oyster Bay*, 166 F.3d at 497; *City of Chamblee*, 10 F. Supp. 2d at 1334 (finding that remand

"'would be a waste of time and would frustrate the [TCA's] direction to expedite these

proceedings'" (quoting *County of Peoria*, 963 F. Supp. at 747)); *Coweta County*, 50 F. Supp. 2d

at 1350-51 (declining to remand for further consideration where local government controlled the

timing and procedure for considering the application and "had ample opportunity to hire experts

or to conduct other types of investigation regarding the propriety of the [proposed facility] prior

to voting on the application").

## III.   CONCLUSION

**A.      Defendants' Motions To Dismiss**

American Tower had standing to appeal to the BZA as a matter of Alabama law, and plaintiffs have standing to pursue their TCA claims before this court as "person[s] adversely affected" by the BZA's decision.  Plaintiff's claims also satisfy the standing limitations imposed by Article III of the United States Constitution.  Therefore, defendants' 12(b)(1) Motion to Dismiss is due to be denied.  Plaintiffs are entitled to relief under the Civil Rights Act for violations of the TCA; in this respect, Defendants' 12(b)(6) Motion to Dismiss is due to be denied.  In all other respects, defendants' 12(b)(6) Motion to Dismiss is moot.

**B.      Cross Motions for Partial Summary Judgment**

The parties agree that the BZA produced a decision in writing.  The BZA's decision to deny plaintiffs' Application, however, is not supported by substantial evidence in the Record.  Therefore, American Tower and BGR have standing to pursue claims under subsection (i) of the TCA.  Further, plaintiffs are entitled to have those claims reviewed de novo by the court and to conduct discovery on those claims.  Thus, plaintiffs' Motion for Partial Summary Judgment is due to be granted, and defendants' Motion for Partial Summary Judgment is due to be  denied.

The court is of the opinion that only injunctive relief will effectively remedy the BZA's violation of the TCA.  Accordingly, defendants must grant plaintiffs' Application and issue to plaintiffs the special exception and variance requested in the Application and in BZA Case No. 5918.

DONE this *29th* day of September, 2000.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Court