# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

01 JUN 12 AM 8: 40

.  .  . COURT
. OF ALABAMA

AMERICAN TOWER, L.P., a Delaware )
limited partnership, TRITEL )
COMMUNICATIONS, INC., a Delaware )
corporation, and BGR PROPERTIES, )
L.L.C., an Alabama limited )
liability company, )
　)
        Plaintiffs, )
　)      **CASE NO. CV-99-B-2933-NE**
    v. )
　)
CITY OF HUNTSVILLE, ALABAMA, )
DAVID WILLIAMS, BOB GAMMONS, )
JANET WATSON, CRAWFORD HOWARD )
and PHIL LOFTIS, in their )
capacities as Members of the )
Board of Zoning Adjustment of )
the City of Huntsville, )
　)
        Defendants. )

JUN 1 2 2001

## MEMORANDUM OPINION

Currently before the Court is Defendants' Motion To Alter or Amend Judgment (the "Motion"). Defendants ask the court to vacate its Order and Memorandum Opinion entered on October 2, 2000, granting relief to plaintiffs under the "substantial evidence" provision of Section 704 of the Federal Telecommunications Act of 1996 (the "TCA"), codified at 47 U.S.C. § 332(c)(7)(B)(iii). Upon consideration of the record, the submissions of the parties, the arguments of counsel, and and the relevant law, the court is of the opinion that defendants' Motion is due to be denied.

47

## I.  PROCEDURAL HISTORY

Over a year ago, the Board of Zoning Adjustment (the "BZA") of the City of Huntsville denied plaintiffs' application for a special exception and variance requesting authorization to locate a wireless telecommunications facility in Huntsville.  Plaintiffs then filed this action seeking relief under, *inter alia*, the TCA, in which Congress expressed its intention that injured parties obtain relief "on an expedited basis."  47 U.S.C. § 332(c)(7)(B)(v).  During the ensuing litigation, defendants disputed plaintiffs' claims under subsection (iii)[1] of the TCA, both in response to plaintiffs' Motion for Partial Summary Judgment and in support of their own Motion for Partial Summary Judgment.

After considering six briefs, oral arguments, and proposed orders submitted by the parties, the court found that defendants violated the TCA and that plaintiffs were entitled to injunctive relief.  (Order entered Oct. 2, 2000; Memorandum Opinion ("Mem. Op.") entered Oct. 2, 2000.)  Defendants now ask the court, pursuant to Federal Rule of Civil Procedure 59(e), to vacate its October 2, 2000, Order on the heretofore unasserted ground that subsection (iii) of the TCA violates the Tenth Amendment to the United States Constitution.

## II.  FACTUAL SUMMARY

The facts relevant to defendants' Motion are largely procedural.  The court entered a Scheduling Order on March 22, 2000, allowing the parties to file potentially dispositive motions before the commencement of discovery and establishing a schedule for the parties to submit briefs and oral arguments to the court in support of such motions.  (Scheduling Order entered Mar. 22, 2000.)  Pursuant to the Scheduling Order, the parties filed cross motions for partial

---

[1]	For simplicity of reference, the court will refer only to the numbered subsections of 47 U.S.C. § 332(c)(7)(B).  For instance, "subsection (iii)" refers to 47 U.S.C. § 332(c)(7)(B)(iii).

summary judgment on March 24, 2000, seeking judgment on plaintiffs' claims under subsection (iii) of the TCA.

Plaintiffs submitted their Brief in Support of Plaintiffs' Motion for Partial Summary Judgment on March 24, 2000, ("Pls.' Br. in Support"), in which they cited *Petersburg Cellular Partnership v. Board of Supervisors of Nottoway County*, 205 F.3d 688 (4th Cir. 2000)  (Pls.' Br. in Supp. at 13, 15, 25-26.)  In *Nottoway County*, two of the three judges on a panel of the United States Court of Appeals for the Fourth Circuit found that the local government's zoning decision was not supported by substantial evidence contained in a written record, as required by subsection (iii) of the TCA. *Nottoway County*, 205 F.3d at 691, 692-696, 710. Nevertheless, the panel reversed the district court's grant of *mandamus* relief to the wireless service provider because Judge Niemeyer, who found that the local government's decision violated subsection (iii) of the TCA, also found that subsection (iii) of the TCA violates the Tenth Amendment to the United States Constitution. *Id.* at 691-92, 696-706.

In Plaintiffs' Brief in Support, plaintiffs expressly stated the basis for Judge Niemeyer's decision: "Judge Niemeyer decided to reverse the district court on the grounds that Congress's imposition of the TCA's substantial evidence test on local governmental decisions violates the Tenth Amendment to the United States Constitution." (Pls.' Br. in Supp. at 25-26 n.11.)  In defendants' Brief in Support of Motion for Partial Summary Judgment, also submitted on March 24, 2000, ("Defs.' Br. in Support"), defendants neither challenged the constitutionality of the TCA nor cited the *Nottoway County* case.

On April 13, 2000, plaintiffs submitted Plaintiffs' Brief in Opposition to Defendants' Motion for Partial Summary Judgment ("Pls.' Br. in Opposition"), and on April 21, 2000, and defendants submitted Defendants' Brief in Opposition to Plaintiffs' Motion for Partial Summary

3

Judgment ("Defs.' Br. in Opposition").  At the time these briefs were filed, the *Nottoway County* decision was over one month old.  Plaintiffs had previously provided defendants with Plaintiffs' Brief in Support, containing the published citation of the *Nottoway County* decision and a summary of Judge Niemeyer's constitutional misgivings.  (*See* Pls.' Br. in Supp. at 25-26 n.11.) Nevertheless, defendants neither challenged the constitutionality of the TCA nor cited the *Nottoway County* case in their Brief in Opposition.  Plaintiffs also cited the *Nottoway County* decision in Plaintiffs' Brief in Opposition to Defendants' Motion for Partial Summary Judgment. (Pls.' Br. in Opposition at 11 and n.5.)

Defendants submitted their Reply Brief in Support of Defendants' Motion for Partial Summary Judgment ("Defs.' Reply Br.") on May 5, 2000, almost two months after the Fourth Circuit issued the *Nottoway County* decision and almost one and one-half months after plaintiffs provided defendants with the published *Nottoway County* citation and the substance of Judge Niemeyer's constitutional concerns.  In Defendants' Reply Brief, their third brief to the court addressing subsection (iii) of the TCA, defendants neither mentioned the *Nottoway County* decision nor questioned the constitutionality of any portion of the TCA.  Defendants also participated in oral arguments before the court on July 17, 2000, without mentioning the *Nottoway County* decision or questioning the constitutionality of the TCA.

The court informed the parties during a telephone conference on July 20, 2000, that it would grant plaintiffs' Motion for Partial Summary Judgment, deny defendants' Motion for Partial Summary Judgment, and grant the injunctive relief requested by plaintiffs.  The court also instructed plaintiffs to prepare a proposed memorandum opinion and order for the court's consideration.  Plaintiffs submitted a proposed memorandum opinion and order to the court and defendants on July 28, 2000.  Defendants then requested that the court's memorandum opinion

and order resolving the cross Motions for Partial Summary Judgment also memorialize the court's denial of defendants' Motions to Dismiss.[2] After conferring with the court, plaintiffs revised the proposed memorandum opinion and order accordingly and again presented it to defendants. Defendants again requested changes to the proposed memorandum opinion and order. After incorporating many of defendants' requested revisions, plaintiffs submitted the revised proposed memorandum opinion and order to the court on September 22, 2000. While the revised proposed memorandum opinion and order was under submission to the court, defendants notified plaintiffs that a decision of the United States Court of Appeals for the Eleventh Circuit that was cited in the revised proposed memorandum opinion had been vacated. Plaintiffs notified the court of this development by letter dated September 27, 2000, and the court revised the proposed memorandum opinion accordingly. (Mem. Op. at 15-16.) Despite defendants' continued involvement in the preparation and submission of a proposed memorandum opinion and order to the court, at no time during the two and one-half months between the court's July 20, 2000, telephone conference and the entry of the Memorandum Opinion and Order on October 2, 2000, did defendants raise their constitutional concerns to the court or to plaintiffs.

As noted above, on October 2, 2000, the court entered an Order, *inter alia*, granting plaintiffs' Motion for Partial Summary Judgment, denying defendants' Motion for Partial Summary Judgment and granting plaintiffs' request for injunctive relief to remedy defendants'

---

[2] On December 14, 1999, pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants filed a Motion to Dismiss. On January 19, 2000, pursuant to Federal Rule of Civil Procedure 12(b)(1), defendants filed another Motion to Dismiss. The court conducted a conference call on February 15, 2000, at which time the court informed the parties that it intended to deny both of these Motions as they pertained to plaintiffs' TCA claims and other claims based on lack of standing. During the conference call, the court also stated that it would postpone ruling on these Motions as they pertained to plaintiffs' § 1983 claims on the alleged TCA violations, pending a ruling by the Eleventh Circuit in the appeal of *AT & T Wireless v. City of Atlanta,* 50 F. Supp. 2d 1352 (N.D. Ga. 1999).

violation of subsection (iii) of the TCA.  (Order entered Oct. 2, 2000.)  Also on October 2, 2000, the court entered a Memorandum Opinion finding that the BZA's denial of plaintiffs' application was not supported by substantial evidence contained in a written record and, therefore, violated subsection (iii) of the TCA.  (*See* Mem. Op. at 17-36.)  In the Memorandum Opinion, the court twice cited the *Nottoway County* decision as it related to the application of the substantial evidence standard to the Record, (Mem. Op. at 25, 26), and noted that the court in *Nottoway County* reversed the district court's grant of *mandamus* relief despite the findings by two of the three judges on the panel that the local government's decision was not supported by substantial evidence, (Mem. Op. at 25 n.11).

Defendants now ask the court to vacate its October 2, 2000, Memorandum Opinion and Order on the grounds that subsection (iii) of the TCA violates the Tenth Amendment to the United States Constitution.  In Defendants' Brief in Support of Motion to Alter or Amend Judgment ("Defs.' Br."), as well as at oral argument, defendants conceded that they were aware of the *Nottoway County* decision and Judge Niemeyer's constitutional concerns prior to the entry of the October 2, 2000, Memorandum Opinion and Order.  (*See* Defs.' Br. at 3.)  However, because the court "would not have needed to reach the Tenth Amendment issue had it ruled in favor of defendants at the summary judgment level, defendants elected not to burden the Court with this additional issue during the pendency of the summary judgment motions."  (*Id.*)

### III.  DISCUSSION

**A.      Defendants' Rule 59(e) Motion**

The court is of the opinion that defendants have not asserted proper grounds to support their Rule 59(e) Motion, and legitimate concerns of finality weigh against the consideration of defendants' untimely legal argument.

1.     *Grounds for Defendants' Rule 59(e) Motion*

Rule 59(e) does not set forth the grounds that will support a motion to alter or amend a

judgment. *See* Fed. R. Civ. P. 59(e).  Among the limited grounds that courts have recognized as

proper support for a Rule 59(e) motion are (i) an intervening change in controlling law and

(ii) the need to correct clear error or prevent manifest injustice.  *See, e.g., Sussman v. Salem,*

*Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D. Fla. 1994); 11 CHARLES ALAN WRIGHT,

ARTHUR K. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (Civil 2d

1995).  "'The function of a motion to alter or amend a judgment is not to serve as a vehicle to . . .

present the case under a new legal theory . . . [or] to give the moving party another "bite at the

apple" by permitting the arguing of issues and procedures that could and should have been raised

prior to judgment.'"  *Mincey v. Head,* 206 F.3d 1106, 1137 n.69 (11th Cir. 2000) (quoting *In re*

*Halko,* 203 B.R. 668, 671-72 (Bankr. N.D. Ill. 1996)); *see also In re Kellogg,* 197 F.3d 1116,

1119-20 (11th Cir. 1999) (affirming bankruptcy court's denial of motion brought pursuant to

Federal Rule of Bankruptcy Procedure 9023 (incorporating by reference Rule 59) and finding

that a party may not use such a motion "to raise arguments available but not advanced at the

hearing"); *Stone v. Wall,* 135 F.3d 1438, 1442 (11th Cir. 1998) ("The purpose of a Rule 59(e)

motion is not to raise an argument that was previously available, but not pressed."); *Federal*

*Deposit Ins. Corp. v. World University, Inc.,* 978 F.2d 10, 16 (1st Cir. 1992) (finding that Rule

59(e) motions should be "aimed at reconsideration, not initial consideration," and "may not be

used to argue a new legal theory") (internal quotations and citations omitted); *In re McDaniel,*

217 B.R. 348, 351 (Bankr. N.D. Ga. 1998) ("The Court's decisions are not intended as mere first

drafts, subject to revision and reconsideration at a litigant's pleasure. . . . Nor should Rule 59(e)

be viewed as a means for overcoming one's failure to litigate matters fully.") (quotations and

citations omitted); *All West Pet Supply Co. v. Hill's Pet Prods. Div.,* 847 F. Supp. 858, 860 (D. Kan. 1994) ("'[A] party's failure to present his strongest case in the first instance does not entitle him to a second chance in the form of a motion to amend.'" (citations omitted)); 11 CHARLES ALAN WRIGHT, ARTHUR K. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (Civil 2d 1995) ("The Rule 59(e) motion may not be used to relitigate old matters, or to raise arguments . . . that could have been raised prior to the entry of judgment.").

The use of a Rule 59(e) motion to present a new legal argument is particularly inappropriate where the failure to present the issue before the entry of judgment results from a calculated, strategic decision on the part of the moving party. In *Sussman,* for instance, the defendants "adopted a wait-and-see attitude," waiting for the court to "educate[] [them] on its point of view" and then seeking to relitigate the issue at bar. *Sussman,* 153 F.R.D. at 695. The court concluded that "'a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.'" *Id.* (citations omitted); *cf. Lockard v. Equifax, Inc.,* 163 F.3d 1259, 1267 (11th Cir. 1998) (finding that a district court's discretion to deny a motion to alter or amend judgment is "'especially soundly exercised'" when the moving party offers no reason for its failure to raise the issue earlier in the litigation (quoting *O'Neal v. Kennamer,* 958 F.2d 1044, 1047 (11th Cir. 1992))).

In the instant case, defendants do not cite any intervening change in controlling law or manifest error of law to support their Motion. Instead, defendants argue that the court should consider their untimely legal argument because subsection (iii) of the TCA "has been found by a federal appellate court judge to be unconstitutional . . . ." (Defs.' Br. at 3.)[3] To support their

---

[3]     Defendants also argue that the court's order, "if carried out, will definitely have a significant and long-term impact on an area of Huntsville." (Defs.' Br. at 3.) According to defendants, this constitutes a "compelling reason[]" for the court to consider defendants'

argument, defendants cite *Lussier v. Dugger,* 904 F.2d 661 (11th Cir. 1990), and *Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527 (11th Cir. 1990), *cert. denied,* 498 U.S. 943 (1990). (*See id.*) Neither case supports defendants' Motion.[4]

---

untimely legal argument. (*Id.*) Any judgment will impact the non-prevailing party. This truism hardly constitutes grounds to support a Rule 59(e) motion. Moreover, the relief granted by the court on October 2, 2000, is precisely the relief requested by plaintiffs in their pleadings and Motion for Partial Summary Judgment. Thus, defendants were aware of the alleged impact of such relief long before the court entered its October 2, 2000, Memorandum Opinion and Order. If this alleged impact is a "compelling" reason for anything, it is a compelling reason for defendants to have presented their constitutional argument to the court earlier in this litigation.

[4]     In addition to the *Lussier* and *Sherman* cases, defendants appear to rely on the alleged gravity of their new legal argument to support their Motion. (Defs.' Br. at 3 (arguing that, because Judge Niemeyer recently has concluded that subsection (iii) of the TCA is unconstitutional, "it is even more appropriate now than before for the Court to examine the constitutionality of [subsection (iii) of the TCA], despite the fact that this issue is being raised for the first time in rule 59(e) motion"and arguing that "important issues of federalism [are] at stake" in defendants' Motion).) Chief Judge Posner, writing for a unanimous panel of the United States Court of Appeals for the Seventh Circuit, disagreed with a similar argument in *In re Reese,* 91 F.3d 37, 39 (7th Cir. 1996). In *Reese,* the debtor failed to renew her constitutional argument on remand to the bankruptcy court until that court had granted summary judgment to the creditor. *Id.* The debtor then filed a motion under Rule 59(e) seeking to vacate the summary judgment on the ground that it was based on an unconstitutional statute. *Id.* On appeal, Judge Posner offered the following analysis:

> So it is as if [the debtor] had first raised her constitutional challenge on appeal to the district court, and the [creditors] argue that this is too late, that she has waived it. Since she raises a pure issue of law, on which factual development in the bankruptcy court would cast no light, the waiver could be forgiven. . . . [W]e might hesitate to exercise lenity if the result would be to declare an act of Congress unconstitutional; it is right to make litigants turn square corners when they ask courts to confront another branch of government in so fell and portentous a fashion.

*Id.* (internal citations omitted). In the present case, defendants ask the court to declare an act of the United States Congress having a significant impact on the national wireless telecommunications industry to be unconstitutional -- a declaration that, at this time, no other court has made and only one member of the federal judiciary has advocated. The extraordinary relief that defendants now request justifies a rigorous application of both the Federal Rules of Civil Procedure and the court's Scheduling Order establishing deadlines for presenting briefs and arguments in connection with the parties' cross Motions for Summary Judgment.

In *Lussier,* the plaintiff asserted a claim under the federal Rehabilitation Act. *Lussier,* 904 F.2d at 663.  The district court granted judgment in favor of the defendants because it found that they were not subject to the Rehabilitation Act's requirements.  *Id.* at 664.  The plaintiff then moved for reconsideration on the grounds that the Civil Rights Restoration Act, enacted approximately six months earlier, expanded the scope of the Rehabilitation Act, subjecting the defendants to its requirements.  *Id.*  The district court denied the plaintiff's motion for reconsideration and stated:

> The policy of finality must be respected, where, as here, plaintiff had every opportunity to present the applicability [of] the amendment to this case but did not [do] so.  Plaintiff had his bite at the apple, he may not have another.

*Id.* at 667 (quoting the district court's Memorandum and Order of March 28, 1989).  The United States Court of Appeals for the Eleventh Circuit concluded that the district court should have considered the statutory amendment's impact on the plaintiff's claim:

> In this case, the district court's refusal to alter an order, entered ten days before [the plaintiff] sought reconsideration with regard to it, occurred six months after the passage of the 1988 legislation, which was an important chapter in the development of American statutory civil rights law.  Its enactment was a highly publicized event.  In that context, the district court deemed [the plaintiff's] failure to discuss the amendment in his response to defendants' . . . motion for summary judgment to be inexcusable.  That is an understandable position.  But it is equally difficult to understand why defendants similarly failed to alert the court to the new law.  Accordingly, in our view, the district court's refusal to correct a ten-day-old order, when that order reached a result contrary to the clear intent of Congress, constitutes an abuse of discretion.

*Id.* at 667-68.

Defendants' reliance on *Lussier* is misplaced.  In the instant case, defendants urge the court to vacate its October 2, 2000, Memorandum Opinion and Order because they are inconsistent with the views of one federal judge.  Unlike the statutory amendment in the *Lussier* case, Judge Niemeyer's view of the TCA's constitutionality is not binding on this court.  At

most, Judge Niemeyer's view constitutes a legal argument that defendants should have raised in connection with the parties' cross Motions for Partial Summary Judgment.[5] Moreover, unlike the defendants in the *Lussier* case, plaintiffs brought Judge Niemeyer's constitutional concerns to defendants' attention in their brief filed on March 24, 2000. Finally, there is no suggestion in *Lussier* that the plaintiff was aware of the statutory amendment before the entry of judgment. By contrast, defendants admit that they were aware of Judge Niemeyer's constitutional concerns and analysis before the court entered its October 2, 2000, Memorandum Opinion and Order. Rather than "burden the Court with this additional issue," however, defendants strategically opted to await the entry of judgment and to present their constitutional argument in this Motion

Defendants also mistakenly rely on *Sherman* to support their Motion. In *Sherman,* the plaintiff brought claims pursuant to, *inter alia,* 42 U.S.C. § 1981. *Sherman,* 891 F.2d at 1529. The defendants appealed the district court's judgment in favor of the plaintiff, raising issues that are not relevant to defendants' Motion in the instant case. *Id.* at 1531. On appeal, the United States Court of Appeals for the Eleventh Circuit considered *sua sponte* the applicability of a decision of the United States Supreme Court that was handed down after oral argument. *Id.* The court found that the Supreme Court's decision significantly narrowed the scope of 42 U.S.C. § 1981 and, consequently, that the plaintiff had no cause of action. *Id.* at 1534-35.

---

[5] The court notes that on March 15, 2000, approximately one week after Judge Niemeyer wrote the decision in *Nottoway County,* Judge Neimeyer authored the decision in *360 Degrees Communications Co. of Charlottesville v. Board of Supervisors of Albermarle,* 211 F.3d 79 (4th Cir. 2000), holding that the denial of the zoning permit was supported by substantial evidence and that the denial did not have the effect of prohibiting the provision of personal wireless services. Judge Neimeyer noted that "in . . . *Nottoway County,* we held that a county board decision, which was based upon 'the irrational concerns of a few constituents,' was not supported by 'substantial evidence.'" *Id.* at 84. However, Judge Neimeyer did not even mention the part of the decision in *Nottoway County* relating to the Tenth Amendment.

The Eleventh Circuit has overruled its *Sherman* decision on a point closely related to the point on which defendants rely. In *Kimbrough v. Bowman Transportation, Inc.,* 920 F.2d 1578 (11th Cir. 1991), the court found that its decision in *McGinnis v. Ingram Equipment Co.,* 918 F.2d 1491 (11th Cir. 1990) *(en banc),* overruled the *Sherman* decision to the extent that the *Sherman* decision stands for the proposition that a defendant may not waive the scope of a defense under 42 U.S.C. § 1981:

> In *Sherman,* . . . . [t]he defendant had not raised the scope of section 1981 as a defense either in the district court, in the briefs on appeal, or during oral argument. Nevertheless, the court held that the district court had committed plain error in granting plaintiff relief under section 1981 . . . . [I]nsofar as *Sherman* can be read as limiting whether defendant may waive the scope of section 1981 as a defense, we conclude that it has been overruled by *McGinnis.*

*Kimbrough,* 920 F.2d at 1582.

Even if the *Sherman* decision is valid precedent for the proposition for which defendants cite it, it is inapplicable to the instant case. The *Sherman* case involved the court's consideration of a legal issue *sua sponte;* it does not purport to address the broad discretion that district courts enjoy in considering Rule 59(e) motions. Moreover, the *Sherman* court was concerned with the applicability of a binding United States Supreme Court decision. In contrast, as discussed previously, Judge Niemeyer's views concerning the constitutionality of the TCA are not binding on this court. Finally, the United States Supreme Court decision considered by the *Sherman* court was handed down after the district court entered its judgment and after the parties briefed and argued their cases on appeal. In the instant case, plaintiffs informed defendants and the court of Judge Niemeyer's constitutional concerns more than six months before the entry of the court's October 2, 2000, Memorandum Opinion and Order. Defendants admit that they were aware of the *Nottoway County* decision before the court entered judgment but consciously

decided not to present the constitutional argument to the court until now.  For these reasons, the *Sherman* case does not support defendants' position.

Defendants urge the court to vacate its Memorandum Opinion and Order because it is inconsistent with the view of one judge sitting on the United States Court of Appeals for the Fourth Circuit -- a view that was published before plaintiffs and defendants filed their cross Motions for Partial Summary Judgment and that was called to defendants' attention in plaintiffs' briefs long before the court entered judgment.  Defendants could and should have raised this constitutional argument before the court entered summary judgment.  As the Eleventh Circuit has noted:

> There is a significant difference between pointing out errors in a court's decision on grounds that have already been urged before the court and raising altogether new arguments on a motion to amend; if accepted, the latter essentially affords a litigant "two bites at the apple."

*American Home Assurance,* 763 F.2d at 1239.

Defendants' position is compromised further by the fact that the failure to present their legal argument to the court before the entry of summary judgment resulted from a calculated, strategic decision concerning the most effective means of defending against plaintiffs' TCA claims.  Like the moving party in *Sussman,* defendants adopted a "wait-and-see" attitude, opting to withhold their constitutional argument until learning the court's conclusion on plaintiffs' claims under subsection (iii) of the TCA:

> Because cross motions for partial summary judgment had already been filed and were actually under submission before defendants learned of Judge Niemeyer's opinion, *and because the Court would not have needed to reach the Tenth Amendment issue had it ruled in favor of defendants at the summary judgment level*, defendants elected not to burden the Court with this additional issue during the pendency of the summary judgment motions.

(Defs.' Br. at 3) (emphasis added.)[6]  Under the court's March 22, 2000, Scheduling Order,

defendants had four opportunities (three written briefs and oral argument) to present their

strongest arguments against plaintiffs' TCA claims.  The court will not grant a fifth.

###### 2.      Concerns of Finality and Law of the Case Principles

Concerns of finality and "law of the case" principles also weigh against the consideration

of defendants' untimely legal argument.  "After a judgment has been entered, the interest in

finality may be deemed 'compelling.'"  *Sussman,* 153 F.R.D. at 695 (citations omitted).  "There

is a badge of dependability necessary to advance the case to the next stage."  *Id.* at 694  "Law of

the case" principles are related closely to -- and serve to further -- interests in finality.  "Law of

the case principles . . . rest[] on good sense and the desire to protect both court and parties

against the burdens of repeated reargument by indefatigable diehards."  18 CHARLES ALAN

WRIGHT, ARTHUR K. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 4478

(Civil 2d 1995).

Congress directs courts to consider TCA cases on an expedited basis.  47 U.S.C. §

332(c)(7)(B)(v).  In light of this direction, plaintiffs' interest in the finality of the court's October

2, 2000, Memorandum Opinion and Order and the advancement of this action to the next stage is

particularly compelling.  No less compelling is the court's interest in the final resolution of the

issues raised in the parties' cross Motions for Partial Summary Judgment.  As the court in

---

[6]      Defendants allege that they decided to withhold their constitutional argument so as not to
burden the court with an additional issue.  (*See* Defs.' Br. at 3.)  This motive seems implausible.
The burden of addressing defendants' legal argument in connection with the parties' cross
Motions for Partial Summary Judgment is obviously preferable to the burden of considering an
additional Rule 59(e) Motion.  Delay in the final resolution of plaintiffs' TCA claims -- and not
the conservation of judicial resources -- has been the result of the defendants' untimely assertion
of their constitutional argument.

*Sussman* stated, a "busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." *Sussman,* 153 F.R.D. at 695 (quotation marks omitted).

Defendants cannot support their Rule 59(e) Motion with appropriate grounds. Moreover, the interest served by the finality of the court's October 2, 2000, Memorandum Opinion and Order outweighs defendants' interest in further delaying the resolution of this case. Therefore, regardless of the merits of defendants' untimely legal argument, defendants' Motion is due to be denied.

**B.   Defendants' Constitutional Challenge to Subsection (iii) of the TCA**

Even if defendants could support their Motion with proper procedural grounds, the Motion would fail on the merits. As noted above, defendants contend that subsection (iii) of the TCA violates the Tenth Amendment to the United States Constitution and ask the court to vacate its October 2, 2000, Memorandum Opinion and Order.[7]  Defendants rely almost exclusively on Judge Niemeyer's opinion in *Nottoway County* to support their position. Judge King most effectively rebuts Judge Niemeyer's arguments in his dissenting opinion in *Nottoway County*.

---

[7]     Defendants also attack subsection (ii) of the TCA (requiring local governments to act upon permit requests within a reasonable period of time) as mandating the issuance of zoning permits in circumstances in which they otherwise would be denied. (Defs.' Br. at 4-5.) However, defendants appear to challenge the constitutionality only of subsection (iii) of the TCA. (Defendants' Motion to Alter or Amend Judgment ("Defs.' Mot.") at 1, 2; *see also* Defs.' Br. at 3, 4 & n.2, 11.) In any event, the October 2, 2000, Memorandum Opinion and Order challenged by defendants does not address or rely on subsection (ii) of the TCA; therefore, any argument respecting the constitutionality of subsection (ii) would be immaterial to defendants' Motion.

*See Nottoway County*, 205 F.3d at 710-20 (King, J., dissenting).[8]  Judge King identified the irony

of defendants' position:

> In the name of federalism, [defendants] would force Congress to deprive states of
> the substantial zoning authority that [the TCA] leaves in their hands, instead
> concentrating all zoning authority over the siting of telecommunications towers in
> the nation's capital.  And to promote political accountability, [defendants] would
> have [this court] strike down a statute passed by a popularly elected Congress
> regarding a subject squarely within the scope of the Commerce Clause.

*Id.* at 711 (King, J., dissenting).  The court agrees with the analysis and conclusion of Judge

King's dissent in *Nottoway County*, as well as with the analysis applied by many courts

concluding that other provisions of the TCA do not violate the Tenth Amendment.  *See, eg.,*

*Patterson v. Omnipoint Communications, Inc.,* 122 F. Supp. 2d 222 (D. Mass. 2000); *AT & T*

*Communications of Michigan, Inc. v. Michigan Bell Telephone Co.,* 60 F. Supp. 2d 636 (E.D.

Mich. 1998); *MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.,* 9 F. Supp.

2d 766 (E.D. Ky. 1998); *US West Communications, Inc. v. MFS Intelnet, Inc.,* 35 F. Supp. 2d

1221 (D. Or. 1998); *AT & T Communications of the Southern States, Inc. v. BellSouth*

*Telecommunications, Inc.,* 1997 WL 1133454 (D. S.C. Dec. 11, 1997); *AT & T Communications*

*of the Southern States, Inc. v. BellSouth Telecommunications, Inc.,* 1997 WL 1133449 (E.D.

N.C. Nov. 20, 1997).

    *1.*    *The Tenth Amendment*

        The Tenth Amendment to the United States Constitution provides that "[t]he powers not

delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved

---

[8] Judge King dissented in *Nottoway County* because he would not have reversed the district
court's grant of injunctive relief to the wireless service provider.  *Nottoway County,* 205 F.3d at
711, 720.  Judges King and Niemeyer disagreed on the constitutionality of the TCA, while Judge
Widener did not find it necessary to reach the constitutional issue.  *Id.* at 691-92, 706-20.

to the States respectively, or to the people." U.S. CONST. amend. X. Thus, the Tenth Amendment reserves to the states the powers not delegated to the federal government by the Constitution. The Supreme Court has interpreted the Tenth Amendment to mean that "the States unquestionably do retain a significant measure of sovereign authority . . . [but] only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 549 (1985) (citation and internal quotations omitted). In upholding the Tenth Amendment, the Supreme Court has clearly stated that Congress may not pass legislation which requires a state to regulate or enforce a federal statute. *See Printz v. United States*, 521 U.S. 898, 926, 932-33 (1997); *New York v. United States*, 505 U.S. 144, 161, 175-77 (1992). However, the Supreme Court has also clearly stated that Congress may properly enact legislation which requires the state to either regulate in a certain area or opt out and allow the federal government to preempt that area. *See, e.g., New York,* 505 U.S. at 167; *FERC v. Mississippi,* 456 U.S. 742, 763-64 (1982); *Hodel v. Virginia Surface Mining and Reclamation Association, Inc.,* 452 U.S. 264, 288-91 (1981).

      2.    *Interaction Between the Tenth Amendment and the Commerce Clause*

      The Commerce Clause of the United States Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. Under the Commerce Clause, Congress has the authority to regulate "even activity that is purely intrastate in character . . . where the activity, combined with like conduct by others similarly situated, affects commerce among the States." *Hodel,* 452 U.S. at 276 (quoting *Fry v. United States*, 421 U.S. 542, 547 (1975)). Where Congress acts pursuant to its Commerce Clause powers the resulting law becomes "the supreme Law of the Land." U.S. CONST. art. VI, cl. 2 ("This

17

Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . .").

As noted above, the Tenth Amendment prohibits Congress from compelling states to administer or enact federal regulatory programs. *See, e.g., Printz*, 521 U.S. at 933; *New York*, 505 U.S. at 180-83. However, when Congress has the authority to regulate private activity pursuant to the Commerce Clause, the Tenth Amendment does not prohibit it from offering states the choice of either regulating that activity according to the standards it establishes "or having state law pre-empted by federal legislation." *New York*, 505 U.S. at 167. Though Congress may not compel a state to enact any particular legislation, it may induce a state to participate in a regulatory scheme by conditioning the state's receipt of federal funds on taking prescribed action. *Id.* As Judge King noted in his dissent in *Nottoway County*:

> Congress may not force states to choose between two courses of action, neither of which Congress could constitutionally require the state to follow. . . . But where Congress acts in a field in which it could preempt state law entirely, Congress may still require states to choose between regulating in accordance with federal standards or being preempted by otherwise valid federal regulation.

*Nottoway County*, 205 F.3d at 714 (King, J., dissenting) (citing *New York,* 505 U.S. at 174, 176; *Hodel,* 452 U.S. at 288-89; *FERC,* 456 U.S. at 764-65).

The United States Supreme Court has spoken many times regarding the interaction between Congress' power under the Commerce Clause and the Tenth Amendment. Thus, a number of cases provide guidance in the instant case. In *New York*, 505 U.S. 144, the Court considered a challenge to provisions of the federal Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LRWPAA"), which offered states incentives to address waste disposal issues. The Court found two of the provisions constitutional, *id.* at 173-74, but found that the "take title" provision of the LRWPAA, which required states to either regulate in

conformance with federal regulations or to assume title to and liability for radioactive waste

generated within their borders, constituted a forced transfer of ownership and an unlawful

coercion, *id.* at 174-77.  The Supreme Court found that neither option under the "take title"

provision, if enacted alone, would constitute a valid exercise of Congress' authority; therefore,

Congress could not command the states to choose between them.  *Id.* at 175-76.  As to the

provisions the Court found constitutional, the Court concluded that they represented a

"conditional exercise of Congress' commerce power," and did not intrude on the sovereignty

reserved to the states by the Tenth Amendment."  *Id.* at 174.  The Court further stated:

> [W]here Congress has the authority to regulate private activity under the
> Commerce Clause, we have recognized Congress' power to offer States the
> choice of regulating that activity according to federal standards or having state
> law pre-empted by federal regulation. . . . This arrangement, which has been
> termed "a program of cooperative federalism," . . . is replicated in numerous
> federal statutory schemes.
>
> . . . . .
>
> By [the above method], as by any other permissible method of encouraging a
> State to conform to federal policy choices, the residents of the State retain the
> ultimate decision as to whether or not the State will comply. If a State's citizens
> view federal policy as sufficiently contrary to local interests, they may elect to
> decline a federal grant. If state residents would prefer their government to devote
> its attention and resources to problems other than those deemed important by
> Congress, they may choose to have the Federal Government rather than the State
> bear the expense of a federally mandated regulatory program, and they may
> continue to supplement that program to the extent state law is not pre-empted.
> Where Congress encourages state regulation rather than compelling it, state
> governments remain responsive to the local electorate's preferences; state
> officials remain accountable to the people.

*New York*, 505 U.S. at 167-68 (internal citations omitted).

In *Printz*, 521 U.S. 898, the Court struck down a section of the Brady Handgun Violence

Prevention Act requiring local officials to conduct background checks before allowing the

purchase of handguns.  *Printz*, 521 U.S. at 932-33.  The Court stated:

19

> The Federal Government may neither issue directives requiring the States to
> address particular problems, nor command the States' officers, or those of their
> political subdivisions, to administer or enforce a federal regulatory program.

*Id.* at 935.

In *Hodel*, 452 U.S. 264, the Court considered a challenge to legislation that offered states

the opportunity to develop a regulatory program consistent with federal standards, and provided

for federal regulation if a state chose not to participate. *Hodel*, 452 U.S. at 288-93. Though the

Court noted that the legislation prescribed federal minimum standards and limited the states'

legislative choices concerning important issues, the Court concluded that the statute was not

constitutionally infirm. *Id.* at 290. The Court stated:

> Appellees' claims accurately characterize the Act insofar as it prescribes federal
> minimum standards governing surface coal mining, which a State may either
> implement itself or else yield to a federally administered regulatory program. To
> object to this scheme, however, appellees must assume that the Tenth Amendment
> limits congressional power to pre-empt or displace state regulation of private
> activities affecting interstate commerce. This assumption is incorrect. A wealth
> of precedent attests to congressional authority to displace or pre-empt state laws
> regulating private activity affecting interstate commerce when these laws conflict
> with federal law.

*Id.* at 289-90.

In *FERC*, 456 U.S. 742, the Supreme Court reviewed and upheld a provision of the

Public Utilities Regulatory Policies Act of 1978, under which Congress gave states a choice

between considering federal regulatory proposals concerning energy rates or abandoning

regulation of the field altogether. *See id.* at 765-70. The Supreme Court found that this

provision did not violate the Tenth Amendment even though a state which chose to "abandon the

field" would leave an area of great local importance unregulated. *See id.*

Keeping the above principles and precedent in mind, the court now turns to the issue of whether subsection (iii) of the TCA is a valid exercise of Congress' commerce power under the Tenth Amendment.

### 4.   Application of the Tenth Amendment and the Commerce Clause to the TCA

The provision of the TCA that is at issue in this case provides:

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7)(B)(iii). Defendants assert that, in enacting the TCA, Congress did not have the authority to compel the "local zoning authority [to] approve every zoning permit unless its denial can be supported by the federally-imposed 'substantial evidence' standard." (Defs.' Br. at 5.) Defendants further contend that "because the 'substantial evidence' provision commandeers and forces local zoning authorities . . . to regulate according to a federal standard, this provision of the TCA is clearly of the kind that the Tenth Amendment categorically prohibits." (Id. at 11.)

In arguing that the TCA violates the Tenth Amendment, defendants compare subsection (iii) of the TCA to the "take title" provision of the LRWPAA invalidated by the Supreme Court in New York. (Defs.' Br. at 9-11.) The "take title" provision of the LRWPAA, however, "[did] not represent the conditional exercise of any congressional power enumerated in the Constitution." New York, 505 U.S. at 176. The Court noted that "[i]n this provision, Congress has not held out its spending power or its commerce power, but instead, the provision required the states to follow one of two affirmative, federally mandated instructions. Id. In contrast, here, a state may abandon the field as an alternative to reviewing permit applications in accordance with federal standards. As noted above, the Supreme Court has previously upheld

statutory schemes that require states to choose between abandoning a preemptible regulatory field or regulating in accordance with federal instructions. *See New York,* 505 U.S. at 167 ("[W]here Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation.") (citing *Hodel*, 452 U.S. at 288; *FERC*, 456 U.S. at 764-65).[9]

Finally, defendants attempt to distinguish the *FERC* case from this case by observing that the statute at issue in *FERC* contained only the "command" that state utility agencies "consider," but not necessarily adopt, federal standards as a precondition to continued state regulation of an otherwise preemptible field, while the TCA mandates either application of federal standards or the abdication of all zoning authority over communications facilities. (*See* Defs. Br. at 10 & n.6.) However, the court notes that in *FERC,* the Supreme Court cited with approval the decision in *Hodel:*

> [In *Hodel*], the Federal Government could have pre-empted all surface mining regulations; instead, it allowed the States to enter the field if they promulgated regulations consistent with federal standards. In the Court's view, this raised no Tenth Amendment problem.

_____

[9]     Defendants suggest that the choice offered by the TCA is so coercive that it is meaningless. (*See* Defs.' Br. at 10 ("Indeed, it is no choice at all.").) However, as noted above, the Supreme Court has previously upheld such a choice. The Court in *FERC* stated:

> We recognize, of course, that the choice put to the States--that of either abandoning regulation of the field altogether or considering the federal standards--may be a difficult one. And that is particularly true when Congress, as is the case here, has failed to provide an alternative regulatory mechanism to police the area in the event of state default. Yet in other contexts the Court has recognized that valid federal enactments may have an effect on state policy--and may, indeed, be designed to induce state action in areas that otherwise would be beyond Congress' regulatory authority.

*FERC,* 456 U.S. at 766. Thus, the court finds this argument unpersuasive.

*FERC,* 456 U.S. at 764. Therefore, the command that state utility agencies only "consider," rather than adopt, the federal regulations was not the decisive factor in the *FERC* Court's holding.

Under the guidance of the decisions discussed above, the court is of the opinion that the TCA does not violate the Tenth Amendment and is a permissible exercise of Congress' power under the Commerce Clause. Congress enacted the TCA pursuant to its power to regulate interstate commerce, *see* 47 U.S.C. § 151, and made its intent to preempt certain areas of local zoning control clear and manifest in the TCA's specific limitations on state zoning powers, *see* 47 U.S.C. § 332(c)(7)(B). The Supreme Court has held that Congress can preempt state regulation even in the area of land-use planning. *Hodel,* 452 U.S. at 289-92; *see also FERC,* 456 U.S. at 767 n.30. Further, the Supreme Court has held that Congress may completely preempt a field even if that decision would leave the field entirely unregulated. *See FERC,* 456 U.S. at 766. Thus, pursuant to its Commerce Clause authority, Congress may regulate the siting of wireless telecommunications facilities, as it has done by enacting the TCA. *See Nottoway County*, 205 F.3d at 711 (King, J., dissenting) ("the siting of telecommunications towers substantially affects interstate commerce") (citing *United States v. Lopez,* 514 U.S. 549, 558-59 (1995) ("Congress' commerce authority includes the power to regulate . . . those activities that substantially affect interstate commerce.")); *see also id.* at 705 (Niemeyer, J.) (finding that "the power to regulate and promote interstate wireless communications falls well within Congress' commerce power").[10]

---

[10] As Judge King further noted:

> The Act itself unquestionably focuses on issues central to the national economy: "[T]he Act . . . promotes competition and reduces regulation in order to secure lower prices and higher quality services for American telecommunications

Because Congress could completely preempt state regulation in the field of siting wireless telecommunications facilities, Congress can also condition its exercise of that preemptive power on a state's willingness to regulate in accordance with the procedural requirements of subsection (iii) of the TCA.  Thus, Congress may constitutionally offer the states a choice of (1) denying an application to "place, construct, or modify personal wireless service facilities," only where there is a written record containing "substantial evidence" supporting the state's decision; or (2) not regulating the placement, construction, or modification of such facilities at all.  Therefore, the court concludes that 47 U.S.C. § 332(c)(7)(B)(iii) is a constitutional exercise of Congress' power under the Commerce Clause.  The Act allows the State to either participate in the regulation of the telecommunications systems or to be preempted in that field of regulation.  *See MCI Telecommunications,* 9 F. Supp. 2d at 772 ("Because the Act allows the State to either participate in the regulation of the telecommunications systems or to be preempted in that [field] of regulation, the Act is a permissible exercise of Congress' power. Hence, the Act does not violate the Tenth Amendment.").

## IV.  CONCLUSION

After a year of litigation and numerous opportunities to present their arguments on cross Motions for Partial Summary Judgment, defendants now -- after entry of a final order by the

---

consumers and encourage the rapid deployment of new telecommunications technologies."  H.R. Rep. No. 104-204, at 47 (1996), reprinted in 1996 U.S.C.C.A.N. 10.  More specifically, the provisions that eventually became § 704(a) were driven by Congress's desire to address the "inconsistent and, at times, conflicting patchwork of [state and local] requirements" that hindered the development of "[a] high quality national wireless communications network." *Id.* at 94-95, reprinted in 1996 U.S.C.C.A.N. at 61.  There is no doubt that the field addressed by the Act in general, and § 704(a) in particular, is within the scope of the Commerce Clause.

*Nottoway County,* 205 F.3d at 711-12 (King, J., dissenting).

court -- challenge the constitutionality of subsection (iii) of the TCA by a Rule 59(e) Motion. It is too late for defendants to present a new legal argument to the court, particularly a legal argument that defendants were aware of but decided for strategic purposes to withhold. Therefore, defendant's Motion is due to be denied as untimely.

However, even if defendants' Rule 59(e) Motion was supported by proper grounds, defendants' constitutional argument is without merit. The court is of the opinion that Congress acted within its authority under the Commerce Clause of the United States Constitution in enacting subsection (iii) of the TCA. The choice provided to the states by subsection ( ii) -- abide by certain minimal procedural standards in regulating the placement of wireless telecommunications facilities or abandon the field -- constitutes a valid conditional exercise of Congress' Commerce Clause power. Therefore, subsection (iii) of the TCA does not violate the Tenth Amendment to the United States Constitution. The TCA is a permissible exercise of Congress' authority under the Commerce Clause. Therefore, defendants' Motion is due to be denied on the merits. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE**, this _11th_ day of June, 2001.

**SHARON LOVELACE BLACKBURN**
United States District Judge

25