UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN TOWER, L.P.; *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CV 99-B-2933-NE |
| | ) | |
| CITY OF HUNTSVILLE, ALABAMA; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTERED**
OCT - 1 2004

### MEMORANDUM OPINION

This case is presently pending before the court on plaintiffs' Motion for Preliminary Injunction. (Doc. 57.) Plaintiffs ask the court to enjoin defendants from taking any action to remove the telecommunications tower at issue to the disposition of this action. Upon consideration of the record, the submission of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiffs' Motion for Preliminary Injunction, (doc. 57), is due to be granted.[1]

### I. PRELIMINARY INJUNCTION STANDARD

"The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it." *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (citation omitted). "The chief function

---

[1]This Memorandum Opinion supports the court's oral Order granting plaintiffs' Motion for Preliminary Injunction.

1

of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Northeastern Florida Chapter of the Ass'n of General Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir. 1990) (citation omitted). Before a preliminary injunction will issue, the court must find that the movant has established the following four elements:

> (1) a substantial likelihood of success on the merits;
>
> (2) a substantial threat of irreparable injury if the injunction were not granted;
>
> (3) that the threatened injury to the movant outweighs the harm an injunction may cause the nonmovant; and
>
> (4) that granting the injunction would not disserve the public interest.

*Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir. 1992) (citations omitted).

## II. STATEMENT OF FACTS

### A. Tritel's PCS Service

Tritel is a telecommunications service provider offering wireless personal communications services ("PCS") in several southeastern states, including Alabama. (*See* Affidavit of Barry E. Gannon filed Mar. 24, 2000 ("March 24, 2000 Gannon Aff.") at ¶ 3;

First Am. Compl. at ¶ 14[2]; R.[3] at 431, 432.) Tritel holds a broadcast license from the Federal Communications Commission ("FCC") to develop and operate a PCS network in the Huntsville area, (*see* First Am. Compl. at ¶ 15; R. at 431; *see also* R. at 536 (Tr. at 7)). Tritel's PCS network consists of a network of antenna facilities in and around the City that serve portable wireless communications handsets and mobile telephones. (*See* First Am. Compl. at ¶ 16; *see also* R. at 543 (Tr. at 45-46).) Each antenna facility serves an immediately surrounding geographic region, commonly referred to as a "cell." (*See* First Am. Compl. at ¶ 16; R. at 420.) To provide uninterrupted service to PCS customers in a given area, Tritel must provide a continuous, interconnected and overlapping series of antenna facilities providing a continuous signal. (*See* First Am. Compl. at ¶ 17; R. at 420, 423, 432.) Additionally, Tritel must locate each antenna facility within a limited area in the center of each cell (commonly referred to as a "search ring") so that each facility can both produce a PCS signal that reaches all of the surrounding cell and properly interact with surrounding antenna facilities. (*See* First Am. Compl. at ¶ 17; R. at 538 (Tr. at 16-17).)

---

[2]In paragraph 3 of his March 24, 2000, affidavit, Barry E. Gannon ("Gannon") verified the averments in plaintiffs' First Amended Complaint. For the sake of simplicity, citations in this Memorandum Opinion are to the numbered paragraphs of the First Amended Complaint; such citations refer to the specified paragraphs of the First Amended Complaint as verified by Gannon in his Affidavit of March 24, 2000.

[3]Defendants submitted materials, documents and hearing transcripts from the BZA's records (the "Record") to the court on March 24, 2000. The Record includes the evidence before the BZA on October 19, 1999, when it denied plaintiffs' Application. Many citations in this Memorandum Opinion are to the Record, including parallel citations to specific pages of the transcript of the BZA's October 19, 1999, hearing (the "Transcript") where appropriate.

**B.     Selection of the Site**

Tritel's radio frequency ("RF") engineers determined that Tritel must locate an antenna facility in the search ring encompassing Virgil I. Grissom High School and extending east of the intersection of Blevins Gap Road and Bailey Cove Road. (*See* First Am. Compl. at ¶ 20; R. at 423, 424.) Tritel's RF engineers established that the coverage goals of the proposed antenna facility included the provision of Tritel PCS service to nearby roads, homes, and businesses in this vicinity. (*See* First Am. Compl. at ¶ 20; R. at 419, 500.)

After identifying this search ring, Tritel investigated properties in the search ring that would potentially provide a suitable location for Tritel's antenna facility. (*See* First Am. Compl. at ¶ 21; R. at 432-33.) Tritel first investigated the use of any existing towers or other tall structures so as to avoid constructing any new towers, if possible. (*See* R. at 432.) There are no existing towers or tall structures within this search ring or within one and one-half miles of the proposed site. (*See* R. at 419, 428, 432, 498-99, 537 (Tr. at 9), 543 (Tr. at 46-48).) Tritel next sought to identify those tracts having the appropriate size, shape, topography, and development to allow the installation of a telecommunications facility. (*See* First Am. Compl. at ¶ 23; R. at 432-33, 537 (Tr. at 10).) Tritel also analyzed the zoning classifications and conditions of properties in the search ring to determine whether location of a telecommunications facility would be legally permissible. (*See* First Am. Compl. at ¶ 24; R. at 537 (Tr. at 10).) In the applicable search ring, Tritel identified only one available tract large enough and properly developed and zoned to allow the installation of the proposed

telecommunications facility: a 6.33-acre tract of land owned by BGR (the "Property").[4] (*See* First Am. Compl. at ¶ 25; R. at 432-33.) The Property lies east of Bailey Cove Road and Grissom High School and has an address of 1220 Blevins Gap Road, Huntsville, Alabama. (First Am. Compl. at ¶ 26; *see also* R. at 401, 402, 430, 524.) The Property is zoned as a Residence 1-A District ("R-1A") pursuant to the 1989 Zoning Ordinance for the City, as updated to May 1, 1998 (the "Zoning Ordinance"), and portions of the Property are used as soccer fields by Grissom High School and as a Montessori School. (*See* First Am. Compl. at ¶ 26; R. at 402, 420.)

On May 18, 1999, Tritel entered into an Option and Lease Agreement with BGR, thereby securing an option to lease a site (the "Site") consisting of a 10,000 square-foot parcel of the Property. (*See* R. at 438-44.) The Site lies approximately in the center of the Property, and the proposed tower[5] would be approximately 211 feet south of the right of way of Blevins Gap Road. (First Am. Compl. at ¶ 27; *see also* R. at 401, 402, 524.) On June 23, 1999, Tritel assigned its interests in the Option and Lease Agreement with BGR to American Tower. (*See* Affidavit of Barry E. Gannon filed Feb. 10, 2000 ("Feb. 10, 2000 Gannon Aff."), Ex. A.) BGR also executed a Limited Authorization To Act as Applicant, authorizing American Tower to represent BGR before the City for the purpose of obtaining the permits

---

[4]Although the adjacent school property is large enough to accommodate applicable setbacks and other zoning requirements, the Executive Director of Business for the Huntsville City Schools declined plaintiffs' offer to locate the proposed facility on school property. (*See* R. at 502, 527, 545 (Tr. at 59).)

[5]The tower has now been erected.

5

and variances required for the construction and operation of a wireless telecommunications facility at the Site. (*See* R. at 426.) On November 1, 1999, American Tower exercised its option under the Option and Lease Agreement and became the Lessee of the Site. (*See* First Am. Compl. at ¶ 27; Feb. 10, 2000 Gannon Aff. and Exs.)

Plaintiffs submitted evidence to the BZA demonstrating that the Site is the only location in the applicable search ring suitable for Tritel's proposed telecommunications facility, (*see* R. at 423, 433), that the proposed antenna facility at the Site is critical to the overall engineering and technical plan of Tritel's PCS network, (*see* R. at 419, 423, 433, 499-500, 536-40 (Tr. at 7-27), 542 (Tr. at 38-43)), and that without the proposed telecommunications facility at the Site, Tritel would not be able to provide adequate PCS service to this portion of the City, (*see* R. at 423, 433). Plaintiffs submitted evidence demonstrating that the Property is the only available tract located within this search ring that is large enough to accommodate the applicable setbacks and other zoning requirements. (*See* R. at 432-33.) Plaintiffs also noted that the Property is located separate and apart from the residential community, which is located on the opposite side of Blevins Gap Road and further east along Blevins Gap Road. (*See* R. at 401, 402, 524.)

C.     **Plaintiffs' Application**

On August 31, 1999, American Tower, acting on behalf of BGR, filed an Application with the BZA seeking (i) a special exception authorizing the proposed telecommunications facility, and (ii) a variance authorizing American Tower to construct a 180-foot monopole, exceeding the Zoning Ordinance's height limitation by eighty feet. (*See* First Am. Compl.

6

at ¶¶ 35-36; R. at 430.) The Application was scheduled for hearing before the BZA on September 21, 1999, but the BZA voted to delay consideration until October 19, 1999. (*See* First Am. Compl. at ¶ 37; R. at 421.) At the BZA hearing on October 19, 1999, the BZA received the Application and supporting materials, as supplemented and amended through the date of the hearing, and representatives of American Tower and Tritel presented oral testimony and additional documentation and demonstrative evidence supporting the Application. (*See* First Am. Compl. at ¶ 38; R. at 498-504, 534-50 (Tr. at 1-80).) Eleven local residents spoke in opposition to the Application, and one opponent submitted a Memorandum for Record -- a petition -- signed by members of approximately 37 households in the area. (*See* R. at 500-03, 540-48.) At the conclusion of the hearing, the BZA voted to deny the Application. (*See* R. at 532, 548-49 (Tr. at 77-80).)

### D. FEDERAL COURT PROCEEDINGS

On November 3, 1999, American Tower and Tritel filed an Appeal and Complaint Seeking Equitable Relief (the "Original Complaint") challenging the BZA's decision. On February 14, 2000, American Tower, Tritel and BGR filed their First Amended Appeal and Complaint Seeking Equitable Relief (the "First Amended Complaint"). The First Amended Complaint asserts claims against the City and the members of the BZA based on the TCA and Alabama law, as well as certain claims alleging constitutional violation actionable pursuant to 42 U.S.C. § 1983.

On March 24, 2000, plaintiff's filed motion for partial summary judgment on its claim that the BZA's decision was not based on substantial evidence in violation of 47 U.S.C. §

332(c)(7)(B)(iii). On September 29, 2000, this court granted plaintiffs' Motion for Partial Summary Judgment and Ordered defendants to grant American Tower's application for a special exception and a variance; this Order was made final pursuant to Fed. R. Civ. P. 54(b).

After the application was granted, American Tower erected and began operating tower and antenna facilities at the site.

Defendants appealed the court's Order. They also filed a Motion to Suspend or Stay Enforcement of the Injunction pending appeal, which the court denied.

The Eleventh Circuit reversed this court's September 2000 Order, holding that the court erred in finding that defendants' decision was not supported by substantial evidence. *American Tower v. City of Huntsville*, 295 F.3d 1203, 1209 (11th Cir. 2002). The matter was remanded to the court for further proceedings.

After the Eleventh Circuit released its opinion, counsel for defendants faxed counsel for plaintiffs a letter, which stated:

> I suppose by now you have received and reviewed a copy of the 11th Circuit's opinion. The tide appears to have turned, wouldn't you say?
>
> Although a number of significant issues obviously remain outstanding, the most pressing question being posed to me at this time by my client and the adjacent neighbors is: When will the tower come down? Although I do not expect the tower to be removed by your client by the close of business today, I do believe plans should be made for its removal in the immediate future. This contingency should not come as a surprise; the tower was constructed prior to an appellate ruling at your client's risk and peril. Now it must come down. And do not blame us for this dilemma; the City aggressively tried to

delay construction pending the appeal, but your arguments beat ours,[6] and the gamble failed.

(Doc. 61, Ex. 2, ex. A.)

### III. DISCUSSION

#### A. PRELIMINARY INJUNCTION

##### 1. SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs have "focused" their arguments regarding the likelihood of success on the merits of their claims to two of their remaining claims – (1) their state-law *de novo* appeal of the zoning decision, pursuant to Ala. Code § 11-52-81; and (2) their federal-law claim under the TCA regarding alleged prohibition of service.

##### a. Appeal of Zoning Decision

Alabama law provides for the "*de novo* review" of "any final judgment or decision" of the Board of Zoning Adjustment. Ala. Code § 11-51-82. Therefore, this court is empowered to decide anew, and without deference to the findings of the Board of Zoning Adjustment, whether plaintiffs were entitled to a the requested special exception and variance.[7]

---

[6]Actually, defendants' Motion to Stay was not defeated by plaintiffs' arguments; rather, the court held that defendants had failed to make a showing that the final order of the court should be stayed pending appeal.

[7]The court notes that defendants argue that this court is constrained by the holding of the Eleventh Circuit Court of Appeals that the record contains substantial evidence supporting the Board of Zoning Adjustment's decision such that this court must affirm that decision. (Def. Br. in Opp. to Mot. for Prelim. Inj. at 10-11.) However, because the state-law appeal is a *de novo* review, this court does not accord the decision of the Board of Zoning Adjustment deference and may reverse the decision despite the presence of substantial evidence to support it. *See Ex parte Dison*, 469

For the reasons set forth in its Order of September 29, 2000, the court finds that plaintiffs are likely to succeed on the merits of their *de novo* appeal of the Board of Zoning Adjustment's decision to deny them a special exception and a variance.[8] (*See* doc. 33 at 22-36.)

### b. TCA "Prohibit Services" Claim

Plaintiffs contends that the defendants' denial of their application for a special exception and variance had the "effect of prohibiting . . . personal wireless services" in violation of the TCA. 47 U.S.C. § 332(c)(7)(B)(i). Defendants contend that plaintiffs cannot demonstrate that the denial of the application had the effect of prohibiting wireless service.

The legislative history of the TCA describes its purpose as follows:

> to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition . . . .

H.R. Conf. Rep. No. 104-458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124. In furtherance of Congress's goal of increased competition, the TCA "does not eradicate, but certainly limits, a local zoning authority's ability to regulate the placement and construction

---

So.2d 662, 665 (Ala. 1984)("A trial *de novo* means that the slate is wiped clean and a trial in the Circuit Court is had without any consideration being given to prior proceedings." (quoting *Yarbrough v. City of Birmingham*, 353 So.2d 75, 78 (Ala. Crim. App. 1977))), *overruled on other grounds by City of Dothan v. Holloway*, 501 So.2d 1136, 1139 (Ala. 1986).

[8]This decision is not affected by the holding of the Eleventh Circuit, which noted that it determined only "whether substantial evidence exists to support the local board's decision," and it did not decide conflicting evidence or "freely re-weigh the evidence." *American Tower*, 295 F.3d at 1209 n.8.

10

of personal wireless service facilities . . . ." *AT&T Wireless PCS, Inc. v. City of Chamblee*, 10 F. Supp. 2d 1326, 1328-29 (N.D. Ga. 1997). In fact, the TCA "subjects the exercise of local zoning authority to six limitations," including:

> First, local regulation may not unreasonably discriminate among providers of functionally equivalent wireless services. Second, local regulation may not prohibit or have the effect of prohibiting the provision of personal wireless services. Third, local regulators must act on placement, construction and modification applications within a reasonable period of time. Fourth, all decisions denying a request to place, construct or modify a personal wireless services facility must be in writing and supported by substantial evidence contained in a written record. Fifth, any person adversely affected by local regulators' final action on a placement, construction, or modification application may seek judicial review in any court of competent jurisdiction. Finally, the statute substantially limits the authority of local officials to regulate personal wireless facilities on the basis of the environmental effects of radio frequency emissions.

*Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus*, 197 F.3d 64, 68 (3d 1999)(internal citations and footnote omitted). Plaintiffs contend that defendants' denial of the application for special exception and variance had "the effect of prohibiting the provision of personal wireless services" in violation of the TCA.

The court notes that the Eleventh Circuit has not addressed the "prohibit services" provision of the TCA. However, other circuits addressing the issue have held that "local zoning policies and decisions have the effect of prohibiting wireless communication services if they result in 'significant gaps' in the availability of wireless services." *Id.* at 70; *see Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999)("[T]he most compelling reading of subsection B(i)(II) is that local governments may not regulate personal wireless service facilities in such a way as to prohibit remote users from reaching such facilities. In

11

other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines."). *But see AT&T Wireless PCS v. City Count of the City of Virginia Beach*, 155 F.3d 423, 428 (4th Cir. 1998)(holding that this section only applies to "blanket prohibitions" and "general bans").

Following the approach of the Second and Third Circuits, the court finds that plaintiff must prove two elements in order to establish a claim under the "prohibit services" clause of the TCA:

> A service provider must first "show that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network." If this burden is met, the provider must still prove that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve."

*Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Board*, 319 F.3d 627, 633 (3d Cir. 2003)(quoting *APT Pittsburgh Ltd. v. Penn Township*, 196 F.3d 469, 480 (3d Cir.1999)).

Plaintiff has presented evidence showing that there is a gap is service and that the tower was the least intrusive manner to resolve such gap. Defendants do not dispute that the tower fills a significant gap in users' access to service. However, they contend that the record of the proceedings before the Board demonstrate alternatives for providing wireless service in the gap areas. (*See* Defs. Br. in Opp. to Mot. for Prelim. Inj. at 18-19.) Plaintiffs argue that this evidence is "nothing more than speculation and conjecture" and that the record of the proceedings before the Board shows "no alternative site is available within the required area for the construction of the Tower." (Pltfs. Reply Br. in Supp. of Mot. for

12

Prelim. Inj. at 13-14 & n.8.) The court has reviewed the record of the proceedings before the Board and finds a "substantial likelihood" that plaintiffs will be able to establish that the present tower position is "the least intrusive on the values that the denial sought to serve."[9]

## 2. SUBSTANTIAL THREAT OF IRREPARABLE INJURY TO MOVANTS

Plaintiff contends that they "fear that the City will attempt to declare the building permits [issued for the construction of the tower] invalid and commence a zoning-enforcement action against Plaintiffs." (Pltfs. Br. in Supp. of Mot. for Prelim. Inj. at 5.) A zoning-enforcement action could result in significant criminal fines. (*Id.*) They also argue that they would suffer irreparable injury due to the resulting poor or non-existent service if the tower is removed. (*Id.* at 6-7.)

Defendants apparently concede that plaintiffs are threatened by irreparable injury if the injunction is not granted. However, they argue that any injury suffered by removal of the tower prior to the completion of this case is the result of "plaintiffs' unilateral conduct during the pendency of this litigation." (Def. Br. in Opp. to Mot. for Prelim. Inj. at 19.)

The court disagrees that plaintiffs' conduct in erecting the tower was purely a unilateral decision to alter the status quo. The defendants' failure to convince the court to stay its decision pending appeal and the court's order directing defendants to issue plaintiffs the appropriate permits to allow the tower to be erected, (*see* doc. 49), certainly contributed to the completion and operation of the tower pending appeal.

---

[9]The court notes that this determination will benefit from the development of the record through discovery.

13

Based on the court's review of the record, and after considering the arguments of counsel, the court finds the evidence is undisputed that plaintiffs will suffer an irreparable injury if the court does not enjoin defendants from seeking the dismantling of the tower prior to the completion of this action.

### 3. THREATENED INJURY TO MOVANT OUTWEIGHS POTENTIAL HARM TO NONMOVANT

Plaintiffs contend that the entry of the requested preliminary injunction would not harm defendants. (Pltfs. Br. in Supp. of Mot. for Prelim. Inj. at 8 (citing doc. 49 at 3).)[10]

---

[10]The court's prior order held:

> First, defendants have failed to demonstrate that they will suffer irreparable injury if the court's Order is not stayed pending appeal. Defendants argue:
>
>> As to the second factor, there can be little doubt that there will be irreparable economic and aesthetic damage to the community if plaintiffs are allowed to construct the subject tower now. Furthermore, the harm is not one that can effectively be ameliorated after-the-fact if defendants ultimately prevail on appeal. Indeed, once the tower is built, even assuming it could later be lawfully de-constructed, the surrounding property owners, schools, and the neighborhood in general will suffer the consequences of the tower for an indefinite period of time.
>
> (Defs.' Br. at 5-6.) However, harm to the community is not the focus of the second factor; rather, the second factor focuses on harm to the *movant*. [note] Defendants have pointed to no irreparable harm from which they might suffer by performing the ministerial acts involved in granting plaintiffs' application for a special exception and variance. Thus, this factor weighs against granting the stay.
>
> Note:   The interests of the community are generally taken into consideration under the fourth factor, whether the requested stay serves the public interest.

Defendants do not contest plaintiffs' assertion that their threatened injuries greatly outweigh any harm the preliminary injunction would cause defendants.

### 4. PUBLIC INTEREST

Plaintiffs contends that the public's interests would not be disserved by the requested preliminary injunction. (Pltfs. Br. in Supp. of Mot. for Prelim. Inj. at 8-11 (citing, *inter alia*, doc. 49 at 5.) This court has previously found that staying the construction and operation of the tower pending appeal did not "best" serve the public interest, noting that "telecommunication consumers are also members of the public." (Doc. 49 at 5.) Defendants argue that the "mere existence" of the tower undermines the public's interest because it violates the applicable zoning ordinances. (Defs. Br. in Opp. to Mot. for Prelim. Inj. at 21-22.) However, they do not address the interests of members of the public that currently are benefitting from the presence of the tower.

Having considered the arguments of counsel and the record, the court finds that the granting of the requested preliminary injunction, which would prevent defendants from taking steps to remove the tower, would not disserve the public's interest.

Based on the foregoing, the court finds that plaintiff's are entitled to an Order enjoining defendants from taking steps to remove the tower and/or to prosecute plaintiffs for violations of the zoning ordinances until the completion of these proceedings.

---

(Doc. 49 at 3 (emphasis in original).)

B. SECURITY

Plaintiffs contend that they should not be required to post an injunction bond; defendants contend that plaintiff should post such a bond sufficient to cover the cost of removing the tower ($34,000) and sufficient to cover fines for violations of the zoning ordinances.

Rule 65(c) provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c). The court notes that it "may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978).

In this case, the court will not require plaintiffs to post a bond.

## IV. CONCLUSION

For the foregoing reasons, the court is of the opinion that plaintiffs' Motion for Preliminary Injunction is due to be granted. An order granting plaintiffs' Motion for Preliminary Injunction and a Preliminary Injunction will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 30th day of September, 2004.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge