FILED

2005 Mar-31  PM 02:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN TOWER, L.P.; TRITEL COMMUNICATIONS, INC.; BGR PROPERTIES, L.L.C., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CV 99-B-2933-NE |
| CITY OF HUNTSVILLE, ALABAMA; DAVID WILLIAMS; BOB GAMMONS; JANET WATSON; CRAWFORD HOWARD; PHIL LOFTIS, | ) ) ) ) ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

This case is presently pending before the court on defendants' Motion for Summary Judgment.  (Doc. 67.)[1]  Plaintiffs have sued the City of Huntsville and the individual members of the Board of Zoning Adjustments ["BZA"] of the City alleging that defendants violated the anti-prohibition provision of the Telecommunications Act ["TCA"], 47 U.S.C. § 322(c)(7)(B)(i)(II).  Plaintiffs also seek a *de novo* review of the decision of the BZA pursuant to Ala. Code § 11-52-81.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment, (doc. 67), is due to be granted in part and denied in part.

---

[1]Reference to a document number, ["Doc. ____"], refers to the number assigned to each document as it is filed in the court's record.

# I. STANDARDS

## A. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**B.  BZA APPEAL**

According to Ala. Code § 11-52-81, "Any party aggrieved by any final judgment or decision of [a] board of zoning adjustment may . . . appeal therefrom . . . .  In case of such appeal . . . the action in [the] court shall be tried de novo."

## II.  STATEMENT OF FACTS

### I.  Statement of Facts

Plaintiff Tritel, a wireless telecommunications provider, offers wireless services in Huntsville pursuant to a license from the Federal Communications Commission.  (Doc. 20 ¶¶ 14, 15.)[2]  To provide a continuous signal to its customers in Huntsville, Tritel requires a network of interconnected antenna facilities, each of which serves the immediately surrounding geographic region, or "cell," and each of which must be located in a small area, or "search ring," near the center of the cell.  (*Id.* ¶¶ 15-17.)  Tritel's radio-frequency (RF) engineers designed a network consisting of 17 facilities in the City of Huntsville ("the City"), but the original network design did not overlap well with existing towers and other structures and would have required Tritel to build several new towers.  (Doc. 70, Ex. 1 at 4-5.)

---

[2]In an affidavit, Barry Gannon, Zoning Manager for American Tower, stated that "[t]he facts and information contained in the First Amended Appeal and Complaint Seeking Equitable Relief [doc. 20] . . . are true and correct."  (Doc. 27, Attachment, ¶ 3.)

The City of Huntsville Zoning Regulations 73.20.16(1) and 73.20.17(6)[3] require the

---

[3]Regulation 73.20.16 states:

To minimize the adverse visual, aesthetic and environmental impacts associated with the proliferation of towers, co-location of antennas by more than one user on existing or permitted towers shall take precedence over the construction of new towers.  . . .

(1)  Subject to Section 73.20.16(2), no new tower shall be permitted unless the applicant demonstrates by sufficient documentary evidence that at least one of the following conditions is applicable:

(a)  No existing towers or suitable structures are located within the geographic area required to meet applicant's engineering requirements, and no such towers are under consideration for building permits.

(b)  Existing towers or other structures are not of sufficient height and cannot be reasonably altered to meet applicant's engineering requirements.

(c)  Existing towers or other structures do not have sufficient structural strength and cannot be reasonably altered to support applicant's proposed antenna and related equipment.

(d)  The proposed antenna would cause electromagnetic interference with existing antenna(s) on the tower or structure, or the existing antenna(s) would cause interference with the proposed antenna and the interference cannot be prevented at a reasonable cost.

(e)  The applicant demonstrates that there are other limiting factors that render existing towers and structures unsuitable.

(f)  Co-location would have a more detrimental environmental, aesthetic, or visual impact on the surrounding area than would construction of a new tower.

(2)  Even if an applicant is able to demonstrate the existence of one of

4

entity seeking to build a wireless telecommunications tower to demonstrate that co-location of the wireless communications provider's antenna is not possible.  (Doc. 29 at 354-57.) Therefore, Tritel's engineers, Galaxy Engineering Services, redesigned the proposed network to maximize co-location potential, and it designed a network in which 13 of the 17 needed facilities could be co-located on existing structures.  (*Id.* at 5.)

In their response to defendants' interrogatories, plaintiffs stated:

> During the time period from June of 1998 through September of 1999, Tritel utilized Galaxy Engineering Services ("Galaxy") to develop a network plan for location of the seventeen (17) telecommunications facilities Tritel would require to provide wireless PCS [personal communications services]

———————————

the foregoing conditions, a new tower may not be permitted if it is determined that the proposed location of the tower is not essential to the applicant to provide service in a given geographical area, and the tower would:

(a)   interfere   with   or   endanger   the   use   of   other telecommunication facilities; or

(b)  endanger persons or property; or

(c)   not be compatible with existing or proposed adjacent development; or

(d)  have an impermissible environmental, visual, or aesthetic impact on the surrounding area.

(Regulation 73.20.16 (1)-(2), doc. 29 at 354-56.)   Regulation 73.20.17(6) requires the applicant  to provide "[a] signed affidavit . . . verifying the inability to locate the proposed antennas on existing towers or other structures accompanied by supporting documentation." (Regulation 73.20.17(6), doc. 29 at 357.)

coverage in and around the City of Huntsville.  Galaxy utilized propagation modeling software from TECC Cellular known as "Wizard," which was widely used in the industry at the time.  Propagation modeling was based on Lee and Hata propagation algorithms adapted for 1900 MHz PCS . . . band analysis, which are the parameters of Tritel's PCS network.  Site drive tests and propagation model verification tests, used to "tune" the Wizard software for specific geographic regions, were conducted with Grayson 1900 MHz RF transmitters and receivers during April 1999.

Galaxy and Tritel identified the 17 approximate locations that Tritel would utilize to provide coverage in the greater Huntsville area, and each of those locations was identified by a "search ring."  A "search ring" encircles and identifies the limited geographic area where a proposed facility must be located so that the facility can both produce a PCS signal that reaches all of the intended service area for that facility (said geographic region that is to be serviced by the telecommunications facility is commonly referred to as a "cell") and properly interact with the surrounding telecommunications facilities to provide effective, seamless and reliable coverage throughout a given region.  After identifying the search rings for the proposed 17 telecommunications facilities, Tritel and Galaxy determined that the location of many of the search rings would require that Tritel construct a new telecommunications tower due to the lack of an existing telecommunications tower or other suitable tall structure that would support Tritel's antennas.

As a result of the determination that Tritel would need to construct an unacceptably large number of new telecommunications towers in Huntsville to service the Huntsville market, Galaxy redesigned the entire 17 facility network to attempt to make better use of existing telecommunications towers and other tall structures located in the Huntsville area that would allow Tritel to avoid having to construct as many new telecommunications facilities.  This redesigned network enabled Tritel to use many existing towers and other suitable tall structures, such as transmission line towers and rooftops of buildings.

The redesigned network resulted in thirteen (13) antenna facilities being located on existing towers and other suitable structures and in only four (4) new telecommunications towers.  Three (3) of the four (4) telecommunications towers were approved administratively by Huntsville, and the fourth telecommunications tower is the Facility located on the Property.

(Doc. 70, Ex. 1 at 4-5.)

Having maximized co-location potential in the City, Tritel's engineers identified the necessary search rings for the four new towers that Tritel required.  (Doc. 20 ¶ 19.)  The search ring, which encompassed Virgil I. Grissom High School and extended east of the intersection of Blevins Gap Road and Bailey Cove Road, is the only search ring at issue in this case.  (*Id.* ¶ 20.)  When Tritel investigated the land inside the search ring, it found no existing towers or other structures within or nearby this search ring on which Tritel could place its antenna.  (*See* doc. 29 at 537.)  It found only three potential locations for construction of a tower for its antenna:  Grissom High School, Willowbrook Shopping Center, and the 6.33-acre tract of land ("the Site") owned by plaintiff BGR Properties.  (Doc. 70, Ex. 7 at 46-48.)  Within the search ring, "every lot is basically used for residential purposes."  (Doc. 29 at 537.)

Plaintiff American Tower, who was hired by Tritel to "select and acquire interests in properties suitable for the installation and operation of Tritel's telecommunications equipment in Alabama," (doc. 20 ¶ 13), discussed with the Huntsville City School Board of Education about the possibility of replacing one of the light poles at Grissom High School with a monopole structure upon which an antenna could be placed.  (Doc. 70, Ex. 7 at 49.)  The School Board declined to allow the placement of a tower on Grissom High School property because it contended it did not have adequate room.  (*Id.* at 191-92.)  In a letter to the BZA, Paul Kelly, Executive Director of Business for the Huntsville City Schools Board of Education, wrote:

> Our school system is not interested at this time in leasing a portion of our property at Grissom High School for a period of 20 years or greater. Grissom is our most crowded school and, since we have limited acreage, we do not feel that we can afford to tie up any portion of the land for other than school uses.

(Doc. 29 at 527.)

Plaintiffs also considered placing the tower at the Willowbrook Shopping Center. (Doc. 70, Ex. 7 at 53-56.)  However, the shopping center site was not feasible because it would have required not only a height variance, but also a variance of the setback requirements of the zoning regulations.[4]  (*Id.* at 54-55.)  Gannon testified that property "did not meet *any* of the requirements under the ordinance."  (Doc. 29 at 543 (emphasis added).)

The final site available for construction of a tower is east of Bailey Cove Road and Grissom High School, has an address of 1220 Blevins Gap Road, and is zoned Residence 1-A District (R-1A) pursuant to the Zoning Regulation.  (Doc. 20 ¶ 26.)  When BGR purchased the Site in 1997, a portion of it was leased and used by a Montessori school, and BGR subsequently leased a portion of the Site to the Huntsville School System for one dollar per year to allow Grissom High School to use the property for soccer fields.  (Doc.70, Ex. 6 at 16-17, 20, 34-35.)  In May 1999, Tritel secured an option to lease a 10,000 square foot portion in the center of the property, approximately 210 feet south of the right of way of

---

[4]The Regulations provide, "no tower shall be located closer than two hundred feet (200') to any residential district nor closer than a distance equal to the height of the tower to any residential structure."  (Regulation 73.20.3(1), doc. 29 at 347.)

Blevins Gap Road. (Doc. 20 ¶ 27.)[5] BGR had never considered developing the property, and it intended to eventually donate the property to the City. (Doc. 70, Ex. 6 at 17, 33.)

In August 1999, American Tower applied to the BZA for a special exception to allow a tower and antenna facility at the Site and a variance to allow the tower to exceed the Zoning Ordinance's 100-feet height limitation by 80 feet. (Doc. 20 ¶¶ 35-36.)[6] Nathan McNeal, a Radio Frequency engineer, testified that the winding path of Four Mile Post Road and the nearby Huntsville Mountain created the need for a 180-foot tower at the site. (Doc. 29 at 539; doc. 70, Ex. 2 ¶ 5 and ex. A.) His affidavit describes and attaches data collected during a drive test measuring signal strength and coverage in the area surrounding the site while hanging antennas from cranes at the Site at heights of 100 feet and 180 feet. (*Id.*, Ex. 2 ¶¶ 6-10 and exs. B-E.) As a result of this test, American Tower determined that a 100-foot tower would not provide adequate signal strength to provide coverage for the area. (*Id.*, Ex. 2 ¶ 8.)

American Tower submitted documents, supporting material, and testimony to the BZA demonstrating that plaintiff's were entitled to receive the requested special exception for construction of the tower and variance on the height limitation. (Doc. 20 ¶ 36; doc. 29 at 398-412, 415-17, 419, 423-24, 427-29, 431-37, 447-97, 537-39.) After receiving evidence and holding a hearing, at which McNeal, Gannon, and a number of members of the

---

[5]Tritel assigned its option to lease the site to American Tower L.P. in June 1999, and American Tower exercised the option and leased the site in November 1999. (Doc. 20 ¶ 27.)

[6]The Ordinance limits tower height to 100 feet in a residential zone. (Doc. 29 at 381.)

community testified, the BZA denied plaintiffs' application on October 19, 1999. (Doc. 20, ¶ 38; *see* doc. 29 at 498-504, 532.)

Plaintiffs contend that the tower is critical to the overall engineering and technical plan of Tritel's PCS network. (Doc. 20, ¶ 30.) Moreover, they have submitted evidence that the Site is the only property in the search ring that is large enough to accommodate the applicable setbacks and other zoning requirements. (Doc. 29 at 419, 423-24, 428, 541-53; doc. 70, Ex. 3, ex. A; *id.*, Ex. 5, ex. A at 3; *id.*, Ex. 7 at 48-56, 88-98, 109-14, 133-44, 180-94; *id.*, Ex. 8 at 38, 124-25; *id.*, Ex. 9 at 70-73, 79, 95-96; *id.*, Ex. 10 at 115-16.) Plaintiffs have also presented evidence that demonstrates that, due to geographical factors, technological limitations, current development, and zoning restrictions, Tritel and other PCS providers located on the tower cannot close the gap in coverage in this area with a combination of smaller towers in this area. (Doc. 70, Ex. 3, ex. A at 3; *id.*, Ex. 5, ex. A at 2-3; *id.*, Ex. 7 at 182-85; *id.*, Ex. 10 at 115-17, 139-41.) Gannon testified that, ***theoretically***, Tritel could provide the same coverage with additional smaller towers, but such an alternative was not practical because "there is nowhere else to build" additional towers. (*Id.*, 70, Ex. 7 at 183-84.) He testified that he had looked in the search ring and there were no other vacant lots. (*Id.* at 185-86.)

Without the proposed facility at the site, plaintiffs contend that Tritel and other providers located on the tower would not be able to provide adequate reliable PCS service to this area of Huntsville.  (Doc. 20 ¶ 30; doc. 70, Ex. 2 ¶ 14 and ex. I; *id*., Ex. 5, ex. A at 3.)

On March 24, 2000, plaintiffs filed a motion for partial summary judgment on their claim that the BZA's decision was not based on substantial evidence in violation of 47 U.S.C. § 332(c)(7)(B)(iii).  (Doc. 26.)  On September 29, 2000, this court granted plaintiffs' Motion for Partial Summary Judgment and ordered defendants to grant American Tower's application for a special exception and a variance; this Order was made final pursuant to Fed. R. Civ. P. 54(b).  (Doc. 34.)

After the application was granted pursuant to the court's Order, American Tower erected and began operating tower and antenna facilities at the site.  (*See* doc. 57 ¶¶ 4, 5.) Defendants filed a Motion to Suspend or Stay Enforcement of the Injunction pending appeal, (doc. 46), which the court denied, (doc. 49).

Defendants appealed the court's Order granting plaintiffs' Motion for Partial Summary Judgment.  (Doc. 40.)  The Eleventh Circuit reversed this court's September 2000 Order, holding that the court erred in finding that defendants' decision was not supported by substantial evidence. *American Tower v. City of Huntsville*, 295 F.3d 1203, 1209 (11th Cir. 2002).  The matter was remanded to the court for further proceedings.  *Id.*

Greg Vaughn, Ph.D, an engineer retained by plaintiffs, reported that there were 40,000 Tritel calls that used the tower in November 2002.  (Doc. 70, Ex. 5, ex. A at 4.)  Also, in addition to Tritel customers, the tower fills a coverage gap for other providers, including

11

VoiceStream, Cingular, and LA Unwired. (*Id.* at 3.) He also found that these carriers would experience a significant gap of coverage if the tower were to be removed. (*Id.*) Further, Dr. Vaughn reported that providers who do not have antennas on the tower – notably, Nextel Communications, Corr Wireless, Verizon Wireless, and Southern Linc. – have significant gaps in coverage near the tower. (*Id.* at 4.)

## III.  DISCUSSION

### A.  PLAINTIFFS' CLAIMS

In their brief in opposition to Defendants' Motion for Summary Judgment, plaintiffs state:

> Defendants have filed a Motion for Summary Judgment (the "Motion"), seeking summary judgment on Plaintiffs' remaining claims in this case. Plaintiffs have presented sufficient evidence to require (and to prevail at) a trial *de novo* on Tritel Communications, Inc.'s ("Tritel's") prohibition-of-services claim under the Federal Telecommunications Act and on Plaintiffs' zoning appeal under Alabama law. Accordingly, Defendants' Motion should be denied as to those claims.

(Pls. Br. in Opp. to Mot. for Summ. J. at 1.)

In their Second Amended Complaint, plaintiffs allege the following claims:

Count One: Violation of the Telecommunications Act, which includes these alleged violations of the TCA by defendants:

> (a) the BZA's denial of the Application was not in writing, (b) Defendants' actions prohibit or have the effect of prohibiting the provision of personal wireless services, (c) Defendants' actions unreasonably discriminate among providers of functionally equivalent services and (d) the BZA's decision to deny the Application is not supported by substantial evidence.

Count Two: Appeal Pursuant to Alabama Code Section 11-52-81

12

Count Three:  Inverse Condemnation

Count Four:  Unconstitutional Zoning Ordinance

(Doc. 79.)[7]  Because plaintiffs oppose defendants' Motion for Summary Judgment **only** as to Tritel's TCA/prohibition claim and plaintiffs' § 11-52-81 appeal of the BZA's decision, the court finds that plaintiffs have abandoned all other claims set forth in their Second Amended Appeal and Complaint.  *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied* 516 U.S. 817 (1995)).  Defendant's Motion for Summary Judgment as to all claims, except Tritel's TCA/prohibition claim and plaintiffs' § 11-52-81 appeal of the BZA decision, will be granted, and such claims will be dismissed.

## B.  TRITEL'S TCA/PROHIBITION CLAIM

Tritel contends that defendants' denial of its application for special exception and variance in order to construct its 180-foot tower violated the TCA's provision barring a local government's prohibition of personal wireless facilities.

> Congress enacted the Telecommunications Act of 1996 ("TCA") . . . "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and [to] encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996).  Among the technologies

---

[7]Plaintiffs also seek attorneys' fees pursuant to section 1983 and section 1988. Defendants have recently filed a Motion for Partial Judgment on the Pleadings, seeking to dismiss plaintiffs' § 1983 and § 1988 claims based on a recent Supreme Court opinion. *Rancho Palos Verdes v. Abrams*, No. 03-1060, 2005 WL 645206 (March 22, 2005). Nevertheless, plaintiffs' § 1983/§ 1988 claims for attorneys' fees if successful on their TCA claim is not before the court.

addressed by Congress in the TCA was wireless communications services.  In regard to this technology, Congress found that "siting and zoning decisions by non-federal units of government" had "created an inconsistent and, at times, conflicting patchwork of requirements" that was inhibiting the deployment of wireless communications services. H.R. Rep. 104-204, at 94 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61.  At the same time, Congress recognized that "there are legitimate State and local concerns involved in regulating the siting of such facilities . . ., such as aesthetic values and the costs associated with the use and maintenance of public rights-of-way." *Id.*  To address the problems created by local zoning decisions, the House version of the TCA would have given authority to the FCC to regulate directly the siting of wireless communications towers.  The Conference Committee, however, decided against complete federal preemption, opting to "preserve[ ] the authority of State and local governments over zoning and land use matters except in [ ] limited circumstances." *See* H.R. Conf. Rep. No. 104-458, at 207-08 (1996). Therefore, § 704(a) of the TCA, 47 U.S.C. § 332(c)(7), strikes a delicate balance between the need for a uniform federal policy and the interests of state and local governments in continuing to regulate the siting of wireless communications facilities.  Under that section, state and local governments retain the authority to regulate the siting of wireless telecommunications facilities, but their decisions are subject to certain procedural and substantive limitations. *See* 47 U.S.C. § 332(c)(7).

*VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 828-29 (7th Cir. 2003)(footnote omitted).  Only one limitation is at issue in this case:  "the [City's] denial of the permit must not 'prohibit or have the effect of prohibiting the provision of personal wireless services.'" *Id.* at 829 (quoting 47 U.S.C. § 322(c)(7)(B)(i)(II)).  If the court finds that the denial of American Tower's permit "effectively prohibits the provision of wireless service . . ., then under the Supremacy Clause of the Constitution, local law is pre-empted in order to effectuate the TCA's national policy goals." *Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 627 (1st Cir. 2002).

14

Plaintiffs claim that defendants' decision to deny them a special exception and a variance had the effect of prohibiting wireless service; defendants dispute plaintiffs' claims. The Eleventh Circuit has yet to establish a test for determining whether a "regulation of the placement, construction, and modification of personal wireless service facilities by any . . . local government or [its] instrumentality . . . [has] the effect of prohibiting the provision of wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).  Circuit Courts of Appeal that have addressed the issue, have generally adopted one of three approaches.

The Fourth Circuit Court of Appeals has held that only a general ban of all wireless facilities by a local government or its instrumentality would violate the anti-prohibition provision of the TCA.  *See AT&T Wireless PCS v. City Council of Virginia Beach*, 155 F.3d 423, 428 (4th Cir. 1998).  So far, only the Fourth Circuit Court of Appeals has adopted this limited viewed of the anti-prohibition provision, which it continues to apply.  *See Virginia RSA #3 Inc. v. Montgomery County Board of Supervisors*, 343 F.3d 262, 268 (4th Cir. 2003); *360 Communications Co. v. Board of Supervisors of Albemarle County*, 211 F.3d 79, 88 (4th Cir. 2000).

Other Circuits, namely the First,  Second, Third, and Seventh, have developed two-prong tests to determine whether an action by a local government or its instrumentality has the effect of prohibiting service.  The Second and Third Circuits' test requires the provider to show two things:  (1) that the proposed facility would fill a significant existing gap in the ability of remote users to access the national telephone network, and (2) that the proposed facility is the "least intrusive" manner to fill the gap.  *Sprint Spectrum L.P. v. Willoth*, 176

15

F.3d 630, 643 (2d Cir. 1999)("A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means.").

The First and Seventh Circuits' test does not require the provider to show that its proposed facility is the least "intrusive;" rather, their test requires that the provider demonstrate (1) the local government zoning criteria and/or procedures effectively preclude towers and (2) further efforts to obtain proper approval for the proposed facility would be fruitless. *Pelham*, 313 F.3d at 629; *St. Croix*, 342 F.3d at 834. "Under this standard, the provider must show that its 'existing application is the only feasible plan' and that 'there are no other potential solutions to the purported problem.' *St. Croix*, 342 F.3d at 834 (quoting *Pelham*, 313 F.3d at 630, 635).[8]

"[T]he issue of whether the [zoning board] prohibited or effectively prohibited the provision of wireless services is determined de novo by the district court. The district courts are free to consider additional evidence." *Pelham*, 313 F.3d at 629 (citing *National Tower, L.L.C. v. Plainville Zoning Board of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002); *Town of Amherst v. Omnipoint Communications Enterprises, Inc.*, 173 F.3d 9, 16 n.7 (1st Cir. 1999)). "In invoking the effective prohibition language, 'the burden for the carrier . . . is a heavy one: to show from language or circumstances not just that this application has been rejected but

---

[8]In rejecting the Second and Third Circuits' "least intrusive" test, the Seventh Circuit has noted, "A community could rationally reject the least intrusive proposal in favor of a more intrusive proposal that provides better service or that better promotes commercial goals of the community." *St. Croix*, 342 F.3d 818, 834 n.8.

that further reasonable efforts are so likely to be fruitless that it is a waste of time even to

try.'" *Id.* at 629 (quoting *Amherst*, 173 F.3d at 14.)  The First and Seventh Circuits have –

> identified two sets of circumstances where there is a prohibition "in effect."
> The first is where the town sets or administers criteria which are impossible for
> any applicant to meet.  . . .  The second involves the situation where the
> plaintiff's existing application is the only feasible plan; in that case, denial of
> the plaintiff's application "might amount to prohibiting personal wireless
> service."

*Id.* at 630 (quoting *Amherst*, 173 F.3d at 14.); *see St. Croix*, 342 F.3d at 834-35.

Defendants contend that plaintiffs' plan was not the only feasible plan and, therefore,

they are entitled to summary judgment as to plaintiffs' prohibition claim.  Specifically, as

evidence of other feasible alternatives, defendants contend that plaintiffs had an initial design

that did not require a tower on the Site; that there are other feasible sites for the placement

of the tower, and that plaintiffs could provide coverage with two or more smaller towers.

### 1.  Initial Design

Defendants argue that, because Tritel's initial design did not require a tower at the

Site, a design that included a tower at the Site was not the only feasible design.  The

evidence, viewed in the light most favorable to plaintiffs, demonstrates that Tritel rejected

the initial design because it required construction of numerous new towers, which would not

satisfy the collation requirement of section 73.20.16 of the Zoning Ordinance.  Although the

existence of a previous design indicates that there was an alternative, it does not demonstrate

that such alternative design was feasible.

Under Huntsville's Zoning Regulations, plaintiffs would not have been able to build a large number of new towers, when another configuration of its coverage plan would allow it to co-locate the majority of its antennas on existing structures.  The court finds that the original design was not feasible due to the regulations of the City that require an applicant to maximize co-location.

The court finds that evidence of a pre-existing design plan under the circumstances does not provide evidence of a feasible alternative to the 180-foot tower at the Site.

## 2. Other Sites

Plaintiffs' contend that there are no other feasible sites in the search area.  All but three sites – the shopping center, the high school, and the Site – contained insufficient vacant land to build the tower; there were no other vacant lots in the search area.  The shopping center did not allow for a proper set-back, and the over-crowded high school declined to dedicate any portion of its property to a non-school purpose.  For these reasons, the court finds that substantial evidence exists to show that the Site was the only feasible site within the search ring for the placement of the tower.

## 3. Multiple Shorter Towers

Plaintiffs' application to the BZA states, "Without the height variance Tritel would have to add additional towers in the area to make up for gaps in coverage that one facility would provide." (Doc. 29 at 433.)  Defendants contend that such statement indicates that multiple shorter towers were a feasible alternative to a 180-foot tower at the Site.  However, the evidence does not show that such additional towers were feasible.  As Gannon testified,

the multiple shorter towers was a theoretical possibility, but not a feasible alternative because there is no other location within the search ring to build even one more shorter tower.

Based on the foregoing, the court finds that a question of fact exists as to whether there is any feasible alternative to the 180-foot tower at the site to provide adequate coverage in the cell. Therefore, defendants' Motion for Summary Judgment will be denied as to plaintiffs' TCA/prohibition claim.

## C. STATE LAW CLAIMS

Section 11-52-81 of the Alabama Code provides that "[a]ny party aggrieved by . . . [a] decision of [a] board of zoning adjustment" has the right to appeal that decision to the state circuit court. Ala. Code § 11-52-81. The proceedings before the circuit court "shall be tried de novo." *Id.* On appeal, "the circuit court sits as a 'glorified board of adjustment,' and is limited to considering only that which the board itself could have considered." *Ex parte Chapman*, 485 So.2d 1161, 1163 (Ala. 1986)(quoting *City of Homewood v. Caffee*, 400 So.2d 375, 377 (Ala. 1981); other citations omitted).

### 1. Law of the Case

Defendants argue that the decision of the Eleventh Circuit Court of Appeal "prevents plaintiffs from recovering on . . . their remaining state law claims." (Defs. Br. in Supp. of Mot. for Summ. J. at 16.) The court disagrees.

The decision of the Eleventh Circuit Court of Appeals was limited to whether, pursuant to the TCA, the decision of the BZA was supported by substantial evidence. *American Tower v. City of Huntsville*, 295 F.2d 1203, 1205-06, 1209 (11th Cir. 2002). A

19

finding that the BZA supported its decision with substantial evidence does not "explicitly or by necessary implication" preclude a trial *de novo* as provided by Ala. Code. § 11-52-80. *See A.A. Profiles, Inc. v. City of Fort Lauderdale*, 253 F.3d 576, 582 (11th Cir. 2001).

   **2.  Legal Entitlement to Special Exception and Variance**

   In this case, plaintiffs contend that they are entitled to (1) a special exception allowing them to construct a tower on the Site, and (2) a variance to allow them to construct the 180-foot tower, which is over the 100-foot limit on the height of such towers set forth in the zoning ordinance.   The Alabama Court of Civil Appeals has noted the difference between a special exception and a variance; in *Shades Mountain Plaza v. City of Hoover*, the court held:

> [A] special exception, though it is not a regular permitted use, is a use that is expressly listed in and permitted by a set of zoning regulations, provided that it is specially approved in accordance with the procedures, and subject to the conditions, set forth in those regulations; whereas a variance is a use that is not listed in the zoning regulations, but is a relaxation of, or, literally, a "variance" from, the uses otherwise permitted by the zoning regulations.

*Shades Mountain Plaza, L.L.C. v. City of Hoover*, 886 So.2d 829, 836 (Civ. App. 2003), *cert. denied* (Ala. 2004).  Because of the distinctions between a special exception and a variance, the court will consider plaintiffs' application in two parts – (1) whether plaintiffs have met the conditions for a special exception for construction of a tower on the Site, and (2) whether plaintiffs are entitled to a variance as to the height of tower.

**1. Special Exception**

The City's Ordinance provides the following regarding a "special exception" for a wireless tower:

92.5   Powers and Duties

The Board of Adjustment shall have the following powers and duties:

. . .

      92.5.2   Special Exceptions

      To hear and decide only such special exceptions as the Board of Adjustment is specifically authorized to pass on by the terms of this ordinance; to decide such questions as are involved in determining whether special exceptions should be granted; and to grant special exceptions with such conditions and safeguards as are appropriate under this ordinance; or to deny special exceptions when not in harmony with the purpose and intent of this ordinance.

(Doc. 29 at 375.)  The Ordinance also provides that "towers intended to support personal wireless service antennas in any residential district" are a use permitted as a special exception.  (*Id.* at 376, 380.)  The Ordinance states:

92.5.3   Permitted Uses as Special Exceptions

The Board of Adjustment may permit, as a special exception, the following uses in the specified district:

. . .

(9)    Towers intended to support personal wireless service antennas in any residential district; approval shall be subject to the conditions contained in Sections 73.20.4 – Lighting, 73.20.5 – Tower Color, 73.20.6 – Site Security, 73.20.8 – Structural Design of Towers, 73.20.9 – Signs, 73.20.10 – Access, 73.20.11 – Landscape, 73.20.16 – Co-Location, and

21

73.20.17 – <u>Building Permits for Towers</u> of this ordinance, and to the following conditions:

(a)  Towers must be monopoles and must be designed to implode under stress; antennas used must be of the least visually obtrusive design available at the time of application.

(b)  A signed affidavit from the applicant verifying the inability to locate the proposed antennas on existing towers or other structures accompanied by supporting documentation as specified in Section 73.10.16 – <u>Co-Location</u>, and including substantial evidence that the tower cannot, by technical necessity, feasibly be located in a non-residential district.

(c)  Any new tower permitted must be designed to accommodate personal wireless service antennas for at least one additional user for a reasonable fee if technically feasible.

. . .

(e)  Tower heights shall not exceed one hundred (100) feet.

(f)  Setbacks for towers shall be at least fifty feet (50') from all lot lines, and setbacks for accessory structures shall be a minimum of twenty (20) feet from all lot lines or as required for primary structures in the district if greater.

. . .

(j)  The Board of Adjustment shall act upon any application for authorization to place, construct or modify any personal wireless service facility, whether for a special exception or a variance, within a reasonable period of time after the application and all required supporting documentation is duly filed, taking into account the nature and scope of such application.

Any decision by the Board of Adjustment to grant or deny an application to place, construct, or modify any personal wireless service facility, whether for a special exception or a variance, shall be in writing and supported by substantial evidence contained in the record.

22

(Regulation 92.5.3(9), *id.* at 376, 380-82.)

The court finds that there is substantial evidence in the record of the BZA proceedings that plaintiffs met these conditions for a special exception regarding the placement of a tower at the Site.  (*See*, *e.g.*, *id.* at 499, 504.)  Therefore, the court finds that plaintiffs have established the first part of their appeal; that is, plaintiffs have shown that they were entitled to a special exception for the construction of a tower at the Site.

**2.  Variance**

In order the grant a variance, the zoning ordinance provides the following:

92.5.4  <u>Variances</u>

To authorize upon appeal in specific cases such variance from the terms of this ordinance as will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of this ordinance will result in unnecessary hardship, and so that the spirit of this ordinance shall be observed and substantial justice done.

A variance from the terms of this ordinance shall not be granted by the Board of Adjustment unless and until:

(1)   A written application for a variance is submitted demonstrating:

(a)   That special conditions and circumstances exist which are peculiar to the land, structure, or building involved and which are not applicable to other lands, structures, or buildings in the same district.

(b)   That literal interpretation of the provisions of this ordinance would deprive the applicant of rights commonly enjoyed by other properties in the same district under the terms of the ordinance.

(c)   That the special conditions and circumstances do not result from the actions of the applicant;

     (d)     That granting the variance requested will not confer on the applicant any special privilege that is denied by this ordinance to other lands, structures, or buildings in the same district.

               No non-conforming use of neighboring lands, structures or buildings in the same district, and no permitted use of lands, structures, or buildings in other districts shall be considered grounds for the issuance of a variance.

. . .

     (3)     The Board shall make findings that the requirements set forth in Section 92.5.4(1) have been met; that the reasons set forth in the application justify the granting of the variance; and that the granting of such variance is in harmony with the spirit of this ordinance and will not be injurious to the neighborhood.

               In granting any variance, the Board of Adjustment may prescribe appropriate conditions and safeguards in conformity with this ordinance. Violations of such conditions and safeguards, when made a part of the terms under which the variance is granted, shall be deemed a violation of this ordinance . . . .

(*Id.* at 386-88.)

Pursuant to Alabama law, "In situations where a variance is at issue, the primary question is whether due to special conditions, a literal enforcement of a zoning ordinance will result in an unnecessary hardship." *Board of Zoning Adjustment for City of Fultondale v. Summers*, 814 So.2d 851, 855 (Ala. 2001)(quoting *Sanders v. Board of Adjustment of the City of Chickasaw*, 445 So.2d 909, 912 (Ala. Civ. App. 1983)). "Exactly what constitutes an 'unnecessary hardship' must be determined from the facts of the particular case." *Id.* (citing *City of Mobile v. Sorrell*, 271 Ala. 468, 470, 124 So. 2d 463, 465 (1960)).

In this case, the court finds that the administrative record contains sufficient evidence to support plaintiffs' application for a variance.  Assuming, as set forth above, that plaintiffs have met the conditions for a special exception, the evidence is sufficient to create a genuine issue regarding the unnecessary hardship created by the 100-foot limitation on the tower as set forth in the Ordinance.  The evidence supports a finding that the tower is ineffective at 100 feet, but effective at 180 feet due to factors peculiar to the Site, that there are no other feasible, alternative sites, and that Tritel has a license from the FCC to provide wireless telephone service in the area, which the court finds is of unique benefit to the public and within the spirit of the Ordinance regarding the placement of wireless telephone towers. Such evidence prohibits the summary dismissal of plaintiffs' appeal.

Therefore, because the court finds that there are disputed issues of material fact and that defendants are not entitled to judgment as a matter of law as to plaintiffs' § 11-52-81 appeal, defendants' Motion for Summary Judgment will be denied.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are material facts in dispute and that defendants are not entitled to judgment as a matter of law as to plaintiffs' TCA claim and its § 11-52-81 appeal.  An order denying defendants' Motion for Summary Judgment as to these claims will be entered contemporaneously with this Memorandum Opinion.  The court also finds that defendants are entitled to judgment as a matter of law as to plaintiffs' inverse condemnation and unconstitutional zoning ordinance claims.  An order granting defendants' Motion for Summary Judgment and dismissing these claims will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 31st day of March, 2005.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE