FILED

2006 Mar-22  AM 10:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| AMERICAN TOWER, L.P.; TRITEL COMMUNICATIONS, INC.; BGR PROPERTIES, L.L.C., | ) )  ) ) |
| Plaintiffs, | ) ) |
| vs. | )  CV 99-B-2933-NE ) |
| CITY OF HUNTSVILLE, ALABAMA; DAVID WILLIAMS; BOB GAMMONS; JANET WATSON; CRAWFORD HOWARD; PHIL LOFTIS, | ) ) ) ) ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION</u>

Beginning June 15, 2005, this court conducted a bench trial on plaintiffs' claims against defendants.  Plaintiffs – American Tower, L.P., Tritel Communications, Inc.,[1] BGR Properties, L.L.C. –  have sued the City of Huntsville and the individual members of the Huntsville Board of Zoning Adjustments [hereinafter collectively referred to as the "BZA"] alleging that defendants violated the anti-prohibition provision of the Telecommunications Act of 1996 ["TCA"], 47 U.S.C. § 332(c)(7)(B)(i)(II).  Plaintiffs also seek de novo review, pursuant to Ala. Code § 11-52-81, of the BZA's decision to deny American Tower's application for a special exception and variance to build a 180' telecommunications tower in a residential district.  In accordance with Rule 52(a) of the Federal Rules of Civil Procedure,

---

[1]Tritel Communications, L.L.C., is now know as Cingular Wireless.  However, for purposes of this opinion, the court will continue to refer to this plaintiff as Tritel.

the court hereby enters this Memorandum Opinion, which sets forth its findings of fact and

conclusions of law.

## I.  <u>STIPULATED FACTS</u>

The parties have stipulated that the following facts are not in dispute:

1.    Plaintiff Tritel Communications, L.L.C. . . . is a wireless telecommunications service provider offering wireless personal communications services in several southeastern states, including Alabama.

2.  Tritel holds a broadcast license from the Federal Communications Commission to develop and operate a wireless network in and around the City of Huntsville, Alabama . . . .[2]

3.  Tritel's network in [Huntsville] consists of a network of antenna facilities in and around [Huntsville] that serve portable wireless communications handsets and mobile telephones.

4.  Tritel and Plaintiff American Tower, L.P. . . . sought to construct a wireless telecommunications tower and antenna facility on a 6.33-acre tract of land owned by Plaintiff BGR Properties, LLC . . . located at 1220 Blevins Gap Road in [Huntsville] (the "Property").

---

[2]The court notes that its FCC license requires Tritel to provide "quality coverage."

For a wireless provider, the absence of coverage over a high-use area (*e.g.* a population cluster or major road) creates legal and commercial problems.  In order to retain its FCC license for a region, a licensee must achieve ***quality coverage*** (defined by the industry as the absence of "dropped" calls) for a certain percentage of the region's population within a certain number of years after the license was granted; if the licensee fails to do so, it will forfeit its entire license.  *See* 47 C.F.R. § 90.685(d) (2002).  In addition, the ability to provide uninterrupted coverage in high-use areas is considered essential for a wireless company to remain competitive in that region.

*Nextel West Corp. v. Unity Township*, 282 F.3d 257, 259-60 (3d Cir. 2002)(emphasis added).

5.  The Property is zoned as a Residence 1-A District (R-1A) under the 1989 Zoning Ordinance for the City, as updated to May 1, 1998 . . ., and portions of the Property are leased and used as soccer fields by Grissom High School and leased and used as a Montessori School.

6.  On May 18, 1999, Tritel entered into an Option and Lease Agreement with BGR, thereby securing an option to lease a site (the "Site") consisting of a 10,000 square-foot parcel of the Property.

7.  The Site lies approximately in the center of the Property, and the tower at the Site stands approximately 211 feet south of the Blevins Gap Road right-of-way.

8.  On June 23, 1999, Tritel assigned its interests in its Option and Lease Agreement with BGR to American Tower.

9.  On August 31, 1999, an application was filed with the BZA (the "Application") seeking a special exception authorizing the placement of a proposed telecommunications facility at the Site and a variance authorizing American Tower to construct a 180-foot monopole, exceeding the Zoning Ordinance's height limitation by 80 feet.

10.  On November 1, 1999, American Tower exercised its option under the Option and Lease Agreement and became the Lessee of the Site.

11.  The BZA conducted a hearing on the Application on October 19, 1999, and at the conclusion of the hearing, the BZA denied the Application.

12.  The record of the materials and testimony received by the BZA on the Application is found in the Statutory Certification of Record of Proceedings Before BZA filed in this action on March 24, 2000 (the "BZA Record").

13.  The Application before the BZA and the zoning appeal under Ala. Code § 11-52-81 to be tried in this case are governed by the Zoning Ordinance, a true and correct copy of which is found at pages 1-397 of the BZA Record.

(Doc. 105 [footnote added].)[3]

For purposes of deciding the issues in this case, the court has accepted the parties' stipulated facts as true.

## II. APPEAL OF THE BZA'S DECISION

Plaintiffs assert that defendants violated the anti-prohibition provision of TCA, 47 U.S.C. § 322(c)(7)(B)(i)(II), when the BZA denied American Tower's request for a special exception and a variance. Also, they seek a de novo review, pursuant to Ala. Code § 11-52-81, of the BZA's denial of American Tower's application for a special exception and a variance.[4] Because a decision favorable to plaintiffs on their de novo appeal would moot the TCA claim, this court, "sit[ting] as a 'glorified board of adjustment,'" *Ex parte Chapman*, 485 So. 2d 1161, 1163 (Ala. 1986), will first decide whether American Tower is entitled to a special exception and a variance allowing them to construct a 180' communications tower at the Blevins Gap Road site.

Section 11-52-81 of the Alabama Code provides that "[a]ny party aggrieved by . . . [a] decision of [a] board of zoning adjustment" has the right to appeal that decision to the

---

[3]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

[4]Defendants have argued that American Tower did not have standing to apply for the special exception and variance. However, American Tower's standing has been established in earlier rulings by this court, which were affirmed by the Eleventh Circuit in *American Tower LP v. City of Huntsville*, 295 F.3d 1203, 1206 n.2 (11th Cir. 2002)("In the light of the BZA's motion to dismiss, the district court determined that American Tower had standing to bring its application before the BZA and to bring its Section 332(c)(7)(B)(iii) claim in this case. Given the usual rules of agency, the district court's conclusion was correct.").

state circuit court.[5]  Ala. Code § 11-52-81.  The proceedings before the circuit court "shall be tried de novo."  *Id.*  On appeal, this court "sits as a 'glorified board of adjustment,' and [it] is limited to considering only that which the board itself could have considered."  *Ex parte Chapman*, 485 So. 2d at 1163 (quoting *City of Homewood v. Caffee*, 400 So.2d 375, 377 (Ala. 1981); other citations omitted).

## A.  DECISION OF BZA

American Tower filed an application for a special exception to allow it to construct a communications tower in a residential district and for a variance to allow it to build a 180' tower, which would exceed the 100' height limitation of the Ordinance.  (*See* Pls. Ex. 16.)  The transcript of the hearing before the BZA reveals the basis for its decision to deny American Tower's application.  *See American Tower v. City of Huntsville*, 295 F.3d 1203, 1207 n.3 (11th Cir. 2002)("The BZA sent American Tower a letter denying [its] application, and the BZA's reasons for that denial appear in the minutes and transcript of the hearing.").  At the hearing, the members of the BZA stated:

> MR. GAMMONS:  Your Honor, can I make a motion that the request for a special exception be granted but subject to a 100 foot limitation.

> CHAIRMAN WILLIAMS:  There is a motion.  Is there a second?

> It dies for the lack of a second.

---

[5]American Tower, as well as Tritel and BGR, are "part[ies] aggrieved" by the BZA decision to deny American Tower's application for a special exception and a variance.  *See Ex parte Steadham*, 629 So.2d 647 (Ala.1993).

All right, back to the original motion.  The request is for the location and height of a telecommunications tower facility at 1220 Blevins Gap Road. All those is favor signify by raising your hand.

CHAIRMAN WILLIAMS:   And I see none.  It is defeated.

. . .

. . . Let me do this for the record.

In my personal opinion, I was not willing to grant a special exception for the height reason and because of the fact that it would not provide them sufficient coverage, I did not feel like a special exception was in order.

MR. HOWARD:    My reasoning against it was the fact of its proximate location to the school and the kids in the soccer field – there is a potential safety hazard that it could pose if the kids, as an example kicked their soccer ball over – the gate is locked and all – and start climbing the fence and go over inside to get it.  It can cause a potential problem – a safety hazard out there.

CHAIRMAN WILLIAMS:  Anyone else, for the record?

MS. WATSON:  Well, I was leaning on the health and safety issue, too, as well as the aesthetic impact.  When you see you have the topography that you have out there and the number of homes – I thought it definitely would have an aesthetic impact.

MR. GAMMONS:  I think that the record in this case is probably more clear – at least in my view – than many other cases that have been presented. In that we have had some technical input from both sides.  I certainly don't think that anyone from the tower company is misrepresenting anything – I know they have their view as to what is optimum – but I think the health and safety issue is a concern.  That it is densely populated residential area concerns me.  In addition to the school, I think that – in my view, there should be a higher burden to come in and see what the ordinance authorizes – that is, the 100-foot level.  I would have been prepared to vote to accept the 100-foot tower, given the work that has been done on the ordinance, but not beyond that, in this particular location.

(Pls. Exh. 36, Hearing Transcript at 77-79.)[6] Hulan Smith sent a letter to American Tower that stated its application for a variance and special exception had been denied.  (Pls. Exh. 35.)

## B.  SPECIAL EXCEPTION

### 1.  Zoning Ordinance

"[A] special exception, though it is not a regular permitted use, is a use that is expressly listed in and permitted by a set of zoning regulations, provided that it is specially approved in accordance with the procedures, and subject to the conditions, set forth in those regulations."  *Shades Mountain Plaza, L.L.C. v. City of Hoover*, 886 So.2d 829, 836 (Civ. App. 2003), *cert. denied* (Ala. 2004).  The Huntsville Zoning Ordinance provides a special exception for placement of "[t]owers intended to support personal wireless service antennas" in a district zoned for residential use.  (Pls. Exh. 11, § 92.5.3(9).)  The Ordinance states:

> The Board of Adjustment may permit, as a special exception, the following uses in the specified district:
>
> . . .
>
> (9)    Towers intended to support personal wireless service antennas in any residential district; approval shall be subject to the conditions contained in Sections 73.20.4 – <u>Lighting</u>, 73.20.5 – <u>Tower Color</u>, 73.20.6 – <u>Site Security</u>, 73.20.8 – <u>Structural Design of Towers</u>, 73.20.9 – <u>Signs</u>, 73.20.10 – <u>Access</u>, 73.20.11 – <u>Landscape</u>, 73.20.16 – <u>Co-Location</u>, and

---

[6]The transcript of the BZA hearing contained in the record is condensed with multiple pages reduced and copied onto a single page.  The court has cited to the page number of the original transcript.

73.20.17 – <u>Building Permits for Towers</u> of this ordinance, and to the following conditions:

(a)  Towers must be monopoles and must be designed to implode under stress; antennas used must be of the least visually obtrusive design available at the time of application.

(b)  A signed affidavit from the applicant verifying the inability to locate the proposed antennas on existing towers or other structures accompanied by supporting documentation as specified in Section 73.10.16 – <u>Co-Location</u>, and including substantial evidence that the tower cannot, by technical necessity, feasibly be located in a non-residential district.

(c)  Any new tower permitted must be designed to accommodate personal wireless service antennas for at least one additional user for a reasonable fee if technically feasible.

(d)  Accessory facilities shall be fully automated and shall not include offices, vehicle storage, outdoor storage, or broadcast studios.

(e)  Tower heights shall not exceed one hundred (100) feet.

(f)  Setbacks for towers shall be at least fifty feet (50') from all lot lines, and setbacks for accessory structures shall be a minimum of twenty (20) feet from all lot lines or as required for primary structures in the district if greater.

(g)  Towers shall not be permitted within the boundaries of any historic district listed on the National Register nor shall towers be located on the same lot with a residential structure.

(h)  Accessory buildings and security fences or walls shall be constructed so as to be compatible with the surrounding residential neighborhood by virtue of their design, materials, textures, and colors.

(i)  New towers permitted on mountain tops or slopes should be clustered with existing towers, if any, to the extent that such location is technically feasible and safe as well as aesthetically, environmentally and visually compatible.

8

(*Id.*)  At trial, the only disputed issue regarding whether American Tower met the conditions for a special exception was whether it satisfied the co-location criteria.[7]  The Ordinance contains the following requirements regarding co-location of communication antennas:

> 73.20.16  Co-Location[8]
>
> To minimize the adverse visual, aesthetic and environmental impacts associated with the proliferation of towers, co-location of antennas by more than one user on existing or permitted towers shall take precedence over the construction of new towers.  Towers shall be designed to maximize shared use to the extent possible for the type of tower proposed without creating structural instability or electromagnetic interference with other antennas on the tower.
>
> (1)  Subject to Section 73.20.16(2), no new tower shall be permitted unless the applicant demonstrates by sufficient documentary evidence that at least one of the following conditions is applicable:
>
> > (a)  No existing towers or suitable structures are located within the geographic area required to meet applicant's engineering requirements, and no such towers are under consideration for building permits.
> >
> > (b)  Existing towers or other structures are not of sufficient height and cannot be reasonably altered to meet applicant"s engineering requirements.

---

[7]The parties do not dispute the fact that American Tower's proposed tower exceeded the 100' height limitation; however, American Tower sought a variance from this limitation. The merits of American Tower's application for a height variance is discussed below.

[8]The process of locating wireless antennas on existing structures is sometimes referred to as "collocation."  *See PrimeCo Personal Communications, Ltd. Partnership v. City of Mequon*, 352 F.3d 1147, 1151 (7th Cir. 2003)("The commissioners invoked a preference for 'collocation' (also and more illuminatingly spelled 'co-location') – that is, for placing a new antenna in an existing telecommunications tower or other structure of the requisite height and capacity, such as a church steeple.")  However, for the sake of clarity, the court will use "co-location," the spelling adopted in the Zoning Ordinance.

9

(c) Existing towers or other structures do not have sufficient structural strength and cannot be reasonably altered to support applicant's proposed antenna and related equipment.

(d)  The proposed antenna would cause electromagnetic interference with existing antenna(s) on the tower or structure, or the existing antenna(s) would cause interference with the proposed antenna and the interference cannot be prevented at a reasonable cost.

(e) The applicant demonstrates that there are other limiting factors that render existing towers and structures unsuitable.

(f)  Co-location would have a more detrimental environmental, aesthetic, or visual impact on the surrounding area than would construction of a new tower.

(2)  Even if an applicant is able to demonstrate the existence of one of the foregoing conditions, a new tower may not be permitted if it is determined that the proposed location of the tower is not essential to the applicant to provide service in a given geographical area, and the tower would:

(a)  interfere with or endanger the use of other telecommunication facilities; or

(b)  endanger persons or property; or

(c)  not be compatible with existing or proposed adjacent development; or

(d)  have an impermissible environmental, visual, or aesthetic impact on the surrounding area.

(3)  Written requests by certified mail to co-locate on an existing or proposed tower shall be answered by the tower owner within thirty days of receipt of the request.  Denial of a request without substantial documentary evidence as required herein demonstrating why co-location would not be possible or failure to respond to a request shall be a violation of the Zoning Ordinance.

(*Id*. § 73.20.16.)

With regard to the co-location requirements, the parties dispute that plaintiffs have shown that a tower at the site is "essential" to the provision of service, (*see id*.(2)); that it presents a safety problem, (*id*. (2)(b)); and that would have an impermissible aesthetic impact, (*id*. (2)(d)).

## 2.   Essential to Applicant to Provide Service in a Geographical Area

As required by § 92.5.3(9), plaintiffs have submitted "[a] signed affidavit . . . verifying the inability to locate the proposed antennas on existing towers or other structures . . . and . . . substantial evidence that the tower cannot, by technical necessity, feasibly be located in a non-residential district." (*See* Pls. Exh. 11, § 92.5.3(9)(b); Pls. Exh. 18; *see* Pls. Exh. 11, § 73.20.16(1).)  The parties do not dispute the fact that there is no existing tower or suitable structure in the search ring.  Therefore, the court assumes that plaintiffs have meet the requirement of § 73.20.16(1)(a).

When co-location is not possible, a special exception for a tower in a residential district may not be denied if the tower is "essential to the applicant to provide service in a given geographical area." (Pls. Exh. 11, § 73.20.16(2).) The parties dispute the fact that a tower at the Blevins Gap Road site is essential to the provision of service in the area. Plaintiffs have presented evidence that technically and practically a tower for Tritel's antenna is necessary at the site and cannot be placed elsewhere.  Defendants contend that a tower at the site is not essential because a prior network design did not include a tower at the site,

11

because a lower-signal would provide coverage in the area, and/or because the tower could be placed on another site and provide coverage in the area.

### a.  Original Network Design

The geographic area for the tower was fixed based on the design for the Huntsville area created by Galaxy Engineering for Tritel.  (Tr.42, 227-28.)  Defendants contend that, because the design at issue was the second design and because the first design did not include a tower at the site, the tower at the site is not essential to provide service in this geographic area.

Tritel holds an FCC license to provide wireless communication services for the Huntsville area.  (*See* doc. 105.)  This license requires Tritel to provide quality, uninterrupted service, (Tr.107); failure to provide such adequate coverage could cause Tritel to lose its license.  *See Nextel West Corp. v. Unity Township*, 282 F.3d 257, 259-60 (3d Cir. 2002).  The court notes that wireless networks have certain parameters – technical and practical – within which they must be designed.

Generally speaking –

> To create a wireless network that provides uninterrupted cell phone service for a given geographical region, a telecommunications company must stitch together a patchwork of transmission cells.  An antenna is located in the approximate center of a cell and the antenna transmits wireless signals to and from cell phone users in that cell.  Because an antenna transmits signals on a line-of-sight basis, it is typically mounted on a tower or other tall structure.  The perimeter of each cell is shaped by the topography surrounding the antenna.  Where the terrain is flat, a cell is circular and several miles in diameter.  But . . . hilly terrain [will] distort[] the shape and shrink[ ] the size

12

of a cell.  The gaps these distortions create complicate the process of stitching together cells to blanket the targeted region.

> Because each wireless company is licensed by the Federal Communications Commission ("FCC") to use a different radio frequency, and because different companies use different transmission technologies, each wireless provider must deploy its own network of antennae, spaced at intervals so that their cells interlock.

*Unity Township*, 282 F.3d at 259.

Moreover, "the system must be designed so that signals that are generated in one cell do not interfere significantly with signals at the same frequencies that are used in non-adjacent cells." (Tr.504.)  Gregg L. Vaughn, Ph.D., P.E., a licensed engineer and the Chair of the Electrical and Computer Engineering Department of University of Alabama at Birmingham, testified –

> Typical cellular systems have a frequency reuse pattern, so that the same frequency is not used in adjacent cells, but it is used in the same area, in the Huntsville area. . . .  The frequency reuse typically employed is a seven-cell pattern.  So some frequencies are going to be reused among [the 17 antennas in Tritel's Huntsville network].  Now, when you do anything at one tower or in one area to increase coverage, . .  you may increase coverage in that area, but it's going to cause more interference in another area across town and decrease coverage in that area.  So the whole thing has to be balanced.

(*Id.*; *see also* Pls. Exs. 52, 53.)

The original design of Tritel's Huntsville network required the building of numerous new towers. (Tr.63, 338-39.)  The Ordinance requires that wireless telephone towers be co-located on existing towers or other structures if possible. (Pls. Exh. 11, §§ 73.20.16, 92.5.3(9)(b).)  The second network design required 17 antenna sites to provide coverage in

Huntsville.  (Tr.97.)  Of these 17 sites, 13 antennas were co-located on existing structures; therefore, only four new towers were required.  (*Id.*)  Of these four towers, permits were issued for towers at three sites in areas zoned for commercial use.  (*Id.*)  Only the site at issue in this case was in an area zoned for residential use and, thus, required a special exception and variance.  (*Id.*)

The court finds that the first network design did not meet the requirements of § 73.20.16 and § 92.5.3(9) of the Ordinance.  Therefore, the court finds that the first network design was not a feasible alternative and, therefore, evidence of the first design is not evidence that an antenna at the BGR site was not essential.

### b.  Required Signal Strength

Plaintiffs have presented propagation studies[9] they contend show an impermissible lack of coverage without a tower at the site based on a lack of adequate signal strength at the site without the tower.[10]  (Pls. Exh. 21 at Bates no. 001485-46.)  According to Nathan

---

[9]A propagation study is "a computerized calculation of how a tower will perform.  It's . . . a prediction tool.  So if you put in certain parameters, it's going to give you the results of what the coverage will be."  (Doc. 54 at 40-41.)  The engineer enters certain information – such as "site, . . . tower height, antennas, parameters about the propagation, the effects of the surrounding area – into a computer and "he can generate an anticipated downlink of coverage."  (Tr.261.)  "A downlink, which is the RF energy from the site to a model, a location on the ground."  (*Id.*)

[10]Defendants have presented evidence that some residents of the area had cell phone service before the tower was built.  (*See* Tr. 665, 680,-81.)  However, these residents did not use Tritel's service.  (*Id.* at 665, 681.)  With regard to granting a special exception for a tower in a residential district, the Ordinance specifically states that the applicant must show that the tower was essential to ***the applicant's*** ability to provide service in the geographic area; the applicant is not required to show that the tower was essential to ***any*** provider's service in the

14

McNeal, a radio frequency engineer involved in the design of Tritel's Huntsville network, a signal strength of at least -88 dBm is needed for in-vehicle coverage. (Pls. Exh. 54 at 108-09.) He testified that a user of a Tritel phone could stand outside and "operate a call" at -92 dBm. (*Id*. at 108.) He also testified that there is a loss of 6-8 dBm inside a vehicle, and a loss of 10-12 dBm inside a building. (*Id*. at 109) Ron Rowland, an engineer with Tritel, testified that the engineer designing a network would also add a "fade margin" of 5-7 dBm above the minimum at which the system could operate "to account for variations in signal strength." (Tr.332.) Although defendants have presented evidence that Tritel's phones will work on some level at -104 dBm, (*see* Tr.753), the court finds that the weight of the evidence favors plaintiffs' position that Tritel needed a signal strength of at least -88 dBm to have quality in-vehicle coverage in the geographic area around the site. Therefore, the court finds that a tower and antenna at the site were essential to providing quality coverage in the geographic area surrounding the site.

### c.  Alternative Sites

Defendants contend that plaintiffs have not shown that the tower at Blevins Gap Road was essential to Tritel because there are alternative sites for the tower and antenna. For the reasons set forth below, the court disagrees.

─────────────

area. (*See* Pls. Exh. 11, § 73.20.16(1)(a) and (2).) Therefore, the fact that another provider was able to provide service in the area without the tower is not relevant to the court's determination of whether American Tower satisfied the co-location criteria for a special exception.

### i. Search Ring

A search ring "is just an area, a bounded area, that the RF engineer wishes to locate a site, a bounded geographical area, based on his analysis of the propagation expected from the tower." (Tr.257.) When Galaxy designed the network, it specifically established the area in which antenna was to be located.   (Tr.42.)   Vaughn testified that "the applicant's engineering has resulted in a search ring, in which the tower would be required to be built or to reside.  So the tower would need to be built in the search ring." (Tr.486; *see also* Tr.340.)[11]  McNeal testified that he had never located an antenna outside a search ring.  (Pls. Exh. 54 at 77.)  Vaughn testified that antennas could be located outside the search ring to provide coverage within the search ring, but that such a placement of antennas was rare and only used "on occasion to provide targeted service to a generally very specific location, such as to increase coverage along a highway.   And typically those antennas that are not in a regular cell structure are called microcells, and their coverage is in hundreds of feet rather than in miles." (Tr.515-16.)

Defendants have presented evidence that search rings are generally round and the search ring at this site is irregularly shaped. (Tr.770-71; Pls. Exh. 3 at 2.)  McNeal testified that this search ring was irregular due to differences in elevation of the land.  (Pls. Exh. 54

---

[11]When asked whether an antenna could be located outside of a search ring, Rowland testified, "If the engineer has dropped the search ring and has looked at options within the search ring, I would want to say that – if it was a search ring that I issued, the answer would be no."  (Tr.340.)

at 77-78.)  The court finds that the search ring at issue follows the elevation lines of a topography map of the area.  (*Compare* Pls. Exh. 1 *with* Pls. Exh. 3 at Bates no. 00002.) Therefore, the court finds the irregular shape of the search ring is dictated by the topography.

Based on the evidence, the court also finds that engineering requirements of Tritel's network require that the tower and antenna be placed inside the search ring.

### ii.  Selection of the Site

Based on the evidence, the court finds that the BGR site was selected because it was in the search ring, was not occupied by a residence, was sufficiently large enough to provide space for the tower and equipments and for the set-backs mandated by the Ordinance, and the owners were willing to lease the property.  (*See* Pls. Exh. 16; Tr. 98-99.)  Although other sites were considered, no other site within the search ring met all these requirements.

### iii.  Alternative Sites Within the Search Ring

### A.  Grissom High School

The Huntsville City School Board refused, in writing, to negotiate with American Tower for placement of the tower at Grissom High School.  (Pls. Exh. 13.)  In a letter to William McCarroll of American Tower, Paul Kelly, Executive Director, Business, for the Huntsville City School System, wrote:

> Our school system is not interested at this time in leasing a portion of our property at Grissom High School for a period of 20 years or greater. Grissom is our most crowded school and, since we have limited acreage, we do not feel that we can afford to tie up any portion of the land for other than school uses.

(*Id*.)

Because the Huntsville City School System refused to tie up "any portion" of its Grissom High School property, the court finds Grissom High School was not an available alternative to the Blevins Gap Road site.

### B. Antennas on Smaller Towers

Defendants have suggested that a number of antennas on smaller towers would provide coverage in the targeted area.  Vaughn testified that "***many*** smaller antennas" would be needed to replace the antenna on the tower at the Blevins Gap Road site.  (Tr. 516.) According to the evidence, every site within the search ring – other than the BGR property and Grissom High School – is currently occupied by a residence.  (Tr. 166-67; Pls. Exh. 36, Hearing Transcript at 10.) The Zoning Ordinance prohibits the placement of a tower on the same land as a residence.  (Pls. Exh. 11, Ordinance § 92.5.3(9)(g).)  The court finds that there is no lot in the search ring, other than Grissom High School and the BGR property, that is not occupied by a residence.  Therefore, even if the court found that multiple smaller towers were a viable technical alternative to the 180' tower at the BGR site, nothing in the record indicates that placement of multiple smaller towers in the search ring is a viable alternative due to the residential development within the search ring.

### iv.  Alternative Sites Outside the Search Ring

The record contains evidence that American Tower considered four sites outside the search ring as alternatives to placing Tritel's antenna in a residential district.  For the reasons set forth below, the court finds that these are not feasible alternatives to the BGR site.

### A.  Willowbrook Shopping Center

The Willowbrook Shopping Center is across Bailey Cove Road from Grissom High School.  Although a tower at the Willowbrook Shopping Center, which is outside the search ring, (*see* Pls. Exh. 3 at 2), would provide some coverage in the area, the owner would not agree to lease land to American Tower and the shopping center did  not have sufficient space to meet the Ordinance's setback requirements, (Tr.122-24, 237-38).  Barry Gannon of American Tower testified:

> [T]he Willowbrook Shopping Center was another property that we did talk to, and they were not willing to lease land.  So you have to have a willing property owner to do a tower as well or do anything.  That property owner was not willing to do it from that standpoint.
>
> Also from that property, there were zoning and compliance issues that were associated with that, setback issues, which could not be met.  It would have required variances like we did on our site as well.

(Tr. 122-23.)

The court finds these facts are sufficient to show that Willowbrook Shopping Center is not a feasible alternative to the BGR site for Tritel's antenna.

B. **Water Tank**

McNeal testified that the water tank on Huntsville Mountain is not a feasible alternative site for Tritel's antenna.  Based on a propagation study, McNeal determined that an antenna on the water tower would overshoot Tritel's coverage objectives.  (Pls. Exh. 54 at 34.)  Likewise, Rowland testified:

> Well, I think there were two issues with the water tank location was that it would be too far away to cover the area in question.
>
> And also the water tank is located up on a hilltop.  Anytime you locate a cell site on a hilltop, and if you're aiming it away on the hilltop side away from the area you're covering, you get an effect known as shading where the knee of the hillside actually blocks the signal going down hill.
>
> . . .
> [Overshooting] can potentially cause interference long distances away to other mobile subscribers.  They may be far enough away that they should get a line of sight coverage from the hilltop site, and it can cause – depending on the frequency plan that's being used, it could cause interference.
>
> It also can cause the subscriber to lock on to the site without, you know, program hand off to get off the site because of the area where it's located.
>
> So it ends up doing what we call a drag and drop where he's on the site, but he's so far away, he has no site to hand off to, and he actually drops the call.

(Tr. 288-89.)

McNeal also testified that, because the water tower was only 40 feet tall, the signal from an antenna on the water tower would be blocked by the surrounding trees.  (*Id.*; *see also* Tr. 208.)

20

Based on this evidence, the court finds the water tank is not a feasible alternative to a tower at the Blevins Gap Road site.

### C.  Commercial Areas North and South of the Search Ring

In addition to the locations above, Gannon testified that he also considered the two commercial areas closest to the Blevins Gap Road site for placement of the tower:  (1)  the commercial area near the intersection of Bailey Cove Road and Four Mile Post Road to the north and (2) the commercial area at the intersection of Bailey Cove Road and Weatherly Road  to the south.  (Tr.121; *see also* Pls. Exh. 22.)  Gannon testified that these sites did not provide coverage to the area and that there was too much overlap with other existing sites. (Tr.122.)

The court finds that plaintiffs have established that these two sites in commercial districts outside the search ring are not feasible workable alternatives to a tower at the site. Therefore, the court finds that plaintiffs have established that a tower at the site is essential to Tritel to provide service in the geographic area around the tower and that there are no feasible alternatives that would provide adequate service in the area.

The court notes that, because plaintiffs have shown that the antenna is essential to providing service in the area, a special exception cannot be denied based upon Ordinance 73.20.16(2)(b), for reasons of safety or aesthetic concerns.  According to the plain language of 73.20.16(2)(b), a permit to construct a new tower can be denied only if the antenna and tower are not essential to providing service in a geographical area.  (*See* Pls. Exh. 11,

21

Ordinance § 73.20.16(2)(b).)  Nevertheless, the court finds that plaintiffs have shown that a tower and antenna at the site would not endanger persons or property and would not have an impermissible aesthetic impact.

### 3.  Endanger Persons or Property

One of the reasons the BZA gave for denying American Tower's application for a special exception and a variance was a concern about safety.  The court notes that the Zoning Ordinance imposes very specific structural requirements on towers that are borrowed from published engineering standards (the EIA/TIA standards).  (*See* Pls. Exh. 11, Zoning Ordinance § 73.20.8; Tr.374-76.)  At trial, defendants questioned the tower's safety during a tornado.  As built, the tower will withstand winds of 70 miles per hour, which is the required EIA standard for Madison County.  (Tr. 378.)  Jim Walker, a structural engineer, testified that it is "very unlikely" that the tower would fail because of bending due to wind.  (*Id*. at 385.)  This is because, "if it started to bend a little, it gets stronger." (*Id*. at 385, 386.) He testified that "[p]robably nothing would happen" if the tower was hit with 100 mph winds.  (*Id*. at 386.)  When asked about tornados, Walker testified that, although "[t]ornados are not a designed-based event," the tower was more likely to withstand the wind than the school.  (*Id*. at 393.)

The court finds that the tower does not pose a safety risk based on its inability to withstand tornado force winds.

Defendants also contend that the tower presents a safety risk because is it located near a school.  (*See* doc. 110 at 41.)  Joel F. Thomas, a resident whose home is across the street from the site, testified that the tower was "an attractive nuisance, and it begs to be climbed." (Tr.622.)  Similar concerns were raised by defendant Howard, who expressed a concern that children playing soccer on the adjacent soccer field may climb the fence surrounding the tower to retrieve an errantly kicked soccer ball, (Pls. Exh. Ex. 36, Hearing Transcript at 78.) The court finds that compliance with the Ordinance's fencing requirements for site security as well as signs indicating potentially dangerous radiation within the fenced area are sufficient to eliminate the foreseeable danger that a child might attempt to enter the site and climb the tower.  Therefore, the court finds that the potential for trespassing children is very slight and, therefore, the tower does not pose a danger to children.

**4.  Impermissible Aesthetic Impact on the Surrounding Area.**

Substantial evidence supports the BZA's finding that the proposed tower would have some negative visual impact on the surrounding area.  However, plaintiffs presented expert testimony that the tower, as built, did not have an actual affect on property values.  Plaintiffs presented expert testimony from Harris B. Simpson, an MAI-certified real property appraiser who, among other types of appraisal work, has performed special studies over the last ten years to determine whether telecommunications towers affect surrounding property values. (Tr.401-05; Pls. Ex. 51.)  As part of his special study on the tower at issue in this case, Simpson visited the site and the surrounding neighborhoods.  (Tr.410-11.)  He described the

area surrounding the site as heavily wooded with deciduous and evergreen trees and said that in driving in the neighborhood around the site, there are not many places from which he could get a clear view of the tower.  (Tr.413.)

Simpson also met with a local privately-employed appraiser and Madison County's appraiser.  (*Id*. at 411, 413-14.)  Simpson testified that the Madison County appraiser told Simpson that he had never had anyone argue to him that their property value had been harmed by a telecommunications tower.  (*Id*. 414.)

Simpson also researched actual sales data in Huntsville in the area surrounding the tower and in other residential areas of Huntsville that were near telecommunications towers.  (*Id*. at 414-19; Pls. Exhs. 51, 55.)  He concluded that telecommunication towers had not negatively affected the values of properties in the surrounding area or the rates of appreciation of those properties.  (Tr.420.)

Defendants did not present any expert testimony to rebut the findings of Simpson. However, five local residents testified that they believed the presence of the tower was harming their property values.[12]  However, none of these residents had actually sold or tried to sell their homes, and none had had their homes appraised before and after the tower was built.  (Tr.625,  660, 674-75, 687.)  Therefore, the court finds their testimony regarding a

---

[12]Such testimony by property owners is permissible as lay opinion under Rule 701 of the Federal Rules of Evidence.  *See Neff v. Kehoe,* 708 F.2d 639, 644 (11th Cir. 1983).

reduction in the value of their homes was speculative and was not based on first-hand experiences of the witnesses.

One witness, Joel F. Thomas, testified that he had received a valuation notice from Madison County, which showed an increase in his property value, but that he did not believe that the increase value was as significant as it would have been without the tower. (Tr. at 625-26). Such testimony, without more, is too speculative to base a finding that the value of Thomas's home was lower than it would be without the tower. Thomas also acknowledged that the tower is more visible from the side of Huntsville Mountain than in the valley surrounding the tower, (Tr.646), yet new homes continued to be built on the side of the Huntsville Mountain after the tower was constructed, (id.).

The court finds that plaintiffs have established that the tower, although visually unappealing, has not actually affected property values in the surrounding neighborhood and that it is not expected to affect property values in the surrounding neighborhoods. Therefore, the court finds that any negative aesthetic impact of the tower is not impermissible.

Based on the foregoing, in consideration of the testimony and exhibits presented at trial, the court finds that plaintiffs have established that American Tower met all the requirements for a special exception to build a tower to support personal wireless service antennas in a residential district, except for the minimum height requirement for which they seek a variance.

## C. VARIANCE

The Zoning Ordinance providing a special exception for towers in residential districts restricts the height of such towers to 100'.  American Tower applied for a variance to allow it to build a tower of 180', which it contends is needed for Tritel to provide adequate coverage.

Under Alabama law –

[V]ariances should be granted sparingly and only under unusual and exceptional circumstances where the literal enforcement of the ordinance would result in unnecessary hardship.  An "unnecessary hardship" sufficient to support a variance exists where a zoning ordinance, when applied to the property in the setting of its environment, is so unreasonable as to constitute an arbitrary and capricious interference with the basic right to private property.  The determination of what constitutes an "unnecessary hardship" must be determined from the facts of the particular case.

*Town of Orrville v. S & H Mobile Homes, Inc.*, 872 So.2d 856, 858-59 (Ala. Civ. App. 2003)(internal citations and quotations omitted).  "The unnecessary hardship which will suffice for the granting of a variance must relate to the land rather than to the owner . . . . Further, a self-inflicted or self-created hardship may not be the basis for a variance or for a claim thereof."  *Id*. at 861.

With regard to variances, the Zoning Ordinance states that the BZA may –

authorize upon appeal in specific cases such variance from the terms of this ordinance as will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of this ordinance will result in unnecessary hardship, and so that the spirit of this ordinance shall be observed and substantial justice done.

(Pls. Ex. 11, § 92.5.4.)

### 1. Special Conditions and Circumstances

The court notes that the "use" of the site for a "tower to support personal wireless service antennas" is permitted on the property under the conditions of the special exception. (*Id.* § 92.5.3(9).)  For the reasons set forth above, the court finds that plaintiffs have met all the requirements for the special exception, except that plaintiffs need a 180' tower, and that the Blevins Gap Road property is the only site in the area that is suitable for placement of this antenna.

The court finds that the topography of the area surrounding the site requires that Tritel's antenna be placed at 180' to achieve coverage in the area.  The tower is in a valley at the foot of Huntsville Mountain.  (Pls. Exh. 1 at 2.) McNeal testified that terrain is "the most important factor" in predicting how a tower and antenna will operate because:

> depending on the elevation, it will either limit the distance or the [radio frequency] propagation or it will give you more distance basically.  If you're in a mountainous area, you're not going to – its not going to propagate as far.
>
> Q.  Is that because mountain make –
>
> A.  Mountains will block the signal.  They will block the signal.
>
> If you're in a valley dealing with the terrain, you're going to have – it's not a good area to put – usually to put a tower.  The valley, the surrounding area, as you're going up, it's going to block the signal.
>
> So you try to use elevation to make up for that.

(*Id.* at 44-45.)  McNeal testified that he performed propagation studies for an antenna placed at 100', 150', and 180', and that antennas at 100' and 150' did not work.  (Pls. Exh. 54 at 43.)

The court finds that there are special conditions and circumstances peculiar to the Blevins Gap Road site that require a 180' tower to provide wireless services. Nothing in the record indicates that the special conditions and circumstances that necessitate American Tower's need for a 180' tower to support Tritel's antenna apply to other sites, structures, or buildings in the district. (*See* Pls. Exh. 11, § 92.5.4(1)(a)(variance will not be granted "unless and until" the applicant shows that "special conditions and circumstances exist which are peculiar to the land, structure, or building involved and which are not applicable to other lands, structures, or bguildings in the same district").) Therefore, the court finds that plaintiffs have established the special conditions required by § 92.5.4(1)(a).

## 2. Unnecessary Hardship

Plaintiffs contend that strict enforcement of the Zoning Ordinance prohibiting a 180' tower would impose unnecessary hardships on Tritel. The court agrees.

As set forth above, McNeal testified that a tower of 100' or 150' would not fill the gap in coverage. A gap in coverage results in lost revenues and lost goodwill, (Tr.107-08), and could result in a loss of Tritel's FCC license, *see Unity Township*, 282 F.3d at 259-60. The court finds that this gap in coverage is an unnecessary hardship for Tritel. Gannon testified:

> So in the sense that Tritel is a licensed wireless service provider, their FCC license requires that they provide service to this market. There's a gap in coverage to that area of the city that could not be covered with a hundred foot tower as would [be allowed] under the special exception.[13]

---

[13]One court has held "literal enforcement of the zoning ordinance," which limited the height of a cellular tower, "would result in an unnecessary hardship" because the hilly terrain

No other parcels or landowners in the area would be similar to Tritel in [that] they're not licensed FCC service providers that have to provide coverage to this part of the city. So it certainly stands them out from adjacent property owners and other landowners in the area which the variance criteria probably applies to.

Other hardships that Tritel would certainly be maybe more along the business terms or financial terms, lost revenues from customers who would either drop the service, because they were not providing coverage to that area; customers who would never maybe sign up for Tritel service because they couldn't provide service to that area of Huntsville. I think it's general goodwill with their customers that would be lost.

(Tr. 107-08. [footnote added].)

The court does not find that plaintiff BGR would suffer an "unnecessary hardship" without the variance. BGR's loss would be loss of rental income, which is a mere economic loss to the landowner. *See Ex parte Board of Zoning Adjustment of City of Mobile*, 36 So.2d 415, 418 (Ala. 1994)("It is clear that the loss of potential future economic gain on the part of the landowner is insufficient to establish an 'unnecessary hardship' justifying the grant of a use variance.").

Based on the foregoing and consideration of the testimony and exhibits, the court finds that the evidence supports a finding that Tritel and American Tower will suffer unnecessary hardship caused by the peculiar conditions and circumstances of the site if a variance to build a 180' tower is not granted.

---

would block cellular transmissions at the height limitation of the ordinance. *Paule v. Sante Fe County Board of County Commissioners*, 117 P.3d 240, (N.M. 2005).

### 3. Public Interest

The Zoning Ordinance prohibits the BZA from authorizing a variance that is "contrary to the public interest." (Pls. Exh. 11, § 92.5.4.)  *See* Ala. Code § 11-52-80.  "The interest of the public as affected by the contrary interest of the people within a district is a factor to be considered in determining whether to grant a variance." *Pipes v. Adams*, 381 So.2d 86, 88 (Ala. Civ. App. 1980).

"Congress enacted the Telecommunications Act of 1996 (TCA) to promote competition and higher quality in American telecommunications services and to encourage the rapid deployment of new telecommunications technologies." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 125 S. Ct. 1453, 1455 (2005).  Certainly, the public has an interest in competitive, high-quality cellular service.

The court finds that allowing American Tower to build a tower at sufficient height to allow Tritel and other providers of cellular phone service to provide effective cellular service is in the interest of the public.  Therefore, the court finds that granting a variance to allow American Tower to build a 180' tower would not be contrary to the public interest.

### 4. Spirit of the Ordinance

The court notes that, under the terms of the Zoning Ordinance, cellular towers are allowed in residential districts if certain definite criteria, including "substantial evidence that the tower cannot, by technical necessity, feasibly be located in a non-residential district," (Pls. Exh. 11, § 92.5.3(9)(b).)  For the reasons set forth above, the court finds that plaintiffs

have proven that their proposed tower and antenna met all the criteria for a special exception, except the height limitation.  Plaintiffs have proven that an antenna placed on a 100' tower, the height limit set forth in the special exception, would not adequately provide service in the area.  However, a tower of 180' would provide adequate reliable service.

Plaintiffs do not request a use variance, a variance to allow them to use the property in a manner prohibited by the Zoning Ordinance.  Rather, plaintiffs seek a variance only as to the height limitation, without which Tritel's antenna would not be capable of providing reliable wireless service to the area.  The court finds that granting of the variance under these conditions observes the spirit of the ordinance and that denying the variance would work a substantial injustice.

For the foregoing reasons, the court finds plaintiffs have established, by substantial evidence, that they are entitled to a special exception for the construction of a tower to support Tritel's antenna at the Blevins Gap Road site, and that they are entitled to a variance to allow them to construct a 180' tower.

## D.  APPROPRIATE CONDITIONS AND SAFEGUARDS

Section 92.5.4(3) states, "In granting any variance, the Board of Adjustment may prescribe appropriate conditions and safeguards in conformity with this ordinance."  (Pls. Exh. 11, § 92.5.4(3).)  Based on the evidence presented at trial, the court finds that additional conditions regarding the appearance of the tower and its surrounding area should be imposed to minimize, to the extent possible, the negative aesthetic impact on the surrounding homes.

31

To this end, the court will order the parties to submit suggestions regarding such additional conditions within 45 days of the entry of the court's judgment.  The court will specifically retain jurisdiction for the purpose of prescribing such additional conditions.

### III.  TCA PROHIBITION CLAIM

For the reasons set forth above, the court finds that plaintiffs are entitled to a special exception and variance for the construction of a 180' tower to support Tritel's wireless communications antenna at the Blevins Gap Road site.  Therefore, the TCA claim is moot.  However, the court finds, as an additional or alternative ground for its decision to approve the construction of a 180' tower at the Blevins Gap Road site, that the BZA's denial of American Tower's application for a special exception and variance violated the anti-prohibition provision of the TCA.

Plaintiffs allege that the BZA's denial of American Tower's application for a special exception and a variance violated the anti-prohibition clause of the TCA.   The Telecommunications Act of 1996 –

> was enacted "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124.  In addition, the TCA was intended "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56, 56 (1996).  Wireless telephone service was one of the many telecommunications technologies Congress considered when enacting the TCA.

> With respect to the construction of telecommunications facilities, Congress recognized zoning decisions by state and local governments had created an inconsistent array of requirements, which inhibited both the deployment of personal communications services and the rebuilding of a digital technology-based cellular telecommunications network. H.R.Rep. No. 104-204, at 94 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 61. Despite this recognition, Congress also acknowledged "there are legitimate State and local concerns involved in regulating the siting of such facilities . . ., such as aesthetic values and the costs associated with the use and maintenance of public rights-of-way." *Id*. at 94-95, reprinted in 1996 U.S.C.C.A.N. 10, 61. As a result, Congress enacted § 704(a) to "preserve[ ] the authority of State and local governments over zoning and land use matters except in . . . limited circumstances . . . ." H.R. Conf. Rep. No. 104-458 (1996), at 207-08, reprinted in 1996 U.S.C.C.A.N. 124, 222.
>
> In § 704(a), codified at 47 U.S.C. § 332(c)(7), Congress enunciated a number of substantive and procedural limitations upon the authority of state or local governments to regulate the construction of facilities for wireless communication services. Local zoning authorities may not unreasonably discriminate among providers of functionally equivalent services, may not make zoning decisions which prohibit or effectively prohibit the provision of personal wireless services, and may not make zoning decisions premised on concerns regarding the environmental effects of radio frequency emissions associated with wireless telephone service. 47 U.S.C. §§ 332(c)(7)(B)(i)(I), 332(c)(7)(B)(i)(II), 332(c)(7)(B)(iv) (1994).

*Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1214-15 (11th Cir. 2002).

The TCA states, in pertinent part, "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C.A. § 332(c)(7)(B)(i)(II).

The Eleventh Circuit has not had occasion to address an alleged violation of the anti-prohibition provision of the TCA. However, the Fourth Circuit has held that only a general

ban on towers would result in a violation of the anti-prohibition clause of the TCA. *USCOC of Virginia RSA #3 v. Montgomery County Bd. of Supervisors*, 343 F.3d 262, 268 (4th Cir. 2003). That court has held:

> To be entitled to relief under a (B)(i)(II) prohibition of service claim, the plaintiff's burden is substantial. In *AT&T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 428-29 (4th Cir.1998), we held that a telecommunications provider could not prevail in a challenge to an individual zoning decision absent a general ban or policy to reject all applications. *See also 360° Communications Co. v. Board of Supervisors of Albemarle County*, 211 F.3d 79, 88 (4th Cir. 2000)("The burden for the carrier invoking this provision is a heavy one: to show from language or circumstances not just that this application has been rejected, but that further reasonable efforts are so likely to be fruitless that it is a waste of time to try."). In determining that an individual zoning decision could not form the basis for a prohibition of service claim, we reasoned that because subsection (B)(iii) specifically preserves the authority of local governments to reject applications for wireless facilities, a reading of the statute that prohibited local governments from rejecting individual applications would effectively eliminate local control. To preserve local authority and to reconcile subsections (B)(i)(II) and (B)(iii), we determined that the statute should be interpreted to provide relief only upon a showing of a blanket ban of wireless facilities. *Virginia Beach*, 155 F.3d at 429. We have since recognized, however, the theoretical possibility that the denial of an individual permit could amount to a prohibition of service if the service could only be provided from a particular site, but we noted that such a scenario "seems unlikely in the real world." *Albemarle County*, 211 F.3d at 86.

*Id.*

Other circuit courts have rejected the Fourth Circuit's blanket prohibition test and "have held that . . . a locality can run afoul of the TCA's 'effective prohibition' clause if it prevents a wireless provider from closing a 'significant gap' in service coverage." *MetroPCS v. City and County of San Francisco*, 400 F.3d 715, 731 (9th Cir. 2005). "This inquiry

generally involves a two-pronged analysis requiring (1) the showing of a 'significant gap' in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations." *Id.*; *see also VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 828-29 (7th Cir. 2003); *Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Bd. of Easttown Township*. 331 F.3d 386, 397-98 (3d Cir. 2003); *Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 627 (1st Cir. 2002); *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999).

## A.  SIGNIFICANT GAP IN COVERAGE

"[T]he term 'significant gaps' embraces a de minimis principle. 'Where the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases) the lack of coverage likely will be de minimis so that denying applications to construct towers necessary to fill these holes will not amount to a prohibition of service.'" *APT Pittsburgh Ltd. Partnership v. Penn Tp. Butler County of Pennsylvania*, 196 F.3d 469, 480 n.7 (3d Cir. 1999)(quoting Willoth, 176 F.3d at 643-44).  In other words, the "significant gap" must be more than a dead spot.

The circuit courts that have addressed this issue disagree about whether a gap in coverage is defined as a gap in a particular provider's coverage or a gap in any coverage. "The test employed by the Second and Third Circuits holds that a 'significant gap' in service exists only if *no provider* is able to serve the 'gap' area in question." *MetroPCS*, 400 F.3d

35

at 731 (citing, *inter alia*, *Omnipoint*, 331 F.3d at 398; *Willoth*, 176 F.3d at 643) (emphasis in

original); *see also Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 632

(1st Cir. 2002). As explained in *MetroPCS*,

> This test is sometimes referred to as the "one provider" rule since, if any single
> provider offers coverage in a given area, localities may preclude other
> providers from entering the area (as long as the preclusion is a valid,
> nondiscriminatory zoning decision that satisfies the other provisions of the
> TCA). This rule has been touted as proceeding from the consumer's
> perspective rather than the individual service provider's perspective, which the
> Third Circuit argues is more in keeping with the regulatory goals of the TCA
> – as long as *some* provider offers service in the area, consumers will be
> adequately served and the TCA's goal of establishing nationwide wireless
> service will be achieved. Under this view, the TCA protects only the
> individual user's ability to receive service from one provider or another; it
> does not protect each service provider's ability to maintain full coverage
> within a given market.

*Id*. at 731-32 (internal citations omitted, emphasis in original).

The one-provider rule has been rejected by the First and Ninth Circuits. These circuits

have adopted a rule "that a significant gap in service (and thus an effective prohibition of

service) exists whenever a provider is prevented from filling a significant gap in *its own*

service coverage." *Id*. at 733 (emphasis in original). The *MetroPCS* court held:

> The First Circuit has recently rejected the "one provider" approach and
> held that a local regulation creates a "significant gap" in service . . . if the
> *provider in question* is prevented from filling a significant gap *in its own*
> service network. *See Second Generation Props.*, 313 F.3d at 631-33. This
> approach formally takes the perspective of the individual service provider in
> assessing coverage gaps, but, as the *Second Generation Properties* court
> persuasively explains, this approach actually better serves both individual
> consumers and the policy goals of the TCA. The *Second Generation
> Properties* court notes that the TCA "aims to secure lower prices and better
> service for consumers by opening all telecommunications markets to

36

competition." *Id.* at 631 (citing H.R. Conf. Rep. No. 104-458, at 113 (1996)). The court then warns against the dysfunctional implications of the Second and Third Circuits' "one provider rule":

> A flat "any service equals no effective prohibition" rule would say that a town could refuse permits to build the towers necessary to solve any number of different coverage problems . . . . Such a rule would be highly problematic because it does not further the interests of the individual consumer. To use an example from this case, it is of little comfort to the customer who uses AT & T Wireless (or Voicestream, Verizon, Sprint, or Nextel) who cannot get service along the significant geographic gap which may exist along Route 128 that a Cingular Wireless customer does get some service in that gap . . . . ***The result [of such a rule] would be a crazy patchwork quilt of intermittent coverage. That quilt might have the effect of driving the industry toward a single carrier***. When Congress enacted legislation to promote the construction of a nationwide cellular network, such a consequence was not, we think, the intended result.

*Id.* at 633 (footnote omitted).  In short, the First Circuit's multiple provider rule better facilitates the robust competition which Congress sought to encourage with the TCA, and it better accommodates the current state of the wireless services market.

*Id.* at 732-33(emphasis in original).

This court adopts the multiple-provider rule of the First and Ninth Circuits as such rule best satisfies the goals of the TCA.  And, based on the evidence cited above, the court finds that plaintiffs have established that Tritel has a significant gap in coverage without an antenna at the site.  Moreover, the court finds that the evidence clearly demonstrates that, without an antenna at 180', the signal strength in the area is inadequate to provide quality service.

## B. FEASIBLE ALTERNATIVES

"Under all existing versions of the 'significant gap' test, once a wireless service provider has demonstrated that the requisite significant gap in coverage exists, it must then make some showing as to the intrusiveness or necessity of its proposed means of closing that gap." *MetroPCS*, 400 F.3d at 734.  The Second, Third, and Ninth Circuits' test requires the provider to show "that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that denial sought to serve." *Nextel West Corp. v. Unity Township*, 282 F.3d 257, 266 (3d Cir. 2002)(quoting *APT Pittsburgh Ltd. Partnership v. Penn Township*, 196 F.3d 469, 480-81 (3d Cir. 1999); *see MetroPCS*, 400 F.3d at 734-35 ("The Second and Third Circuit[s'] 'least intrusive' standard . . . allows for a meaningful comparison of alternative sites before the siting application process is needlessly repeated. It also gives providers an incentive to choose the least intrusive site in their first siting application, and it promises to ultimately identify the best solution for the community, not merely the last one remaining after a series of application denials); *Willoth*, 176 F.3d at 643 ("A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means.").

The First and Seventh Circuits' test does not require the provider to show that its proposed facility is the least "intrusive;" rather, their test requires that the provider demonstrate "that its 'existing application is ***the only feasible plan***' and that 'there are no

other potential solutions to the purported problem.' *St. Croix*, 342 F.3d at 834 (quoting *Pelham*, 313 F.3d at 630, 635)(emphasis added).[14]

The court notes that it is of the opinion that the more exacting test of the First and Seventh Circuit best serves the goals of the TCA and allows local zoning authorities to prohibit the siting of a wireless antenna if there is any other available alternative site. However, in this case, the court finds plaintiffs have proven that the denial of the application for special exception and variance would violate the anti-prohibition provision of the TCA under either the "least intrusive" test or "feasible alternative" test.

As set forth above, the evidence in this case shows that Blevins Gap Road site is the *only* site available for Tritel's antenna that would close the significant gap in coverage along Bailey Cove Road.  Plaintiffs have established that only a tower in the search ring would provide adequate coverage for the area.  The Blevins Gap Road site is the only available property in the area on which to construct any tower.  Also, they have established that only a tower at 180' would provide adequate coverage for the area.  For the reasons discussed above, the court finds that the Blevins Gap Road site is the only feasible, and therefore, the least intrusive, alternative to close the significant gap in Tritel's coverage.

---

[14]In rejecting the "least intrusive" test, the Seventh Circuit has noted, "A community could rationally reject the least intrusive proposal in favor of a more intrusive proposal that provides better service or that better promotes commercial goals of the community." *St. Croix*, 342 F.3d 818, 834 n.8.

Therefore, the court finds that denial of a special exception and variance to allow plaintiffs to build and operate a 180' tower at the Blevins Gap Road site would have the effect of prohibiting wireless service in the area in violation of the TCA.

## **CONCLUSION**

For the reasons set forth above, the court finds that plaintiffs are entitled to a special exception and a variance for the construction of a 180' wireless communications tower at the Blevins Gap Road site.  The court also finds that defendants violated the anti-prohibition clause of the TCA; however, such claim is moot based upon the court's de novo consideration of the application.

**DONE** this 22nd day of March, 2006.


*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE